STEVEN T. GUBNER - Bar No. 156593
LARRY W. GABRIEL - Bar No. 68329
REAGAN E. BOYCE - Bar No. 248064
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:    sgubner@ebg-law.com
          lgabriel@ebg-law.com
          rboyce@ebg-law.com

Attorneys for Howard Grobstein,
Liquidating Trustee for the New Meatco Liquidating Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>NEW MEATCO PROVISIONS, LLC,<br><br>               Debtor,<br><br>_____<br><br>HOWARD GROBSTEIN, LIQUIDATING TRUSTEE FOR THE NEW MEATCO LIQUIDATING TRUST,<br><br>               Plaintiff<br>      v.<br><br>MORAD HAROUNI, an individual;  THE AVISAR FAMILY TRUST, by and through its trustees, EYTAN AVISAR, an individual, and SUSAN AVISAR, an individual;    and DOES 1 through 10, inclusive,<br><br>               Defendants. | Case No. 2:13-bk-22155-DS<br><br>CHAPTER 11<br><br>**ADVERSARY CASE NO. 2:15-ap-01170-DS**<br><br>**SECOND AMENDED COMPLAINT**<br><br>**1) TO AVOID FRAUDULENT TRANSFERS (ACTUAL INTENT);**<br>**2) TO AVOID FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)**<br>**3) TO RECOVER FRAUDULENT TRANSFERS;**<br>**4) BREACH OF CONTRACT;**<br>**5) BREACH OF FIDUCIARY**<br><br>**DEMAND FOR JURY TRIAL**<br><br>[11 U.S.C. §§544, 550; Cal. *Civ. Code* §3439]<br><br>**<u>Initial Status Conference</u>**<br>**Date:  TBD**<br>**Time: TBD**<br>**Place:** Courtroom 1339<br>        United States Bankruptcy Court<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |

1325471

Plaintiff, Howard Grobstein, the duly authorized and acting, liquidating trustee ("***Trustee***" or "***Plaintiff***") for the New Meatco Liquidating Trust, (the "***Trust***"), as the successor in interest to the Debtor and Debtor-In-Possession, New Meatco Provisions, LLC ("***New Meatco***" or the "***Debtor***"), for claims against Defendants, Morad Harouni, an individual and The Avisar Family Trust, by and through its trustees, Eytan Avisar, an individual, and Susan Avisar, alleges as follows:

## I.    REQUIRED PLEADING DISCLOSURE

1.    In accordance with the requirements of Local Bankruptcy Rule 7008-1, the Trustee asserts that at least some of the claims for relief in this Second Amended Complaint constitute core matters pursuant to 28 U.S.C. § 1334 and 28 U.S.C. §§ 157(a), (b)(2)(A), (b)(2)(H) and (b)(2)(O). The other claims for relief are related to the bankruptcy case and the outcome of the claims could have a significant impact on the Debtor's bankruptcy estate. To the extent that the claims for relief herein are determined to be non-core matters, the Trustee consents to entry of final orders or judgment by the Bankruptcy Court.

## II.    NATURE OF PROCEEDING

2.    By this action the Trustee seeks to avoid and recover the approximate $20 million, or an amount according to proof, that Defendants Harouni and the Avisar Family Trust obtained from the Debtor through a leveraged buyout that they engineered in April 2011, and that rendered the Debtor insolvent and unable to pay debts as they became due. The Trustee also asserts claims against Harouni and the Avisar Family Trust for breach of their fiduciary obligations owed to the Debtor as officers and directors of New Meatco, for breaches of contractual confidentiality and non-compete obligations owed to New Meatco, and for conversion of New Meatco's corporate assets.

## III.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, because, among other things, the claims for relief arise in or are related to a case pending under title 11 in this Court.

4.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 151, the *Local Bankruptcy Rules* of the United States Bankruptcy Court for the Central District of California ("***Bankruptcy Court***"), and General Order Number 13-05 of the United States District

1325471

Court for the Central District of California.

5.      In addition, this proceeding is a civil proceeding arising in or related to a case under Title 11 of the *United States Code* ("**Bankruptcy Code**"). This adversary proceeding arises in or relates to the bankruptcy case *In re New Meatco Provisions, LLC* case number 2:13-bk-22155-DS ("**Meatco Bankruptcy**").

6.      Plaintiff has standing to bring this adversary proceeding pursuant to 11 U.S.C. § 323 and the Court Approved *Third Amended Joint Chapter 11 Plan of the Official Committee of Unsecured Creditors and New Meatco Provisions, LLC*, ("**Plan**") approved by the Bankruptcy Court on August 26, 2014, and the powers and authority granted to Plaintiff under the concurrent Liquidating Trust Agreement executed pursuant to the Plan on August 27, 2014. Howard Grobstein was appointed the Liquidating Trustee on August 27, 2014, pursuant to the Plan and Liquidating Trust Agreement and continues to serve in that capacity. Because the Trustee was not appointed as Liquidating Trustee until after the occurrence of the facts alleged in this Complaint, he has no personal knowledge of such facts. Accordingly, the Trustee alleges all such facts on information and belief based on a review of business records of the Debtor and other records obtained.

## IV.    THE PARTIES

### A.      Plaintiff.

7.      Plaintiff, Howard Grobstein, is the duly authorized and acting Liquidating Trustee for the New Meatco Liquidating Trust, the successor in interest to the assets of the Debtor and Debtor-In-Possession, **New Meatco** in the Meatco Bankruptcy The Trustee acts solely in his capacity as the Liquidating Trustee in bringing this action.

### B.      Defendants.

8.      Defendant Morad Harouni, ("**Harouni**"), is a resident of Los Angeles County, State of California.

9.      Defendant The Avisar Family Trust ("**Avisar Family Trust**") is a family trust established under and pursuant to California law.

10.     Defendant Eytan Avisar is sued herein in his capacity as a trustee for the Avisar Family Trust ("**E.Avisar**"). At all times relevant herein, E.Avisar resided in and/or conducted

1325471

1  business in the County of Los Angeles, State of California.

2      11.    Defendant Susan Avisar, ("*S.Avisar*" and jointly with *E.Avisar*, the "*Avisar*

3  *Trustees*") is sued herein in her capacity as trustee for the Avisar Family Trust. At all times relevant

4  herein *S.Avisar* resided in, and/or conducted business in the County of Los Angeles, State of

5  California.

6      **C.    DOE Defendants**

7      12.    Plaintiff is ignorant of the true names of Defendants DOES 1 through 10 inclusive

8  and has sued them by the foregoing fictitious names, and states that when their true names are

9  discovered, the Complaint will be amended to include their true names.

10     **D.    Agency Allegations**

11     13.    Plaintiff is informed and believes and based thereon alleges that each of the named

12 defendants and DOES 1 through 10, (collectively the "*Defendants*" and each individually a

13 "*Defendant*") are and/or were the partners, principals, servants, employees, employers, agents,

14 representatives, subsidiaries, affiliates, joint venturers, and/or the alter-egos of each other Defendant

15 and each Defendant was otherwise acting in concert with, aided and abetted, and acting in

16 furtherance of a civil conspiracy with each other Defendant, in doing all things herein alleged, and

17 was acting within the purpose and scope of their authority as such partners, principals, servants,

18 employees, employers, agents, representatives, subsidiaries, affiliates, joint venturers, and/or the

19 alter-ego relationship with each other Defendant, and engaged in the conduct that was authorized,

20 ratified, approved and/or otherwise sanctioned with advanced knowledge or subsequent ratification

21 or acquiescence by each other Defendant.

22     14.    Plaintiff is informed and believes, and based thereon alleges that each of the

23 Defendants were responsible, negligently, intentionally and/or in some actionable manner, including

24 as corporate successors liable for the acts of their predecessors, for the events referred to herein, and

25 caused injuries and damages legally to Plaintiff, as alleged, either through each Defendants' own

26 conduct, or through the conduct of each Defendants' agents, servants, employees, aiders and

27 abettors, and co-conspirators, or due to the ownership, maintenance, or control of the instrumentality

28 causing the injury to Plaintiff, or in some other actionable manner.

1325471

# V. STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

## A. Background

15. Commencing in or around 1988 and continuing up until April 2011, Harouni and the Avisar Family Trust each owned a 50% interest in a company called Meatco Provisions, Inc., ("**Meatco**"), an importer and distributor of refrigerated and frozen protein products to approximately 2,000 Hispanic grocery stores and bodegas in Southern and Central California. Meatco's products included meat, poultry, and seafood, with its seafood offerings being marketed under the name King Seafood.

16. Prior to 2011, Meatco's financial condition was on solid footing. Meatco's balance sheet as of December 31, 2008 showed total assets of $22,140,783, total liabilities of $13,692,618, and stockholders' equity of $8,448,165. Meatco's net income for 2008 was $2,778,975.

17. Meatco's balance sheet as of December 31, 2009 showed total assets of $27,778,998, total liabilities of $17,455,009, and total shareholders' equity of $10,323,989. Meatco's net income for 2009 was $2,894,823.

18. Meatco's balance sheet as of December 31, 2010 showed assets of $38,879,742, total liabilities of $24,015,675 and total shareholders' equity of $14,864,067. Meatco's net income for 2010 was $6,620,954.

## B. The Leveraged Buyout

19. Harouni and the Avisar Family Trust became interested in liquidating their ownership interests in Meatco, and were able to negotiate a leveraged buyout of Meatco, whereby Harouni and the Avisar Family Trust would receive substantial amounts for their ownership interests. The leveraged buyout would consist of adding significant debt to the balance sheet of Meatco or a successor company to fund the amounts to be paid to Harouni and the Avisar Family Trust. Harouni and the Avisar Family Trust were aware of the structure of the leveraged buyout, and that funds to be used to pay them were to be largely based on new debt.

20. In order to facilitate the leveraged buyout of Meatco, on or about April 11, 2011, Harouni and the Avisar Trustees formed a California limited liability company, New Meatco. Meatco was the sole member of New Meatco. At or about the same time, Harouni and the Avisar

1325471

Trustees caused Meatco to transfer all of its assets and liabilities to New Meatco in exchange for all of the membership interests of New Meatco. As a result, Meatco's only asset following the transfer was its 100% membership interest in New Meatco. The transfer of assets and liabilities in exchange for membership interests, and the subsequent leveraged buyout, was code-named "Project Protein."

21.     On or about April 18, 2011, newly formed Meatco Acquisition Company, LLC ("**MAC LLC**") a Delaware limited liability company, entered into an Interest Purchase Agreement (the "**Purchase Agreement**") for the purchase of New Meatco. The Purchase Agreement was by and among MAC LLC, Harouni, the Avisar Family Trust and Meatco, pursuant to which MAC LLC purchased and acquired from Meatco 80.10% of the membership interests in New Meatco (the "**MAC Acquisition**"). The remaining 19.90% of membership interests in New Meatco were indirectly owned by Harouni as the sole remaining shareholder of Meatco. MAC LLC and Meatco also entered into an LLC operating agreement ("**Operating Agreement**") for New Meatco which agreement included non-compete and confidentiality clauses. A true and correct copy of the "Purchase Agreement" dated as of April 18, 2011 is attached hereto as **Exhibit 1**, and expressly incorporated herein by reference as though set forth in full. A true and correct copy of the "Operating Agreement" dated as of April 20, 2011 is attached hereto as **Exhibit 2**, and expressly incorporated herein by reference as though set forth in full.

22.     The Purchase Agreement states in Paragraph 3.2 that "Purchaser has informed Sellers and the Company, and Sellers and the Company agree, that the Purchase Price will be funded by: (i) loans (the "Debt Financed Portion") to New Meatco of $25,000,000.00; (ii) cash up to $7 million ("Purchaser's Cash Payment") paid by Purchaser; and (iii) the Seller Note (described in Section 4.3(d) in the amount of $5,000,000.00. Sellers and the Company agree to cooperate reasonably with Purchaser in its efforts to obtain the loans described above. Notwithstanding anything to the contrary contained in this Agreement, Purchaser's obligation with respect to the payment of the Purchase Price shall be limited to the payment of Purchaser's Cash Payment described in clause (ii) of the second sentence of this Section 3.2."

23.     The Purchase Agreement provides in Paragraph 4.1 that the amount to be paid at the Closing shall be $35,043,750.00 (the "Purchase Price"), subject to adjustment pursuant to Section

1325471

4.2, and payable in accordance with Section 4.3 as follows:

"(a) to each Lender in an amount sufficient to satisfy in full all amounts due from the Company to such Lender as set forth in such Lender's Bank Payoff Statement;

(b) to each Person to which Transaction Expenses are owed by the Sellers or the Company, as evidenced on the Certificate of Closing Expenses;

(c) an amount equal to the difference between (x) $30,043,750 and (y) the aggregate amount payable pursuant to clauses (a) and (b), to an account or accounts designated in writing by Meatco prior to Closing; and

(d) a subordinated promissory note issued by New Meatco in the amount of $5,000,000.00 payable to Meatco (the "Seller Note"), which Seller Note shall have a term of six (6) years, bear interest at seven percent (7%) per annum (of which 5% shall be payable in cash and 2% shall be payable in kind), with interest payable quarterly in arrears and principal to be paid in a balloon payment at maturity, stand junior in all respects to the Debt of New Meatco with New Lender(s) incurred in connection with the acquisition contemplated by this Agreement, the ongoing financing of the Business and any lender who finances New Meatco's capital improvements and be subject to the terms of a subordination agreement with the New Lenders in form and substance reasonably acceptable to the Sellers. . . .  The cash proceeds allocable to Harouni and Avisar Family Trust (before deduction and/or adjustment (if any) pursuant to clauses (a) and (b) above and Section 4.2(a)) will be $15,000,000.00 to Avisar and $15,043,750.00 to Harouni directly or through his continuing interest in Meatco. Sellers shall cause Harouni to become the sole shareholder of Meatco following the Closing and thereby indirectly own 19.9% of New Meatco."

24.    On or about April 18, 2011, New Meatco:

a.    Obtained a $25 million line of credit from Wells Fargo Bank;

b.    Obtained a $3 million term loan from Wells Fargo Bank;

c.    Obtained a $13 million loan from Prospect Capital Corporation ("***Prospect***").

The above financings (collectively the "***2011 Financing***") were secured by a first lien in favor of Wells Fargo Bank, and a second subordinated lien in favor of Prospect, as against all of New Meatco's assets. Wells Fargo Bank and Prospect are jointly referred to as the "***Secured Lenders***."

1325471

25.    On or about April 27, 2011, Harouni and the Avisar Family Trust, and MAC LLC, completed the Purchase Agreement as specified in paragraphs 21-23 above. Plaintiff is informed and believes and based thereon alleges that the funding for the transfer of funds described in paragraph 23 above, to Harouni and the Avisar Family Trust was from the 2011 Financing, including a draw down on the Wells Fargo line of credit. The transactions in Paragraphs 19 – 24 above are collectively referred to as the "*Leveraged Buyout*."

26.    The Leveraged Buyout rendered New Meatco insolvent and unable to pay its debts as they became due. The Debtor did not receive reasonably equivalent value for the transfers that made up the Leveraged Buyout.

27.    There are, and at all times mentioned herein with respect to the transfers from New Meatco to the Defendants, were, creditors holding unsecured claims that are allowable under 11 U.S.C. § 502.

**C.    Post-Acquisition Management of the Debtor**

28.    At or about the same time as the above described Leveraged Buyout, in April 2011, Harouni was employed as the President and CEO of New Meatco and named a member of its board of directors. In or around April 2011, Harouni and New Meatco entered into a written employment agreement, (the "*Harouni Employment Contract*") setting forth the duties and obligations of Harouni which included fiduciary duties to New Meatco and confidentiality provisions. A true and correct copy of the Harouni Employment Contract is attached as Exhibit 3 and expressly incorporated herein by reference as though set forth in full.

29.    While employed by Debtor, Harouni owned minority equity interests in two other companies, Monarch Trading Company, LLC ("*Monarch*") and Lawrence Wholesale ("*Lawrence*") both of whom were and are engaged in the same business of New Meatco and were competitors of New Meatco, but did not have seafood sales divisions. Harouni did not disclose his interest in Lawrence at the time he executed the Harouni Employment Contract or the Operating Agreement.

**D.    Events Leading Up to the Chapter 11 Filing**

30.    In or around April 2012, New Meatco was unable to meet certain covenants under its secured loan agreements, and New Meatco and the Secured Lenders entered into numerous

1325471

amendments and forbearance agreements in an effort to address New Meatco's liquidity and business concerns. Performance, however, continued to decline.

31.    In or around 2012, Harouni began diverting inventory, employees, and data from New Meatco for his own benefit to Monarch, which was and is one of New Meatco's largest creditors.

32.    New Meatco's books and records also reflect that $38,500.00 was owed to Harouni's other related company, Lawrence.

33.    In or about November 2012, New Meatco defaulted on its secured loan obligations to Prospect by failing to meet certain covenants, including failing to satisfy its minimum required EBITDA. Around this same time, New Meatco experienced a large decline in its inventory.

34.    In addition to the significant financial issues caused by the Leveraged Buyout, between the time of the MAC Acquisition in April 2011 and November 2012, New Meatco experienced extensive operational issues impacting the company's viability, all of which are attributable to Harouni's management, including, but not limited to:

a.    ***Ineffective Management***. New Meatco's growth was accompanied by increasing layers of complexity, and obtaining the support of more seasoned management was one of the factors that lead New Meatco to enter into the MAC Acquisition.

b.    ***Inefficient Warehousing***. Prior to its acquisition, New Meatco operated out of multiple warehouses. In August 2012, New Meatco consolidated its operations into a single warehouse facility that increased New Meatco's rent by $400,000.00 annually.

c.    ***Ineffective Inventory Controls***. New Meatco's key warehousing, inventory control, and distribution systems were ineffective, poorly organized, inefficient, and gave New Meatco no visibility into, or control over, its inventory. Notwithstanding its new warehouse, these inefficiencies resulted in massive inventory shortfalls, including a $2 million inventory write off in 2012.

d.    ***Inappropriate Inventory Control***. Although New Meatco began soliciting proposals to implement a state-of-the-art enterprise reporting system that would provide it with visibility into and control over its inventory, this project was never completed.

1325471

e.    ***Spiraling Cost Structure***. Following the MAC Acquisition, salaries increased by $300,000.00 annually, and workers' compensation premiums escalated by $600,000.00 annually, as a result of the New Meatco's correction of certain errors in its reporting. The cost of equipment leases increased by $800,000.00 annually as New Meatco acquired additional equipment in connection with the move to a new warehouse, and fuel costs jumped by $500,000.00 annually as new equipment was moved into production. In addition, expenses increased by $500,000.00 annually. In total, these items added $3.1 million annually to New Meatco's operating costs.

35.    In 2013, New Meatco's business continued to decline. Immediately prior to the filing of bankruptcy, several key salespeople in the seafood division left the employ of New Meatco only to immediately be employed by Monarch. In addition, data files had been wiped totally clean from the computers in the seafood division, and Excel spreadsheets and similar files were also completely removed from the computers. No other division of New Meatco had its computers wiped.

36.    New Meatco's electronic information and sales personnel were later used at Monarch, which prior to New Meatco's bankruptcy filing did not operate a seafood division, but by early 2013 began operating a seafood division in direct competition with New Meatco.

**E.    Harouni Discloses The Debtor's Confidential Information**

37.    Around March 29, 2013, Seafax, a leading credit reporting and collection agency for the North American food industry, downgraded New Meatco's credit rating from "inconclusive" to "cautionary" status. Following this downgrade, New Meatco's major suppliers stopped further shipments of inventory. Without the ability to meet customer orders, New Meatco's customers rapidly turned to competitors and New Meatco's sales team resigned. New Meatco was thereupon unable to continue and was forced to cease operations.

38.    The Seafax report states that it is based, at least in part, on information that Seafax learned from Harouni. The information that Seafax attributed to Harouni included information about a possible change of ownership, information about New Meatco's default with respect to the Prospect loan and the Prospect's Default and Voting Rights Notice exercised under Prospect's security agreement, and statements to the effect that the company's lenders "took over operational control of the business."

1325471

**F.    New Meatco's Post Leveraged Buyout Financial Condition and the Bankruptcy Petition**

39.    New Meatco's balance sheet as of December 31, 2011, for the year during which the Leveraged Buyout took place, showed assets of $60,099,222.00 (including $19,853,456 of goodwill, which was not reported on the prior balance sheets), total liabilities of $56,089,302.00 and total shareholders' equity of $4,009,920.00. Excluding the goodwill, New Meatco's liabilities exceeded its assets by approximately $15.8 million. Instead of generating net income, as Meatco had done in prior years, Net Meatco suffered a net loss of $2,758,968.00 in 2011.

40.    New Meatco's financial condition continued to worsen after 2011 as a result of the Leveraged Buyout and the actions of Harouni as set forth herein.

41.    Shortly after Harouni made disclosures to Seafax, on or about May 8, 2013, ("**Petition Date**") New Meatco filed for bankruptcy. The schedules filed by New Meatco in the bankruptcy case show total assets of $894,887.00 (primarily consisting of security deposits for leases), and total liabilities of $33,097,182.00.

## FIRST CLAIM FOR RELIEF

## AVOIDANCE OF FRAUDULENT TRANSFER

**(As against Defendants Morad Harouni and The Avisar Family Trust only)**

**[11 U.S.C. §§ 544, 550; Cal. Civ. Code § 3439.04]**

42.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 41 of the second amended complaint as if set forth herein in full.

43.    During the seven year period immediately preceding the Petition Date, in or around April 2011, New Meatco made transfers of the Debtor's property through the Leveraged Buyout, and the 2011 Financing (collectively the "**Transfers**") to or for the benefit of Harouni and the Avisar Family Trust with the actual intent to delay, hinder or defraud the Debtors' creditors.

44.    Accordingly, the Transfers made by New Meatco to Harouni and the Avisar Family Trust are avoidable and should be avoided as fraudulent pursuant to 11 U.S.C. § 544 and Cal. *Civ. Code* § 3439.04(a) and 3439.07.

///

11

1325471

**SECOND CLAIM FOR RELIEF**

**RECOVERY OF AVOIDED FRAUDULENT TRANSFER**

**(As against Defendants Morad Harouni and The Avisar Family Trust only)**

**[11 U.S.C. §§ 544, 550; Cal. Civ. Code § 3439.07]**

45.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 44 of the second amended complaint as if set forth herein in full.

46.    By reason of the foregoing, the Trustee is entitled to recover for the benefit of New Meatco's estate the Transfers from Harouni and the Avisar Family Trust pursuant to 11 U.S.C. §§ 544, 550(a)(1) and Cal. *Civ. Code* § 3439.07.

**THIRD CLAIM FOR RELIEF**

**AVOIDANCE OF FRAUDULENT TRANSFER**

**(As against Defendants Morad Harouni and The Avisar Family Trust only)**

**[11 U.S.C. §§ 544, 550; Cal. Civ. Code § 3439.04]**

47.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 44 of the amended complaint as if set forth herein in full.

48.    The Debtor did not receive reasonably equivalent value from Harouni or the Avisar Family Trust in exchange for the Transfers.

49.    At the time the Transfers were made, New Meatco (i) was insolvent, or became insolvent as a result of the obligations or transfers; and/or (ii) was engaged in a business or transaction, or was about to engage in a business or a transaction, for which any remaining property of the Debtor was an unreasonably small capital; (iii) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and/or (iv) made such transfer to or for the benefit of an insider.

50.    Accordingly, the Transfers to Harouni and the Avisar Family Trust are avoidable and should be avoided pursuant to 11 U.S.C. § 544 and Cal. *Civ. Code* § 3439.04(b) or 3439.05 and 3439.07.

///

///

1325471

**FOURTH CLAIM FOR RELIEF**

**RECOVERY OF AVOIDED FRAUDULENT TRANSFER**

**(As against Defendants Morad Harouni and The Avisar Family Trust only)**

**[11 U.S.C. §§ 544, 550; §3439.07]**

51.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 41 and paragraphs 47 through 50 of the second amended complaint as if set forth herein in full.

52.     By reason of the foregoing, the Trustee is entitled to recover for the benefit of New Meatco's estate the Transfers from Harouni and the Avisar Family Trust pursuant to 11 U.S.C. §§ 544, 550(a)(1) and Cal. *Civ. Code* § 3439.07.

**FIFTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT – EMPLOYMENT CONTRACT**

**(As against Defendant Morad Harouni only)**

53.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 41 of the second amended complaint as if set forth herein in full.

54.     Harouni entered into the Harouni Employment Contract, Exhibit 3 hereof, with Debtor as part of the Leveraged Buyout

55.     The Harouni Employment Contract provides, inter alia:

   a.   Harouni shall serve (i) as the Company's President and Chief Executive Officer, and (ii) as a member of the Company's board of managers ("Board") . . . (Harouni Employment Contract, p. 1, para. 3);

   b.   Harouni shall perform his Executive's duties and responsibilities to the best of Executive's abilities in a diligent, trustworthy, businesslike and efficient manner. Executive shall devote commercially reasonable efforts and his full business time and attention . . . to the business and affairs of the Company;

   c.   Harouni acknowledges that the information, observations and data obtained by Executive while employed with the Company or any predecessor entity, (including Meatco) concerning the business or affairs of the Company or any of its Affiliates or Subsidiaries ("Confidential Information") shall be the

1325471

property of the Company or such Affiliate or Subsidiary. Therefore Executive agrees that Executive shall not disclose to any unauthorized person or use for Executive's own purposes any Confidential Information without the prior written consent of the Board . . . .; and,

    d.  Harouni shall deliver to the Company at the termination of the Employment Period or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data  . . . relating to the Confidential Information of the business of the Company or any Affiliate or Subsidiary that Executive may then possess or have under Executives control.

Harouni Employment Contract, Exhibit 2, p. 6, ¶ 6,

56.    The Harouni Employment Contract constitutes a binding, enforceable agreement between the Debtor and Harouni.

57.    Debtor performed all of its obligations under the Harouni Employment Contract except for those performances which were excused

58.    Harouni, as the Executive Officer of the Debtor,  breached his obligations owed to the Debtor under the Harouni Employment Contract by, among other things:

    a.  Failing to perform his Executive's duties and responsibilities to the best of Executive's abilities in a diligent, trustworthy, businesslike and efficient manner;

    b.  Failing to devote commercially reasonable efforts and his full business time and attention . . . to the business and affairs of the Company;

    c.  Disclosing to unauthorized persons and individuals and using for his own purposes the Debtor's Confidential Information without the prior written consent of the Board . . . .; and,

    d.  Failing to deliver to the Company at the termination of the Employment Period all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data  . . . relating to the Confidential

1325471

1    Information of the business of the Company or any Affiliate or Subsidiary that

2    Harouni then possessed controlled.

3    59.    Harouni's conduct as set forth above, was, and is, a material breach of his contractual

4    obligations owed to the Debtor.

5    60.    As a result of Harouni's breach of the Harouni Employment Contract, Debtor was

6    injured in an amount to be proven at trial but believed to be in excess of $1 million.

7    61.    The Harouni Employment Contract provides for the payment of attorney fees in the

8    event of suit thereon. Accordingly, the Trustee is entitled to his reasonable attorney fees incurred in

9    the prosecution of this action.

10    **SIXTH CLAIM FOR RELIEF**

11    **BREACH OF FIDUCIARY DUTY**

12    **(As against Defendant Morad Harouni only)**

13    62.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 41 of the

14    second amended complaint as if set forth herein in full.

15    63.    As a result of his position as a managing member, director, and/or officer of New

16    Meatco, Harouni owed a fiduciary duty to New Meatco, including but not limited to a duty of

17    loyalty, good faith and fair dealing, and an obligation to perform his duties as a reasonable person

18    would do as a fiduciary of a business, using his judgment in the best interests of the business.

19    64.    Harouni, acting in his capacity as the managing member, officer, and/or director of

20    New Meatco  breached his fiduciary duties owed to the Debtor by, among other things,

21    a.    failing  to act as a reasonably careful managing member, officer and/or

22    director would act by causing or allowing Monarch and other Meatco

23    competitors and third parties to acquire New Meatco's seafood division sales

24    staff, computer files, vendor and customer accounts, and otherwise using New

25    Meatco's confidential and proprietary information to compete in the seafood

26    distribution business;

27    b.    disclosed confidential and proprietary information about New Meatco's

28    financial condition to Seafax and other third party competitors of the Debtor;

15

1325471

c. By his failure to protect against or otherwise allowing Monarch and other third party competitors to acquire the Debtor's sales staff, computer files, vendor and customer accounts, and other confidential and proprietary information, Harouni failed to act as a reasonably careful managing member, officer and/or director would have acted under the same or similar circumstances, and in so doing violated his duty of loyalty, and good faith owed to the Debtor.

d. Structuring and obtaining the benefit of the fraudulent transfers as set forth above, contrary to the best interests of the Debtor and its creditors, in effect rendering the Debtor insolvent and thus unable to continue in business in a manner that would allow for adaptability regarding changing economic factors.

65. As a result of Harouni's acts or failure to act, New Meatco was harmed in an amount to be proven at trial.

66. Defendants' conduct as described herein was willful, wanton, and intentional, and accordingly Plaintiff is entitled to punitive damages on this claim for relief in a sum to be determined at the time of trial of this matter.

**WHEREFORE,** Plaintiff prays for relief as follows:

## AS TO THE FIRST AND THIRD CLAIMS FOR RELIEF

### (Avoidance of Fraudulent Conveyances)

1. Avoidance of the Transfers by Debtor to Harouni and the Avisar Family Trust; and

2. Such preliminary and permanent relief as the Court may deem just and proper.

## AS TO THE SECOND AND FOURTH CLAIMS FOR RELIEF

### (Recovery of Fraudulent Conveyance)

1. Recovery of the Transfers in the amount of $20,000,000.00 or an amount according to proof prior to entry of judgment.

1325471

## AS TO THE FIFTH CLAIM FOR RELIEF

### (Breach of Contract)

1.    For compensatory damages in an amount according to proof before entry of judgment.

## AS TO THE SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

1.    For damages according to proof prior to entry of judgment; and

2.    For punitive damages according to proof prior to entry of judgment.

## AS TO ALL CLAIMS FOR RELIEF

1.    For attorney fees as allowed by law;

2.    For costs of suit;

3.    For interest on all amounts owed;

4.    For such other and further relief as the Court deems just and proper.

DATED:  June 19,2015

Steven T. Gubner
Larry Gabriel
Reagan E. Boyce
EZRA BRUTZKUS GUBNER LLP

/s/ Larry W. Gabriel
By:_____
Attorneys for, Howard Grobstein, Liquidating Trustee
for the New Meatco Liquidating Trust

1325471

1

## <u>DEMAND FOR JURY TRIAL AND CONSENT TO ENTRY OF FINAL JUDGMENT BY</u>

2

## <u>THE BANKRUTPCY COURT</u>

3        Pursuant to Fed. R. Civ. P. 38, Plaintiff Howard Grobstein, Liquidating Trustee for the

4   New Meatco Liquidating Trust hereby demands a trial by jury on all causes of action and issues so

5   triable.

6        Plaintiff consents to the entry of final judgment by the bankruptcy court.

7

8

9   DATED: June 19, 2015                    EZRA BRUTZKUS GUBNER LLP

10

                                                /s/ Larry W. Gabriel
11                                         By:_____

12                                            Steven T. Gubner
                                              Larry Gabriel
13                                            Reagan E. Boyce
                                           Attorneys for, Howard Grobstein, Liquidating Trustee
14                                         for the New Meatco Liquidating Trust

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1325471

EXECUTION COPY

## INTEREST PURCHASE AGREEMENT

INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of April 18 , 2011, by and among Meatco Acquisition Company, LLC ("Purchaser"), a Delaware limited liability company, on the one hand, and Morad Harouni ("Harouni") and The Avisar Family Trust dated September 12, 2000 ("Avisar" and together with Harouni, a "Seller" or "Sellers") and Meatco Provisions, Inc. ("Meatco" or the "Company"), a California corporation.

### RECITALS

A.          Each Seller owns 500 shares of common stock of Meatco, representing all of the issued and outstanding capital stock of Meatco (the "Meatco Stock").

B.          Sellers have caused Meatco to form New Meatco Provisions, LLC, a Delaware limited liability company ("New Meatco"), and have caused Meatco to transfer all of its assets and liabilities to New Meatco in exchange for all of the membership interests (the "New Meatco Membership Interests") of New Meatco (the "New Meatco Formation and Contribution").

C.          Purchaser desires to purchase and acquire from Meatco, and Sellers desire to cause Meatco to sell and transfer to Purchaser, 80.1% of the New Meatco Membership Interests (the "Acquired Interests"), on the terms and subject to the conditions set forth in this Agreement, such that Purchaser will own an 80.1% interest in New Meatco and Harouni will indirectly own (through Meatco) a 19.9% interest in New Meatco.

THEREFORE, the parties hereto agree as follows:

### 1. Defined Terms

1.1.     Defined Terms. The following terms shall have the following meanings:

(a)     "Affiliate" shall mean with respect to any party hereto, any Person which directly or indirectly controls, is controlled by or is under common control with, such party. The term "control" shall mean the power to direct the affairs of such Person by reason of ownership of voting stock or other equity interests or by contract or other legally binding arrangement.

(b)     "Affiliated Group" shall mean an affiliated, consolidated, combined or unitary group for federal income tax purposes.

(c)     "Approvals and Consents" is defined in Section 5.5.

(d)     "Bank Payoff Statement" shall mean a statement received from a Lender setting forth the amount required to discharge in full the Company's Debt to such Lender and for such Lender to release its Liens on the Company's assets.

11008419-v7

(e)    "Benefit Plans" shall mean all "employee pension benefit plans" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), "employee welfare benefit plans" (as defined in Section 3(1) of ERISA), bonus, deferred compensation, incentive or other compensation plans or arrangements, and other employee fringe benefit plans at any time maintained, or contributed to, by the Company for the benefit of any employees, officers or directors.

(f)    "Business" means distributing refrigerated and frozen meat, chicken, pork, seafood and cheese products principally to Hispanic-focused retail grocery chains in Southern California.

(g)    "Code" shall mean the Internal Revenue Code of 1986, as amended and all rules and regulations promulgated thereunder.

(h)    "Contracts" shall mean all agreements, leases, rental agreements, licenses, employee plans, purchase orders, sales orders, commitments, confidentiality non-use or non-disclosure agreements, and all other binding arrangements, whether written or oral, express or implied, of the Company or relating to the Business.

(i)    "Debt" shall mean the following (other than trade payables and accrued expenses incurred in the ordinary course of business):

(i)    all obligations of the Company for borrowed money (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured);

(ii)    all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by the Company, whether periodically or upon the happening of a contingency;

(iii)    all obligations of the Company evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(iv)    all obligations of the Company upon which interest charges are customarily paid or imputed;

(v)    all obligations of the Company under conditional sale or other title retention agreements relating to purchase property;

(vi)    any obligations under capital leases (also referred to as finance leases);

(vii)    any unsatisfied obligation for "withdrawal liability" to a "multi-employer plan," as such terms are defined under ERISA;

(viii)    all amounts owed to any Seller or an Affiliate of any Seller; and

- 2 -

(ix)    any accrued interest related to any of the foregoing.

(j)    "Financial Statements" shall mean the reviewed balance sheets of the Company as of December 31, 2008 and December 31, 2009 and the audited balance sheet of the Company as of December 31, 2010 ("Audited Balance Sheet"), and the reviewed statements of income and changes in financial position of the Company for the years ended December 31, 2008 and 2009 and the audited statements of income and changes in financial position of the Company for the year ended December 31, 2010.  Notwithstanding the foregoing, the audited statements of income and changes in financial position of the Company for the year ended December 31, 2010 does not contain an audit opinion based upon the fact that the auditor did not audit the opening inventory.

(k)    "Governmental Entity" shall mean any federal, state, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body.

(l)    "Income Taxes" shall mean (i) all Federal, state, local or foreign income or franchise taxes of the Company or other taxes or charges imposed on or with respect to the Company's net income or capital, together with any interest or penalties or additions to tax imposed with respect thereto and (ii) any obligations under any agreements with respect to any Income Taxes.

(m)    "Intellectual Property Rights" shall mean the (i) Know-how, (ii) Trademarks, (iii) Trade Names, (iv) Patents, (v) copyrights, and (vi) confidential information and all other intellectual property rights, whether registered or not, of the Company.

(n)    "Know-how" shall mean all trade secrets (including, without limitation, proprietary or confidential information and use and application know-how), recipes, inventions, designs, processes of distribution and manufacturing, computer databases and software, technology, technical information, market surveys and all promotional literature, customer and supplier lists and information and similar data of the Company pertaining to the Business of the Company.

(o)    "Knowledge" shall mean the actual knowledge of either Seller after reasonable inquiry.

(p)    "Laws" is defined in Section 5.11(a).

(q)    "Legal Proceedings" shall mean a suit, claim, action, arbitration, hearing, investigation, audit, charge, complaint, grievance, demand or proceeding before any Governmental Entity.

(r)    "Lenders" shall mean Banco Popular, and other holders of the Company's Debt.

(s)    "Liabilities" is defined in Section 5.6(c).

- 3 -

(t)    "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, claim, right of first refusal, option, charge, assignment, encumbrance, lien (statutory or other) or preference, priority or security interest of any kind or nature whatsoever.

(u)    "Made Available" includes, in the case of information or documents, that such information or documents have been posted in the Company's virtual data room to which Purchaser and its representatives have been given access.

(v)    "Material Adverse Effect" shall mean a material adverse effect on the business, properties, assets, financial condition or prospects of the Company, taken as a whole. Notwithstanding the foregoing, none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: any adverse change or effect (including, without limitation, any litigation, loss of employees, cancellation of or delay in customer orders, reductions in revenues or income or disruption of business relationships) arising from or attributable or relating to (A) the announcement or pendency of the transactions contemplated by this Agreement, (B) conditions affecting the industry or industry sector in which the Company operates or the U.S. economy as a whole, (C) legal, accounting, investment banking or other fees or expenses incurred in connection with the transactions contemplated by this Agreement, (D) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires and other natural disasters, weather conditions and other force majeure events, (E) compliance with the terms of, or the taking of any action required by, this Agreement, (F) the taking of any action approved or consented to in writing by the Purchaser, or (G) any change in accounting requirements or principles or any change in applicable Law, rules or regulations or the interpretation thereof.

(w)    "New Meatco Operating Agreement" shall mean the Amended and Restated Operating Agreement of New Meatco to be entered into by and between Purchaser, Meatco, New Meatco and Harouni in the form attached hereto as Exhibit A.

(x)    "Orders" is defined in Section 5.10(c).

(y)    "Patents" shall mean United States and foreign patents (including all reissues, divisions, continuations, continuations in part and extensions thereof), patent applications and patent disclosures, and all other patent rights of the Company (including those as licensee or licensor).

(z)    "Permits" is defined in Section 5.16.

(aa)    "Permitted Liens" shall mean the following:

(i)    Liens for current Taxes not yet due and payable or Taxes which are being contested in good faith and for which adequate reserves have been set aside on the Company's books in accordance with GAAP;

- 4 -

(ii)      Liens securing assessments, governmental charges or levies or statutory and common law Liens including the Liens of materialmen, carriers, landlords and like Persons, all of which are in relation to sums that are not yet due and payable or which are being contested in good faith and for which adequate reserves have been set aside on the Company's books in accordance with GAAP;

(iii)      Liens that are created by or at the direction of the Purchaser or pursuant to the terms of this Agreement;

(iv)      Liens that are released and discharged at or prior to the Closing;

(v)      the provisions of all existing building, zoning and other applicable requirements of Law;

(vi)      easements, covenants, conditions, restrictions, and other similar matters of record affecting Real Property that do not or would not impair the use, value or occupancy of such Real Property; and

(vii)      workers or unemployment compensation Liens arising in the ordinary course of business and deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Law or other social security.

(bb)      "Person" shall mean any natural person, corporation, association, partnership, joint venture or other entity.

(cc)      "Products" shall mean food products distributed by the Company as of the date hereof.

(dd)      "New Lenders" shall mean Wells Fargo Bank, N.A. and Prospect Capital Corporation.

(ee)      "Taxes" shall mean all taxes of any kind of the Company through conclusion of the Closing, including, without limitation, Income Taxes, those on, or measured by or referred to as income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, customs duties or similar fees, assessments or charges of any kind whatsoever required to be paid or collected and remitted by the Company, together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority, domestic or foreign with respect to such Taxes and any obligations under any agreements with respect thereto.

(ff)      "Trademarks" shall mean trademarks, registrations thereof, pending applications therefor, and such unregistered rights as are used in the Business.

(gg)    "Trade Names" shall mean all names, trade names, brand marks, service marks, trade dress, brand names, logos and all other names and slogans embodying Business or Products goodwill of the Company.

(hh)    "Working Capital" shall mean (i) the current assets of the Company, each determined in accordance with GAAP including, without limitation, prepaid expenses and deposits held by the Company, all post-dated checks held by the Company, non-sufficient funds checks held by the Company net of any reserves , the accounts receivable net of any allowance for doubtful accounts, and the inventory net of any reserves, provided current assets shall exclude cash and cash equivalents, all income tax items and income tax accounts, and all amounts due to Affiliates; minus, (ii) the current liabilities of the Company, each determined in accordance with GAAP, provided current liabilities shall exclude all income tax items and income tax accounts, Debt and all amounts due to Affiliates (other than trade payables incurred in the ordinary course of business). Working Capital is to be calculated in the manner set forth in the "Working Capital Example" attached hereto as reported by the Company using accounting policies and procedures consistent with the past practices in accordance with GAAP.

(ii)    "Working Capital Target" shall mean $17,000,000.

1.2.    Accounting Terms.  Unless otherwise specifically provided for in this Agreement, any accounting terms used in this Agreement shall have the meanings customarily given them in accordance with United States generally accepted accounting principles ("GAAP") as applied on a consistent basis by the Company.  All financial computations, statements and reports hereunder shall be in accordance with GAAP, unless otherwise specifically provided for in this Agreement.

1.3.    Other Rules of Construction.  References in this Agreement to sections, schedules and exhibits are to sections of, and schedules and exhibits to, this Agreement unless otherwise expressly indicated.  The word "including" means "including, but not limited to."

## 2.  Sale and Purchase

Upon the terms and subject to the conditions set forth in this Agreement, the Sellers shall cause the Company to sell, assign, transfer and convey at the Closing to the Purchaser, and the Purchaser shall purchase, all right, title and interest in and to the Acquired Interests, free and clear of any Lien other than Permitted Liens.

## 3.  Closing

3.1.    The Closing.  The closing (the "Closing") shall take place simultaneously with the execution of this Agreement remotely by electronic means, after satisfaction or waiver of the conditions set forth in Section 8 and Section 9, or at such other time, date or place as agreed to in advance by the parties and shall be deemed to occur at 12:01 a.m. on the date set forth in the preamble.

- 6 -

3.2.    Closing Events.  At the Closing, (i) the sale and purchase referred to in Section 2 shall be
effected, (ii) the Purchase Price described in Section 4 shall be delivered, and (iii) each of the
parties shall execute and deliver to each other the documents required to be executed and
delivered pursuant to Section 10.  Purchaser has informed Sellers and the Company, and Sellers
and the Company agree, that the Purchase Price will be funded by: (i) loans (the "Debt Financed
Portion") to New Meatco of $25,000,000; (ii) cash of up to $7 million ("Purchaser's Cash
Payment") paid by Purchaser; and (iii) the Seller Note (described in Section 4.3(d)) in the
amount of $5,000,000.  Sellers and the Company agree to cooperate reasonably with Purchaser
in its efforts to obtain the loans described above. Notwithstanding anything to the contrary
contained in this Agreement, Purchaser's obligation with respect to the payment of the Purchase
Price shall be limited to the payment of Purchaser's Cash Payment described in clause (ii) of the
second sentence of this Section 3.2.

## 4.  Purchase Price

4.1.    Purchase Price.  The consideration to be paid at the Closing shall be $35,043,750 (the
"Purchase Price"), subject to adjustment pursuant to Section 4.2, payable in accordance with
Section 4.3.

4.2.    Working Capital Adjustment.

(a)    Within ninety (90) days after the Closing, Purchaser shall, in good faith, prepare
and deliver to the Sellers an audited balance sheet of the Company as of 12:01 a.m. on the
Closing Date (the "Closing Balance Sheet") based on the Company's books and records and
other information then available.  The Closing Balance Sheet shall not include or incorporate any
changes that are the result of the transactions contemplated by this Agreement (e.g., the
application of purchase accounting).  The calculation of the Working Capital as of the Closing
Date shall be based on the Closing Balance Sheet.  The Closing Balance Sheet shall be audited
by Gumbiner and prepared on a basis consistent with the Audited Balance Sheet and otherwise in
accordance with GAAP.

(b)    The parties acknowledge and agree that, as of the close of business on the
Business Day prior to the Closing, the Company conducted, under the supervision of its auditors,
a physical count of the Company inventory, wherever located (collectively, "Inventory"), for the
purposes of determining the value of the Inventory at Closing.

(c)    The Purchaser shall provide the Sellers and their advisors with copies of such
books, records and financial documents as the Sellers shall reasonably request in connection with
their review of the Closing Balance Sheet and the calculation of the Closing Working Capital.  If
the Sellers disagree with any item on the Closing Balance Sheet or the calculation of the Closing
Working Capital, the Sellers shall notify Purchaser in writing of such disagreement within thirty
(30) days after the Sellers' receipt thereof (such notice setting forth each item and amount of
disagreement and the basis for such disagreement) and the parties shall thereafter negotiate in
good faith to resolve any such disagreements.  If the Sellers fail to give Purchaser written notice
of any disagreement within such thirty (30) day period, then the amounts set forth in Purchaser's

- 7 -

Closing Balance Sheet and the calculation of the Closing Working Capital shall become final and binding on the parties. If the Parties are unable to resolve any such disagreement within thirty (30) days of Purchaser's receipt of the Sellers' notice of disagreement with the Closing Balance Sheet and/or the calculation of the Closing Working Capital, either party may request that the Auditor (as defined in Section 4.2(e) below) resolve the outstanding disagreements identified in writing by either party.

(d)     The "Auditor" shall be RSM McGladrey, Inc., or, if such firm is unable or unwilling to act, such other independent public accounting firm as mutually agreed upon by the Purchaser and the Sellers in writing. The parties shall request that the Auditor resolve all outstanding disagreements identified to Auditor pursuant to Section 4.2(d) within thirty (30) days after referral to the Auditor. The Auditor's review of the disagreements shall be limited to the issues set forth in the written notice of outstanding disagreements given pursuant to Section 4.2(d). The scope of the disagreements to be resolved by the Auditor will be limited to whether the items in dispute that were included in the written notice of outstanding disagreements given pursuant to Section 4.2(d) were prepared in a manner consistent with the Working Capital Example, and the Auditor shall determine, on such basis, whether and to what extent the Closing Balance Sheet and the Closing Working Capital require adjustment. In resolving any disputed item, the Auditor may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the least value for such item claimed by either party. The resolution of such disagreements by the Auditor shall be, absent manifest error or misconduct by the Auditor, final and binding on the parties and enforceable by any court of competent jurisdiction. Auditor's resolution of such disagreements shall be set forth in writing in sufficient detail reasonably necessary for either party to understand the methodology supporting the Auditor's findings and delivered to each of the parties. The fees and expenses of the Auditor shall be allocated to be paid by Purchaser, on the one hand, and the Sellers, on the other, based upon the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by such party, as determined by the Auditor.

(e)     Within three (3) Business Days after the final determination of the Closing Working Capital, Sellers, jointly and severally, shall pay in cash to Purchaser the amount (if any) by which the Closing Working Capital is less than the Working Capital Target.

4.3.   Payment of the Purchase Price. The Purchase Price shall be payable at Closing as follows:

(a)     to each Lender in an amount sufficient to satisfy in full all amounts due from the Company to such Lender as set forth in such Lender's Bank Payoff Statement;

(b)     to each Person to which Transaction Expenses are owed by the Sellers or the Company, as evidenced on the Certificate of Closing Expenses;

(c)     an amount equal to the difference between (x) $30,043,750 and (y) the aggregate amount payable pursuant to clauses (a) and (b), to an account or accounts designated in writing by Meatco prior to Closing; and

- 8 -

(d)     a subordinated promissory note issued by New Meatco in the amount of $5,000,000 payable to Meatco (the "Seller Note"), which Seller Note shall have a term of six (6) years, bear interest at seven percent (7%) per annum (of which 5% shall be payable in cash and 2% shall be payable in kind), with interest payable quarterly in arrears and principal to be paid in a balloon payment at maturity, stand junior in all respects to the Debt of New Meatco with New Lender(s) incurred in connection with the acquisition contemplated by this Agreement, the ongoing financing of the Business and any lender who finances New Meatco's capital improvements and be subject to the terms of a subordination agreement with the New Lenders in form and substance reasonably acceptable to the Sellers. The Seller Note shall be in the form attached hereto as Exhibit D.

The cash proceeds allocable to Harouni and Avisar (before deduction and/or adjustment (if any) pursuant to clauses (a) and (b) above and Section 4.2(a)) will be $15,000,000 to Avisar and $15,043,750 to Harouni directly or through his continuing interest in Meatco. Sellers shall cause Harouni to become the sole shareholder of Meatco following the Closing and thereby indirectly own 19.9% of New Meatco.

4.4.    Election under Section 754. In the discretion of Purchaser, it may cause New Meatco to file an election under Section 754 of the Code, in accordance with the procedures set forth in the applicable regulations promulgated thereunder, in connection with the sale and transfer of the Acquired Interests hereunder, and to maintain a record of adjustments to the tax basis of its assets required in connection therewith, and the Company and if required, the Sellers, will take such actions and execute such documents as Purchaser may reasonably request, so that such election may be made and filed in a timely manner.

4.5.    Allocation of Purchase Price. It is understood and agreed that the sale and transfer of the Acquired Interests will be treated as a sale of assets, subject to a pro rata share of any liabilities encumbering such assets, or which are assumed in connection with such purchase, for income tax purposes. The parties agree that the Purchase Price, including such pro rata share of liabilities, shall be allocated among the Company's assets based on 80.1% of their "book values," as described in the following sentence, with any excess of Purchase Price (including such pro rata share of liabilities) over 80.1% of aggregate "book values" being allocated to the Company's goodwill and going concern value. For this purpose, "book values" shall be determined by reference to the Closing Balance Sheet when it is finally prepared and agreed to in accordance with Section 4.2. Purchaser, Sellers and the Company further agree that such allocation shall govern for income tax purposes, and each party agrees that it shall reflect such allocation in its federal and state income tax returns. Neither Purchaser, Sellers nor the Company shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

- 9 -

27

## 5. Representations, Warranties and Covenants of Sellers

On or prior to the date of this Agreement, each of the Company and the Sellers, on the one hand, and the Purchaser, on the other hand, delivered to the other disclosure schedules (the "Seller Disclosure Schedules" and the "Purchaser Disclosure Schedules," respectively) setting forth, among other things, items being disclosed with respect to, or qualifying the representations and warranties contained in Section 5 with respect to the Company and the Sellers, or in Section 6 with respect to the Purchaser; provided, however, that notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such Disclosure Schedules shall not be deemed to be an admission that such item represents an exception or material fact, event, or circumstance or that such item has had or would reasonably be expected to have a Material Adverse Effect on the Company or the Purchaser, as applicable. Matters disclosed in any schedule in reference to any particular section will be deemed to be disclosed for all purposes of this Agreement to the extent that the applicability of the disclosed item to such other schedules or sections is reasonably apparent.

Except as disclosed or as qualified by the information set forth on the Seller Disclosure Schedules, the Sellers and the Company hereby, jointly and severally, represent and warrant to the Purchaser, as of the Closing Date (except to the extent made only as of a specified date, in which case as of such date) that:

5.1.     Organization and Good Standing; Subsidiaries.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of California and is not qualified as a foreign corporation in any other jurisdictions.  The failure to be so qualified in any other jurisdiction is not reasonably likely to have a Material Adverse Effect.  The Company has no Subsidiaries.

5.2.     Authority.

(a)     Each Seller and the Company has full power and authority to execute and deliver this Agreement and the other agreements and instruments to be executed and delivered by him or it pursuant hereto and to consummate the transactions contemplated hereby and thereby.

(b)     This Agreement has been duly executed and delivered by each Seller and the Company and constitutes, and such other agreements and instruments to be executed and delivered pursuant hereto when duly executed and delivered by each Seller and the Company (assuming the due execution and delivery by the Purchaser and/or New Lender) will constitute, legal, valid and binding obligations of such Seller and the Company enforceable in accordance with their respective terms, except to the extent that such may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights and remedies generally (collectively, the "General Enforceability Exceptions").

- 10 -

(c)     The consummation by the Sellers and the Company of the transactions contemplated hereby will not violate any Law in any material respects, conflict with, result in any breach of or constitute a default (or an event which with notice or lapse of time or both would become a breach or default) under the Articles of Incorporation of the Company or any indenture, mortgage, lease, Contract or other instrument to which the Company is a party or by which the Company, or its Business, is bound, or result in the creation of a Lien, other than Permitted Liens, on the Company or any of its assets.

5.3.    Capitalization.

(a)     *Capital Stock.*  The authorized capital stock of the Company consists of 10,000 shares of Common Stock.  There are 1,000 shares of the Company's Common Stock issued and outstanding, of which Avisar and Harouni each own 500 Shares.  No shares of the Company's Common Stock are held in treasury.

(b)     *Issuance; Ownership.*  All of the outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and nonassessable and not issued in violation of any preemptive rights.  There are no options, warrants, conversion rights or other rights to subscribe for or purchase, or other contracts to which the Company or the Sellers are a party to with respect to any capital stock of the Company and there are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Company.

(c)     *Voting Debt; Repurchase Obligations.*  There are (i) no bonds, debentures, notes or other Debt of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) issued or outstanding, and (ii) no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any shares of capital stock or other securities of the Company.

5.4.    Ownership of Securities; New Meatco.

(a)     Sellers own beneficially, and of record, all of the issued and outstanding capital stock of the Company, free and clear of any Lien, except for restrictions on the transfer of securities imposed by applicable state and federal securities laws. Neither Seller is or was a party to, nor has any knowledge of, any purchase right or other contract or commitment that could require Sellers to sell, transfer, or otherwise dispose of any of the Acquired Interests.  Neither Seller is a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of the Acquired Interests.

(b)     Sellers have caused New Meatco to be formed as a Delaware limited liability company and have effected the New Meatco Formation and Contribution.  Other than formation activities, New Meatco has not engaged in any business and has only the assets and liabilities it acquired from Meatco.

- 11 -

(c)    Meatco owns, beneficially and of record, all of the New Meatco Interests free and clear of any Lien other than restrictions on the transfer of securities imposed by applicable state and federal securities laws. No consent from any Person is necessary for Meatco to transfer its New Meatco Interests in accordance with this Agreement. At Closing, the Acquired Interests will (i) represent 80.1% of the outstanding Interests in New Meatco; and (ii) will be free and clear of any Lien other than such Liens that may be granted by Purchaser in favor of New Lenders.

5.5.    Approvals and Consents. The execution and delivery of this Agreement by the Sellers and the Company do not, and the performance of this Agreement and consummation of the transactions contemplated by the Agreement by the Sellers and the Company will not require any consent of, or filing with or notification to ("Approvals and Consents") any third party or Governmental Entity with respect to Sellers or the Company.

5.6.    Financial Statements.

(a)    The Company's Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved. The Company's Financial Statements fairly present, in all material respects, the financial position of the Company as of the date thereof and the results of operations and cash flows for the periods indicated. The Company's Financial Statements are attached hereto as Schedule 5.6 of the Seller's Disclosure Schedules.

(b)    All books, records and accounts of the Company are accurate and complete in all material respects and are maintained in all material respects in accordance with all applicable Laws.

(c)    The Company has no Liabilities, except, (i) to the extent included on the Audited Balance Sheet, (ii) Liabilities incurred in the ordinary course of business of the Company since the date of the Audited Balance Sheet, and (iii) Liabilities incurred in connection with the transactions contemplated by this Agreement which shall be satisfied by Sellers at or prior to Closing. For purposes of this Agreement, the term "Liabilities" means any Debt, loss, damage, adverse claim, fine, penalty or liability of any kind or nature, whether direct or indirect, known or unknown, asserted or unasserted, accrued or unaccrued, absolute, contingent, matured or unmatured, liquidated or unliquidated, whether in contract, tort, strict liability or otherwise.

5.7.    Legal Proceedings. (i) There are no Legal Proceedings pending, or to the Knowledge of the Sellers, threatened against or affecting the Company; and (ii) there are no judgments, settlements, decrees, injunctions, rules or Orders of any Governmental Entity or arbitrator outstanding against the Company, in the case of clause (i) that, if adversely determined, (x) individually or in the aggregate could reasonably be expected to result in losses in excess of $100,000 or result in injunctive relief against the Company, or (y) would materially and adversely affect the Sellers' or the Company's performance under this Agreement, the other agreements contemplated hereby or the consummation of the transactions contemplated under the Agreement.

- 12 -

5.8.    Real Property. The Company owns no real property. Schedule 5.8 contains a complete list of all leases for real property to which the Company is a party (the "Real Property"). Each such lease (a "Lease") is a valid and binding obligation of the Company, and assuming each such Lease is the valid and binding obligation of the counterparty thereto, in full force and effect, subject to the General Enforceability Exceptions, without any default or breach (including default or breach effective after notice or the passage of time) thereunder by the Company. The Company has Made Available complete copies of all Leases to Purchaser.

5.9.    Personal Property. The Company has valid title to or leases all tangible assets used in, or necessary for, the conduct of its businesses as presently conducted, free and clear of any Liens, except for Permitted Liens. Such tangible assets are reasonably suitable for the purposes for which they are presently used. The assets of the Company are reasonably sufficient to operate the Business as presently conducted. The trucks listed on Schedule 5.9 are all of the trucks used in the Company's Business.

5.10.    Intellectual Property Rights.

    (a)    The Company does not own, license, or use any Intellectual Property Rights. No Intellectual Property Rights are material to the Business as currently conducted.

    (b)    No Legal Proceeding is pending or threatened against the Sellers which involves any Intellectual Property Right.

    (c)    Sellers are not subject to any judgment, order, writ, injunction, judgment, or decree (collectively "Orders") of any Governmental Entity, and they have not entered into any Contract which restricts or impairs the use of any Intellectual Property Right.

    (d)    To the Knowledge of Sellers, the sale of the Products does not infringe upon the Intellectual Property Rights of any third party.

5.11.    Compliance with Laws.

    (a)    The manner in which the Company currently conducts the Business complies in all material respects with all laws, ordinances, regulations, licensing requirements, rules, decrees, awards or orders (collectively "Laws") applicable to the Business.

    (b)    All Products now being sold by the Company meet, in all material respects, all legal requirements applicable to such Products.

5.12.    Contracts.

    (a)    The Company is not party to any Contract:

        (i)    for the employment of any person or with any labor union or association;

- 13 -

(ii)     pursuant to which any person who is or was an officer, director, employee, consultant of the Company or an Affiliate of any such Person has a material interest;

(iii)    relating to the borrowing or lending of money or the guarantee of any obligations for borrowed money in an amount in excess of $25,000, excluding trade payables, or endorsements made for purposes of collection in the ordinary course of business;

(iv)    having an unexpired term of more than 12 months after the Closing and involving payments after the Closing in excess of $100,000;

(v)     for the lease of tangible personal property under which it is the lessee having unexpired terms of more than 12 months after the Closing and involving rent or other payments after the Closing in excess of $25,000 per year for any such lease;

(vi)    for the production or supply by or for it for goods or services having unexpired terms (including any periods covered by options to renew exercisable by other parties) of more than 30 days after the Closing;

(vii)   for capital expenditures or the purchase by it of materials, supplies, equipment or services which requires payments by the Company in excess of $100,000 after the Closing;

(viii)  granting to any person a right to purchase any Asset other than in the ordinary course of business; or

(ix)    containing covenants not to compete in any business or geographical area or restricting it from the use or disclosure of any information in its possession.

(b)      All Contracts material to the Business are in all respects valid and binding obligations of the Company, and assuming each such Contract is the valid and binding obligation of the counterparty thereto, in full force and effect, subject to the General Enforceability Exceptions.  To the Knowledge of Sellers, there is no reason to believe that any such Contract is not a valid and binding obligation of such counter-party or that such counter-party is in bankruptcy.

(c)      The Company has in all material respects performed all obligations required to be performed by such Contracts as of the date hereof.  Neither the Company nor the other party (to the Knowledge of Sellers) is in material breach or default (and with the giving of notice or lapse of time will be in material breach or default), and neither the Company nor the other party (to the Knowledge of Sellers) will be in material breach or default (and with the giving of notice or the lapse of time will be in material breach or default) as a result of the consummation of the transactions contemplated by this Agreement, under any such Contract; and

(d)      The consummation of the transactions contemplated by this Agreement (A) does not require any Consent under any Contract, and (B) will not result in a right to terminate or modify any right or privilege now enjoyed by the Company under any such Contract.

- 14 -

5.13.  <u>Absence of Certain Changes</u>.  Since December 31, 2010, the Company has operated the Business in the ordinary course, consistent with past practices, and has not:

        (i)     entered into any material transaction or incurred any material liability or obligation other than in the ordinary course of business;

        (ii)     had any Material Adverse Effect;

        (iii)     granted or agreed to grant any material increase in compensation to any of its employees or to any consultant or agent or paid or agreed to pay any bonus (other than customary year-end bonuses) to any employee, consultant or agent other than in the ordinary course of business;

        (iv)     waived any of its rights or claims having value, except rights or claims not material in amount or waived in the ordinary course of business and consistent with past practice;

        (v)     violated any Law applicable to the Business, the violation of which would reasonably be expected to have a Material Adverse Effect on the Business;

        (vi)     sold or otherwise disposed of any of its assets except in the ordinary course of business and consistent with past practice;

        (vii)     except in the ordinary course of business and consistent with past practice, modified, amended or waived any provisions of, or terminated or declined to enforce, any Contract material to the Business;

        (viii)     assumed or guaranteed payment or performance of any loan or obligation of any other Person;

        (ix)     made any change in its accounting principles or practices or its methods of application of such principles or practices;

        (x)     made any loan or advance to any Person other than trade credit extended to customers of the Company in the ordinary course of business; or

        (xi)     taken any action not consistent with past business practices the principal purpose of which is to artificially increase Working Capital.

5.14.  <u>Labor Matters</u>.

        (a)     There is no current or threatened work stoppage by any of the Company's employees or any current or threatened work stoppage by any other persons which would materially adversely affect the Business.  The Company is not a party to any collective

bargaining or other labor agreement.  To Sellers' knowledge, no union organizing or election activities involving any of the Sellers' employees are in progress or threatened.

(b)     The Company has not received any written notices with respect to claims or findings of violations under OSHA.

(c)     The Company is in compliance in all material respects with laws governing employment of its employees including, but not limited to, minimum wage and overtime laws, (including rest and meal break laws and wage payments upon separation laws), immigration laws and anti-discrimination laws.

5.15.   Benefit Plans.

(a)     Schedule 5.15 contains a list and brief description of all Benefit Plans of the Company within the past three years (each a "Plan" and, collectively, the "Plans").  The Company has no Plan that the Company or the Sellers intended to be a qualified plan within the meaning of Section 401(a) of the Code.

(b)     All contributions required by any Plan or by applicable Law to have been made through the Closing Date shall have been made by such date.

(c)     The Company has complied, and is now in compliance, in all material respects, with all provisions of ERISA, the Code and all Laws applicable to the Plans.  Each Plan has been operated in material compliance with its terms and in accordance with all applicable Laws.

(d)     No Plan is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA (a "Multiemployer Plan") or a plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA (a "Multiple Employer Plan"), nor has the Company, at any time within six years before the date hereof, contributed to or been obligated to contribute to any Multiemployer Plan or Multiple Employer Plan.

(e)     Except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA, or state group health plan continuation of coverage laws, the Company has no liability for life, health, medical or other welfare benefits to former employees or beneficiaries or dependents thereof.  Each Plan which is a "group health plan" within the meaning of Section 5000(b)(1) of the Code is in material compliance with the notice and continuation requirements of Section 4980B of the Code, the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), Part 6 of Subtitle B of Title I of ERISA and the regulations thereunder, and the privacy and security regulations issued by the U.S. Department of Health and Human Services at 45 C.F.R. Parts 160 and 164.

(f)     Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in, cause the accelerated vesting or delivery of, or increase the amount or value of, any payment or benefit to any employee, manager, officer, director or consultant of the Company.

- 16 -

(g)       There are no Legal Proceedings or any audit or inquiry by the Internal Revenue Service or United States Department of Labor pending or, to the knowledge of Sellers, threatened, which have been asserted or instituted against the Plans, any fiduciaries thereof with respect to their duties to the Plans or the assets of any of the trusts under any of the Plans which could reasonably be expected to result in any material liability of the Company.

(h)       There has been no prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code other than a transaction that is exempt under a statutory or administrative exemption) with respect to any Plan that is reasonably likely to result in liability to the Company.

5.16.    Permits.  The Company has all the franchises, licenses, permits and governmental and regulatory authorizations and approvals material to the operation of Business (the "Permits"). Such Permits are listed on Schedule 5.16.

5.17.    Payments.  The Company has not, directly or indirectly, had any transactions or payments of a material nature, which are not recorded in its accounting books and records or disclosed in its financial statements.

5.18.    Major Suppliers and Major Customers.  Schedule 5.18 lists each of the Company's twenty largest suppliers and customers (each a "Major Supplier" or "Major Customer") and the volume of business done with each during the 12 months ended December 31, 2010.  The Company is not engaged in any dispute with any Major Supplier or Major Customer which is reasonably likely to lead to a material diminution in the amount of business with such customer or supplier, and no Major Supplier or Major Customer has informed either Seller or the Company (orally, electronically or in writing) that it intends to terminate, limit or reduce in a material respect its business relations with the Company.  To the Knowledge of Sellers, the execution of this Agreement, and the consummation of the transactions contemplated hereby, is not reasonably expected to materially adversely affect the relationships of New Meatco with the Company's customers or suppliers.

5.19.    Taxes.

(a)      All income and other Tax Returns required to be filed by or on behalf of the Company have (i) been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all Taxes payable by or on behalf of the Company have been fully and timely paid (whether or not shown on any Tax Return).  With respect to any period for which Tax Returns of or relating to the Company have not yet been filed or for which material Taxes are not yet due or owing, the Company has made due and sufficient accruals for such Taxes on the December 2010 Balance Sheet.  All required estimated Tax payments sufficient to avoid any underpayment penalties have been made by or on behalf of the Company. The Company is not part of any Affiliated Group.

- 17 -

(b)     All certificates required to be collected or tendered by the Company for the purchase or sale of tangible personal property on an exempt basis have been collected or tendered, were to the Knowledge of Seller properly and validly executed, relied on in good faith and records of such have been properly maintained.

(c)     The Company has complied with all applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Taxing Authority all amounts required to be so withheld and paid under all applicable Laws.

(d)     No claim has been made in writing by a Taxing Authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction and no basis exists for such a claim.

(e)     All deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority of the Tax Returns of, or including, the Company have been fully paid, and there are no other audits or investigations by any Taxing Authority in progress, nor has any Seller or the Company received any notice in writing from any Taxing Authority that it intends to conduct such an audit or investigation.  No issue has been raised in writing by a Taxing Authority in any prior examination of the Company which, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period.

(f)     Neither the Company nor any other Person on its behalf has (i) agreed to or is required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of Law nor has any Taxing Authority proposed in writing any such adjustment, nor is there any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to the Company, (ii) executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of Law with respect to the Company, (iii) requested any extension of time within which to file any Tax Return, which Tax Return has since not been filed, (iv) granted any extension or waived the statute of limitations for the assessment or collection of Taxes, which Taxes have not since been paid, (v) granted to any Person any power of attorney that is currently in force with respect to any Tax matter, or (vi) or made any election under Code Section 108(i).

(g)     No property owned by the Company is (i) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or (ii) "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iii) "limited use property" within the meaning of Rev. Proc. 76-30, (iv) subject to Section 168(g)(1)(A) of the Code or (v) subject to any provision of state, local or foreign Law comparable to any of the provisions listed above.

(h)     The Company does not have any "corporate acquisition indebtedness" within the meaning of Section 279 of the Code.

(i)     The Company has not been a U.S. real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

- 18 -

(j)     The Company is not a party to any tax sharing, allocation, indemnity or similar agreement or arrangement (whether or not written) (collectively, a "Tax Sharing Agreement") pursuant to which it will have any obligation to make any payments after the Closing.

(k)     There is no contract, agreement, plan or arrangement covering any person that, individually or collectively, could give rise to the payment of any amount that would not be deductible by the Company by reason of Section 280G of the Code or would be subject to withholding under Section 4999 of the Code.

(l)     The Company is not subject to any private letter ruling of the IRS or comparable rulings of any Taxing Authority.

(m)     There are no Liens as a result of any unpaid Taxes upon any of the assets of the Company other than Permitted Liens.

(n)     The Company has never constituted either a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code.

(o)     There is no taxable income of the Company that will be required under applicable Tax Law to be reported by the Purchaser or the Company, for a taxable period beginning after the Closing Date which taxable income was realized prior to the Closing Date.

(p)     The Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to substantial understatement of federal income tax within the meaning of Section 6662 of the Code.

(q)     The Company has not participated in any reportable transaction, as defined in Treasury Regulation Section 1.6011-4(b)(1), or a transaction substantially similar to a reportable transaction.

(r)     The Company does not have nor has ever had, a permanent establishment in any country other than the United States, or has engaged in a trade or business in any country other than the United States that subjected it to tax in such country.

(s)     The Company does not have an overall foreign loss within the meaning of Section 904(f)(2) of the Code.

(t)     Schedule 5.19(t) contains an accurate and complete description of the Company's basis in its assets reported for Federal income tax purposes, and the Company's tax carryovers.

(u)     The Company (and any predecessor of Company) has been a validly electing S corporation within the meaning of Code § 1361 and § 1362 at all times since inception for Federal, state and local income purposes and Company will be an S corporation up to and including the Closing Date.

- 19 -

(v)     Neither the Company nor New Meatco will be liable for any Tax under Code §1374 in connection with any deemed sale of Company's assets nor does either have any potential liability for any Tax under Code §1374. The Company has not, in the past 10 years (A) acquired assets from another corporation in a transaction in which Company's Tax basis for the acquired assets was determined, in whole or in part, by reference to the Tax basis of the acquired assets (or any other property) in the hands of the transferor or (B) acquired the stock of any corporation that is a qualified subchapter S subsidiary.

(w)     Neither Seller nor Meatco has filed an election to treat New Meatco as a corporation for federal or state income tax purposes.

5.20.   Environmental Matters.

(a)     For purposes of this Agreement, the capitalized terms defined below shall have the meanings ascribed to them below.

(i)     "Environmental Law(s)" shall mean all federal, state or local law (including common law), statute, ordinance, rule regulation, code, or other requirement relating to the environment, natural resources, or public or employee health and safety and includes, but is not limited to, the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. Section § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., the Oil Pollution Act of 1990. 33 U.S.C. § 2701 et seq., and the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., as such laws have been amended or supplemented, and the regulations promulgated pursuant thereto, and all analogous state or local statutes and any applicable transfer statutes.

(ii)    "Environmental Permits" shall mean all approvals, authorizations, consents, permits, licenses, registrations and certificates required by any applicable Environmental Law.

(iii)   "Hazardous Substance(s)" shall mean any flammable explosives, radioactive materials, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products (including but not limited to waste petroleum and petroleum products), methane, hazardous materials, hazardous wastes, pollutants, contaminants and hazardous or toxic substances, as defined in or regulated under any applicable Environmental Law.

(iv)    "Release" shall mean any past spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment.

- 20 -

(b)    The Company:

(i)    has obtained and is in material compliance with all Environmental Permits that are required for the lawful operation of its business;

(ii)    is in compliance in all material respects with any applicable Environmental Law, and

(iii)    has not received written notice of any material violation by or material claim against the Company under any Environmental Law.

(c)    To the Sellers' Knowledge, there have been no Releases, or threatened Release, of any Hazardous Substances into, on or under the Real Property, while the Company has occupied such property, in violation of Environmental Law or that would require remediation.

(d)    The Company has not received written notice that it has been identified as a potentially responsible party at any site on the federal National Priorities List or similar state list.

(e)    Sellers have delivered to Purchaser true and complete copies of any reports, studies, results, analyses, tests, or monitoring possessed by, or on behalf of, the Company pertaining to Hazardous Substances, on or under the Real Property, or concerning compliance, by the Company, with Environmental Laws.

5.21.    Product Retrievals; Warranties.

(a)    During the twenty-four months immediately preceding the date of this Agreement, there have been no Product retrievals, Product recalls or market withdrawals of Products sold by the Company as a result of possible adulteration or product contamination, and, to the Knowledge of Sellers, no facts have been brought to Sellers' attention which would reasonably be expected to result in such actions.  To the Knowledge of Sellers, there are no existing circumstances that would lead to a voluntary recall, or constitute a valid basis for a governmental recall, of any Product sold or distributed by the Company.

(b)    The Company does not provide any express warranties, guaranties or assurances with respect to its Products.  There are no pending or, to the Knowledge of Sellers, threatened Legal Proceedings under any warranty or guaranty against the Company.  The Company has not incurred nor, to the Knowledge of Sellers, is there any reasonable basis for the imposition of, any liability, damage, loss, cost or expense as a result of any defect or other deficiency ("Product Liability") with respect to any Product sold prior to the Closing, whether such Product Liability was incurred by reason of any express or implied warranty (including any warranty of merchantability or fitness), any doctrine of common law (tort, contract or other), any statutory provision or otherwise and irrespective of whether such Product Liability is covered by insurance.

- 21 -

5.22.   Insurance. The Company is insured by insurers unaffiliated with Sellers or the Company, with respect to its properties, assets and operation of the Business in amounts and against such risks as are reasonable and customary to protect such properties, assets and businesses. Such policies are described on Schedule 5.22, which section discloses (a) any and all policies covering general liability, excess liability, product liability, workers' compensation, auto liability, property damage, directors and officers liability, fiduciary liability, employment practices liability, professional liability, errors and omissions liability, or environmental liability of the Company or the Company's employees, managers, officers, directors, property, or business and (b) for each such policy the risks insured against, insurer name, policy number, policy dates, occurrence and aggregate coverage limits, retentions and deductible amounts, premium, broker name, and whether the terms of such policy provide for retrospective premium adjustments. All such policies are in full force and effect in accordance with their terms, no notice of cancellation or non-renewal of such policies has been received, there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default thereunder, and all premiums to date with respect to such policies have been paid in full. The Company is a "named insured" or an "insured" under such insurance policies. The Company has not been refused any insurance, nor has its coverage been limited, by any insurance carrier to which it has applied for insurance or with which it has carried insurance during the past two years. Schedule 5.22 also contains a true and accurate description of all outstanding bonds and other surety arrangements issued or entered into by the Company in connection with the Business and the assets and liabilities relating thereto.

5.23.   Accounts Receivable; Accounts Payable; Products.

(a)   Schedule 5.23(a) is an accounts receivable aging report as of April 10, 2011, which accurately reflects all accounts receivable of the Company as of that date. All accounts receivable of the Company:

(i)   arose from bona fide sales transactions in the ordinary course of business and are payable on ordinary trade terms;

(ii)   are legal, valid and binding obligations of the respective debtors enforceable in accordance with their terms;

(iii)   are not subject to any valid set-off or counterclaim; and

(iv)   do not represent obligations for goods sold on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return arrangement.

(b)   Schedule 5.23(b) lists the Company's accounts payable as of April 10, 2011, by name, address and amount. Such Schedule accurately describes the amounts, nature and payment due dates of all the Company's accounts payable as of such date.

(c)   The Company's Inventories, net of reserves, are in good condition, and are usable and of a quantity and quality saleable in the ordinary course of business. The inventories of the Company constitute sufficient quantities for the normal operation of the Business.

- 22 -

5.24.  Brokers' and Finders' Fees.  There are no claims for brokerage commission, finders' fees
or similar compensation in connection with the Transactions based on any arrangement or
agreement made by or on behalf of the Company or Sellers other than the agreement with Creo
Capital Advisors, LLC described on Schedule 5.24.

5.25.  Disclosure.  No representation or warranty by Sellers in this Agreement (as modified by
the Schedules), or in any other agreement contemplated hereby, contains any untrue statement of
a material fact or omits to state a material fact required to be stated herein or therein or necessary
to make such representation and warranty, in light of the circumstances in which it was made,
not misleading.

## 6.  Representations, Warranties and Covenants of Purchaser

Purchaser hereby represents and warrants to Sellers as of the Closing Date as follows:

6.1.  Organization and Standing.  Purchaser is a limited liability company, duly organized,
validly existing and in good standing under the Laws of the State of Delaware with full power
and authority to own, lease, use and operate its properties and to conduct its businesses as and
where now owned, leased, used, operated and conducted.

6.2.  Power and Authority.  Purchaser has all requisite power and authority to enter into this
Agreement and the additional documents required to be delivered by it prior to or at Closing and
to perform its obligations hereunder and thereunder.  The execution and delivery of this
Agreement and the additional documents and the consummation of the transactions contemplated
hereby and thereby have been duly authorized by all necessary limited liability company action
on the part of Purchaser.  This Agreement has been, and each additional document to which
Purchaser is a party will be, duly executed and delivered by Purchaser and assuming the due
authorization, execution and delivery by the other parties to this Agreement and the additional
documents, constitutes the legal, valid and binding obligation of Purchaser enforceable against
Purchaser in accordance with its terms.

6.3.  Conflicts, Consents and Approvals.  Neither the execution and delivery of this Agreement
or any of the Additional Documents to which Purchaser is a party by Purchaser nor the
consummation of the transactions contemplated hereby or thereby will:

> (i)    conflict with, or result in a breach of any provision of, the Organizational
Documents of Purchaser;

> (ii)    violate, or conflict with, or result in a breach of any provision of, or
constitute a default (or an event which, with the giving of notice, the passage of time or
otherwise, would constitute a default) under, or entitle any party (with or without the giving of
notice, the passage of time or otherwise) to terminate, accelerate, modify or call a default under,
or result in the creation of any Lien upon any of the properties or assets of Purchaser under, or
require Purchaser to obtain any consent, permission, waiver or approval from, send any notice to

- 23 -

or pay any penalty, assessment or special payment to any third party or Governmental Entity in connection with, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, contract, undertaking, agreement, lease or other instrument or obligation to which Purchaser is a party;

       (iii)    violate any Order or applicable Law applicable to Purchaser or its properties or assets; or

       (iv)    require any action or consent or approval of, or review by, or registration or filing by Purchaser or any of its Affiliates with, any third party or Governmental Entity.

6.4.    <u>Investment Intent</u>. Purchaser is acquiring the Acquired Interests as principal for its own account for investment purposes only and not with a view to the distribution thereof, without prejudice, however, to Purchaser's right at all times to sell or otherwise dispose of all or any part of the Acquired Interests in compliance with applicable federal and state securities laws.

6.5.    <u>Purchaser's Knowledge</u>. The Purchaser has no knowledge of any facts, events or circumstances that constitute, or are reasonably likely to constitute, a breach of any of the representations and warranties of the Sellers in Section 5 of this Agreement.

6.6.    <u>Discharge of Implied Warranties</u>. The Purchaser has performed extensive due diligence and investigations with respect to the Company and the Sellers with the intention of forming its own conclusions regarding the financial condition, value, property, liabilities, contacts, contingencies, prospects, risks, and other incidents of the Business in response to the parties' express intention and agreement that as of the Closing the sale hereunder shall be without representation or warranty of any kind (express or implied) regarding the Company, except as set forth herein. The Purchaser shall rely solely on its own business judgment and investigations with respect to the Business and the Acquired Interests. The Purchaser expressly acknowledges and agrees that the Company and the Sellers have not provided (and have no obligation in the future to provide) any information regarding the Company or the Sellers or any further representations or warranties (express or implied) to the Purchaser, except as set forth herein.

## 7. <u>Reserved</u>

## 8. <u>Conditions Precedent to Obligations of Purchaser</u>

All obligations of the Purchaser to effect the Closing hereunder are, at the option of the Purchaser, subject to the conditions precedent that, at the Closing:

8.1.    <u>Performance by Sellers</u>. All the terms, covenants, agreements and conditions of this Agreement to be complied with and performed by the Sellers on or before the Closing shall have been complied with and performed in all material respects.

- 24 -

8.2.   Representation and Warranties. The representations and warranties made by the Sellers in this Agreement shall be true and correct in all material respects as of the Closing (except for the representations and warranties that are made with respect to a specific date, which shall be true and correct as of such date).

8.3.   No Actions or Proceedings. No Legal Proceeding shall have been instituted or threatened to restrain, prohibit or invalidate the transactions contemplated by this Agreement or which may adversely affect the Purchaser's right to own, operate or control, after the Closing, a material portion of the assets of the Company or the Business.

8.4.   Documents. The Purchaser shall have received each of the Documents set forth in Section 10.1 in form and substance reasonably satisfactory to it.

8.5.   New Meatco Formation and Contribution. The New Meatco Formation and Contribution shall have been consummated, including the following:

(a)   The effective filing of the Certificate of Formation of New Meatco with the Secretary of State of the State of Delaware in the form attached hereto as Exhibit E;

(b)   The execution of the operating agreement of New Meatco dated as of the Closing Date; and

(c)   The execution, delivery and performance of the New Meatco contribution agreement, dated as of the Closing Date, between the Company and New Meatco, providing for the contribution by the Company to New Meatco of all of the assets and liabilities of the Company, shall have been executed by each of the parties thereto in the form attached hereto as Exhibit F.

8.6.   Closing Date Certificate. Sellers shall have delivered to Purchaser a certificate (the "Certificate of Closing Expenses"), attached hereto as Exhibit G, which sets forth the Estimated Working Capital, the amount of the Closing Date Debt of the Company and the Transaction Expenses as of the Closing Date.

8.7.   Financing. The New Lenders shall have funded the New Loans and New Meatco shall have issued the Seller Note to Meatco..

## 9. Conditions Precedent to Obligations of the Sellers

All obligations of the Sellers to effect the Closing hereunder are, at its option, subject to the conditions precedent that, at the Closing:

9.1.   Performance by the Purchaser. All the terms, covenants, agreements and conditions of this Agreement to be complied with and performed by the Purchaser on or before the Closing shall have been complied with and performed in all material respects.

- 25 -

43

9.2.    Representations and Warranties. The representations and warranties made by the Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (except for the representations and warranties that are made with respect to a specific date, which shall be true and correct as of such date).

9.3.    No Actions or Proceedings. No Legal Proceeding shall have been instituted or threatened to restrain, prohibit or invalidate the transactions contemplated by this Agreement.

9.4.    Purchase Price. The payment of the Purchase Price shall have been made in accordance with Section 4.3.

9.5.    Documents. The Sellers shall have received each of the Documents referred to in Section 10.2 in form and substance reasonably satisfactory to it.

9.6.    Financing. The New Lenders shall have funded the New Loans and New Meatco shall have issued the Seller Note to Meatco.

## 10. Documents to be Delivered at the Closing

10.1.    Documents to be Delivered by the Sellers. At the Closing, the Sellers shall deliver to the Purchaser the following, executed by all parties thereto other than the Purchaser:

(i)    transfer or assignment documentation evidencing the transfer of the Acquired Interests to Purchaser;

(ii)    the Approvals and Consents set forth on Exhibit H attached hereto;

(iii)    the Harouni Employment Agreement in the form attached hereto as Exhibit I;

(iv)    the Bank Payoff Statements;

(v)    a subordination agreement executed by the holder of the Seller Note in the form attached hereto as Exhibit J;

(vi)    a general release of the Company by each Seller in the form attached hereto as Exhibit K; and

(vii)    the New Meatco Operating Agreement executed by the Company and Harouni.

10.2.    Documents to be Delivered by the Purchaser. At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Sellers the following:

(i)    the Purchase Price in the manner described in Section 4.3;

- 26 -

    (ii)    the Seller Note executed by the Purchaser;

    (iii)    the Harouni Employment Agreement; and

    (iv)    the New Meatco Operating Agreement executed by the Purchaser.

## 11. **Survival and Indemnifications**

### 11.1. Survival.

(a)    The representations, warranties, covenants and agreements contained in this Agreement, and in any agreements, certificates or other instruments delivered pursuant to this Agreement, shall survive the Closing and shall remain in full force and effect, subject to all limitations and other provisions contained in this Agreement, solely for purposes of this Section 11, and such representations and warranties shall terminate at the close of business on the date that is eighteen (18) months after the Closing Date, except that (i) the representations and warranties made in Sections 5.2, and 5.4 shall survive indefinitely, and Section 5.19 shall survive for the applicable statute of limitations period, and (ii) any representations and warranties as to which a written claim for indemnification is made on or prior to the end of the survival period specified therefor above shall continue to survive until all claims thereunder are finally determined or settled.  It is the intention of the parties that any claim for indemnification or suit initiated with respect to any representations and warranties that is not asserted by written notice within the survival period specified therefor may not be pursued and shall be and is hereby irrevocably waived after such time.

(b)    All of the covenants or other agreements of the parties contained in this Agreement shall survive until fully performed or fulfilled, unless and to the extent that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance or is otherwise specifically permitted by this Agreement.  No claim for a breach of covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed by or prior to the Closing Date may be made or brought by either party hereto more than eighteen (18) months after the Closing Date, and (ii) by their nature are required to be performed after Closing may be made or brought by either party hereto after the eighteen (18) month anniversary of the last date on which such covenant was required to be performed; provided, however, that any obligation to indemnify and hold harmless shall not terminate with respect to (i) the covenant in Section 11.6 and (ii) any Losses to which the party entitled to indemnification shall have given notice in writing setting forth the specific claim and the basis therefor in reasonable detail to the party from whom indemnification is being sought in accordance with Section 11.4 before the termination of the applicable survival period.

11.2. <u>Indemnification by Sellers and the Company</u>. Subject to the limitations contained in Section 11.5, Sellers and the Company, jointly and severally, hereby agree following the Closing to indemnify and hold harmless Purchaser and Purchaser's Designee (if any) and their respective successors, permitted assigns and Affiliates (and its and their respective directors, officers, employees, agents and representatives) (collectively, "<u>Purchaser Indemnitees</u>") from and against any and all claims, damages, liabilities, fines, liens, losses or other obligations whatsoever, together with costs and expenses, including reasonable fees and disbursements of counsel and expenses of investigation incurred in connection therewith or in connection with the enforcement of the indemnifying party's indemnification obligations hereunder (collectively, "<u>Losses</u>"):

(i)    arising out of, based upon, or caused by the inaccuracy of any representation or the breach of any warranty or covenant of the Sellers or the Company contained in this Agreement or in any agreement, certificate or other instrument delivered by the Sellers pursuant to this Agreement;

(ii)    for (A) all Taxes (or the non-payment thereof) of the Company or New Meatco for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date ("Pre-Closing Tax Period") including any Taxes which arise from or relate to the transactions contemplated by this Agreement, and (B) any and all Taxes of any person (other than Purchaser and its Subsidiaries) imposed on Purchaser or New Meatco as a transferee or successor of the Company, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring on or before the Closing, including the transactions contemplated hereby; or

(iii)    for any amount necessary to satisfy in full all amounts due from the Company or New Meatco to any Lender or for any Transaction Expense of Sellers, the Company or New Meatco, in each case not paid from the Closing proceeds.

11.3. <u>Indemnification by Purchaser</u>.

(a)    Purchaser hereby agrees to indemnify and hold harmless the Sellers and the Company and their respective successors, assigns and Affiliates (and its and their respective directors, officer, employees, agents and representatives) ("<u>Seller Indemnitees</u>") from and against any and all Losses (i) arising out of, based upon or caused by the inaccuracy of any representation or the breach of any warranty, covenant or agreement of the Purchaser contained in this Agreement or in any agreement, certificate or other instrument delivered by the Purchaser pursuant to this Agreement and (ii) for all Income Taxes (or the non-payment thereof) of the Purchaser, New Meatco, any of their or its Subsidiaries or affiliates or members of an Affiliated Group for all taxable periods ending after the Closing Date and the portion following the Closing Date for any taxable period that includes (but does not end on) the Closing Date ("Post-Closing Tax Period"), other than Taxes (i) arising from or relating to the Transactions contemplated hereby, (ii) arising from or relating to such Seller or the Company or any affiliate thereof being a member of New Meatco, or (iii) allocated to such Seller or the Company or any affiliate thereof as a member of New Meatco. For the avoidance of doubt, the Purchaser shall not be obligated to

- 28 -

indemnify such Seller for Losses relating to Income Taxes of New Meatco to the extent that New Meatco has paid such Income Taxes.

(b)    Tax Indemnification.  Notwithstanding the provisions of Section 11.3(a) above, the parties contemplate that the Sellers' income tax liability resulting from the sale of the Acquired Interests by Meatco as contemplated by this Agreement, including the cost to Sellers of any tax imposed on Meatco by Section 23802 of the California Revenue and Taxation Code with respect to such sale, will be substantially the same as though the Sellers had sold the 80.1% of the outstanding shares of capital stock of Meatco to Purchaser (such tax liability being referred to as the "Reference Tax Liability").  If it is finally determined that Sellers' actual tax liability, including the California income tax imposed on Meatco, resulting from such sale and related transactions, exceeds the Reference Tax Liability, Purchaser will pay to Meatco, or to Sellers as they may direct, an additional amount equal to the quotient resulting from dividing the amount of such excess by a fraction, expressed as a decimal, equal to 1 (or 100%) minus the sum of the maximum federal and California income tax rates imposed on Sellers with respect to long-term capital gains in the year that such payment is made.  For purposes of Section 11.4, Sellers shall notify Purchaser promptly after they receive notice of the commencement of any tax audit or examination by the IRS or Franchise Tax Board that could result in a determination subject to this Section 11.3(b).  At any time after such notice is given and before the conclusion of such audit or examination, Sellers may request Purchaser to open an escrow account into which Purchaser will deposit an amount designated by Sellers, but not to exceed four hundred thousand dollars ($400,000), as security for the performance by Purchaser of its obligations under this Section 11.3(b), subject to an escrow agreement to be executed by the parties that will contain commercially reasonable terms.  Purchaser's liability under this Section 11.3(b) shall not exceed $400,000.  The parties agree to cooperate with each other in promptly drafting the terms of such escrow agreement and executing and performing it after it is drafted.  Purchaser shall have the right, at its sole cost and expense, to participate in the defense of any claim or audit by the IRS or the Franchise Tax Board regarding any claim should Seller's or Meatco's tax liability exceed the Reference Amount.

(c)    Notwithstanding the provisions of Section 11.3(a) and (b) above, Purchasers' indemnification obligations do not apply to the extent that any liability for Taxes is caused by a change in law, regulations or published rulings of general application by the relevant taxing authorities after the date hereof.

11.4.    Notice, Etc.  Any party seeking indemnification pursuant to this Agreement shall promptly give the party from whom such indemnification is sought written notice of the matter with respect to which indemnification is being sought (each, a "Claim" and collectively, the "Claims"), which notice shall specify in reasonable detail, if known, the amount or an estimate of the amount of the liability arising therefrom and the basis of the Claim and indemnification obligation.  Such notice shall be a condition precedent to any potential obligation on the part of the indemnifying party to indemnify the indemnified party, but the failure by the indemnified party to give such prompt notice shall not adversely affect the indemnified party's right to indemnification hereunder except, and only to the extent that the defense of that Claim is materially prejudiced by such failure.  With respect to a claim by a third party against an indemnified party, the indemnifying party shall have the right to participate jointly with the indemnified party in the indemnified party's defense, settlement or other disposition of any

- 29 -

Claim. With respect to any such third party claim relating solely to the payment of money damages and which will not result in the indemnified party becoming subject to injunctive or other relief or otherwise adversely affect the business of the indemnified party in any manner, and as to which the indemnifying party shall have acknowledged in writing the obligation to indemnify the indemnified party hereunder, the indemnifying party shall have the sole right to defend, settle or otherwise dispose of such Claim, on such terms as the indemnifying party, in its sole discretion, shall deem appropriate. The indemnifying party shall obtain the written consent of the indemnified party, which shall not be unreasonably withheld, conditioned or delayed, prior to ceasing to defend, settling or otherwise disposing of any Claim, if as a result thereof, the indemnified party would become subject to injunctive or other equitable relief or the business of the indemnified party would be adversely affected in any manner.

11.5.    Limitations.

(a)    Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any statute of limitations, the obligation of the Sellers and the Company to indemnify the Purchaser Indemnitees from and against any Loss arising from the breach of a representation or warranty (other than the breach of a Fundamental Representation or Warranty, which with respect to Sections 5.2 and 5.4 shall survive indefinitely and with respect to Section 5.19 shall survive for the applicable statute of limitations period) shall terminate on the date that is eighteen (18) months after the Closing Date if no notice of Claim shall have been given with respect to such Loss prior to expiration of said period, provided that Claims pending on, or asserted prior to, the expiration of said period shall continue to be indemnified against until all Claims thereunder are finally determined or settled.

(b)    Notwithstanding the foregoing, no claim for indemnification arising from a breach of a representation, warranty or covenant by the Sellers and the Company (other than the covenants contained in Sections 12.3, 12.6 or 12.7 or for the failure of the Sellers and the Company to satisfy all Debt or pay all Transaction Expenses) shall be made by the Sellers or the Company until the Purchaser's Losses for which it is entitled to indemnification hereunder exceeds $300,000 (the "Threshold Amount") in the aggregate at which point the Sellers and the Company shall be liable only for the amount of the Losses in excess of the Threshold Amount, except that the Threshold Amount shall not apply to breaches of Sections 5.2, 5.4, and 5.19 (the "Fundamental Representations and Warranties"). The maximum amount for which Sellers and the Company may be liable for the breach of any representation or warranty, other than the Fundamental Representations and Warranties, shall be $4,500,000, and the maximum amount for which Sellers may be liable for the breach of any Fundamental Representations and Warranties and any indemnification under Section 11.2(ii) shall be the Purchase Price.

(c)    The Purchaser shall not make any claim for indemnification in respect of any matter, including any breach of a representation or warranty, to the extent that such matter is taken into account in the calculation of any adjustment to the Purchase Price pursuant to Section 4.2. Notwithstanding the foregoing, subject to Section 11.5(i), the Purchaser may make a claim for indemnification if and to the extent it suffers Losses related to a breach of representation or warranty above and beyond the amount that would be payable by the Sellers or the Company, if

- 30 -

any, in connection with any adjustment to Purchase Price pursuant to Section 4.2 and such breach relates to the same matter for which the Purchase Price adjustment is being made.

(d)    Notwithstanding anything to the contrary contained herein, other than claims for fraud, the breach by the Sellers and the Company of any representation or warranty set forth under Sections 5.2(a), 5.2(b) or 5.4 or the failure of the Sellers and the Company to satisfy all Debt or pay all Transaction Expenses or comply fully with Section 12.6, any indemnification amounts due to a Purchaser Indemnitee shall first be deducted from and offset against payments due under the Seller Note, and, if and only when the entire principal amount of the Seller Note has been deducted and offset against, second be paid by Sellers and the Company, jointly and severally, within five business days of a final non-appealable determination with respect to such indemnification obligation by a court of competent jurisdiction.

(e)    The Sellers and the Company shall not be required to indemnify any Purchaser Indemnitees and the Purchaser shall not be required to indemnify any Seller Indemnitees to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to result from the bad faith, gross negligence or willful misconduct of the party seeking indemnification.

(f)    The amount of any Losses for which indemnification is provided under this Section 11 shall be net of any amounts actually recovered or recoverable by an indemnified party under insurance policies with respect to such Losses (net of any Taxes or expenses incurred in connection with such recovery). The parties shall use commercially reasonable efforts to recover under insurance policies for any Losses. If a party receives any insurance proceeds or other compensation, with respect to a matter or Claim, after having received any indemnification payment under this Agreement with respect to such matter or Claim, such party will promptly refund to the other party an amount equal to such insurance proceeds less any costs and taxes associated therewith.

(g)    Each party shall take all commercially reasonable steps to mitigate any Losses upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

(h)    From and after the Closing, the sole and exclusive remedy for any breach of any representation or warranty in this Agreement shall be indemnification in accordance with this Section 11. Notwithstanding the foregoing, this Section 11.5(h) shall not operate to (i) interfere with or impede the operation of the provisions of Section 4.2, (ii) prevent any of the parties from bringing an action based upon allegations of fraud by any other party in connection with this Agreement or (iii) limit the rights of the parties to seek equitable remedies.

(i)    Notwithstanding the fact that a party may have the right to assert claims for indemnification under or in respect of more than one provision of this Agreement (including Section 4.2) in respect of any fact, event, condition or circumstance, no party shall be entitled to recover the amount of any Losses suffered by such party more than once, regardless of whether such Losses may be as a result of a breach of more than one representation or warranty or covenant.

- 31 -

(j)      Except for liability resulting from fraud, willful misconduct or intentional omission of a material fact by the Company or the Sellers, and notwithstanding anything contained herein to the contrary, neither party shall be liable under this Agreement for any punitive, exemplary, consequential, incidental, indirect, or special damages of any kind or nature, regardless of the form of action through which such damages are sought.

11.6 Indemnification for Potential Overtime Claims. Sellers have informed the Purchaser that four former drivers (who were terminated by the Company) have brought, or are threatening to bring, a claim against the Company for overtime pay and on November 22, 2010, Jose Pasaye filed a complaint against the Company in California state court, alleging the Company failed to pay him wages for overtime, meal and rest breaks and upon separation and alleging violations of business and professional conduct. (See Pasaye v. Meatco Provisions, Inc. and DOES 1 to 100, Inclusive, Superior Court of the State of California for the County of Los Angeles - Central District Case No.: BC449923). Sellers and the Company hereby, jointly and severally, agree to indemnify and hold harmless the Purchaser and New Meatco from and against any Losses relating to the foregoing claims. None of the limitations contained in Section 11.5 shall apply to the indemnification under this Section, which will be payable in cash; provided however, neither Sellers nor the Company shall be liable for indemnification under this Section 11.6 for amounts in excess of the Purchase Price. The indemnification provided for in this Section 11.6 shall be Purchaser's and New Meatco's sole remedy with respect to the claims expressly described in this Section 11.6

## 12.  Post Closing Covenants

12.1.  Further Assurances.  From and after the Closing, upon request of the Purchaser, the Sellers and the Company shall execute, acknowledge and deliver all such further documents as may be reasonably requested to further evidence the transfer to the Purchaser of good title to, and possession of, the Acquired Interests.

12.2.  Financial Records; Tax Matters.

(a)      Each party hereby agrees that, after Closing, it shall make available to the other all work papers, records and notes of any kind, at all reasonable times, for the purpose of allowing the appropriate party to complete tax returns, respond to audits, obtain refunds, make any determination required under this Agreement to be made by it, verify issues and negotiate settlements with tax authorities or defend or prosecute tax claims.

(b)      After the Closing, the Purchaser shall (i) afford to Sellers, their counsel and accountants, during normal business hours, reasonable access to the books, records and data relating to the Business or assets with respect to the period through the Closing Date, and (ii) cooperate with Sellers, at Sellers' expense, in connection with any fact-finding by or on behalf of Sellers in connection with any claims made against the Company or the Sellers with respect to the period through the Closing Date.

- 32 -

(c)     Purchaser, Company, and Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceedings and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company, Sellers, and Purchaser agree (A) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until expiration of the statute of limitations (and, to the extent notified by Purchaser or Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Company or Sellers, as the case may be, shall allow the other party to take possession of such books and records.

(d)     Purchaser and Sellers further agree, upon request, to use commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

12.3.   Non-Compete; Non-Disclosure.

(a)     Each Seller and Meatco acknowledges and agrees that the transaction contemplated hereby includes the transfer to Purchaser of all of the goodwill related to the Business of the Company. Accordingly, and as a material inducement for Purchaser to acquire the Acquired Interests, each Seller and Meatco agrees that, for a period of the earlier of four (4) years from the Closing, or two (2) years following the cessation of Harouni owning an ownership interest in New Meatco, neither Meatco, any Seller nor any of its or their Affiliates will in any way, directly or indirectly, take away or interfere or attempt to interfere with any custom, trade, business or patronage of New Meatco and its Affiliates relating to the Business within any counties in the State of California in which the Business operates as of the Closing, and will not, without Purchaser's prior written consent, (x) engage in any business, directly or indirectly, that competes with the Business within any counties in the State of California in which the Business operates as of the Closing, (y) solicit for hire any person that worked for the Company within one year of Closing or that worked for New Meatco at anytime thereafter, or (z) sell any Products within a 200 mile radius of Los Angeles or to any of the Company's customers other than on behalf of Purchaser. Notwithstanding the foregoing, the provisions of this Section 12.3(a) shall not apply to Harouni's current businesses of Monarch Trading, LLC and Sahara Halal Foods, LLC.

(b)     Each Seller and the Company further covenant and agree that, from and after the Closing Date, not to disclose or use, in any manner, any confidential information related to the Company or the Business, other than (i) disclosure to their attorneys, accountants, or other professional ("Sellers' Professionals"), provided however, Sellers shall be liable for the disclosure (other than in accordance with (ii) – (iv) below) by such professionals in breach of this

- 33 -

Section 12.3; (ii) as required by Law; (iii) as becomes available generally to the public at no fault of the Sellers; (iv) is required by judicial or administrative process to be disclosed; or (v) in connection with any employment duties with the Purchaser.

(c)     Each Seller further acknowledges that his failure to comply with the provisions of Section 12.3(a) will result in irreparable and continuing damage for which there may not be an adequate remedy at law and that, in the event of a failure to comply, the aggrieved party and their successors, legal representatives and assigns shall be entitled to seek temporary, preliminary and permanent injunctive relief and to such other and further relief as may be proper and necessary to ensure compliance with the provisions of Section 12.3(a) without posting a bond or other undertaking.

12.4.   Key Man Policy.  Harouni shall cooperate with Purchaser as reasonably requested by Purchaser and at Purchaser's sole cost and expense, so Purchaser may apply for a $3 million key man life insurance policy (the "Key Man Policy") on Harouni's life, which would be owned by the Purchaser and name the Company as beneficiary, and which policy shall be assignable by the Company to the New Lenders.

12.5.   Name Change.  Promptly after Closing, the Company shall change its name to a name that does not contain the word "Meatco" or any similar word.

12.6.   Collection of Accounts Receivable and Payment of Outstanding Checks.  Following the Closing, Sellers shall cause the Company to immediately deliver to New Meatco any amounts collected for accounts receivable or other payments made to the Company after the Closing.  In addition, Sellers shall cause the Company to pay all outstanding checks and other payments made by the Company prior to Closing.

12.7.   Post-Closing Consents. The Company and Sellers shall, within 60 days of the Closing, obtain and deliver to New Meatco and Purchaser, all Approvals and Consents listed on the Sellers' Disclosure Schedules or otherwise required to be delivered by Sellers under this Agreement, which have not obtained and delivered as of Closing.

## 13.  Miscellaneous

13.1.   Amendments and Waivers.  This Agreement may be modified or amended only by written instrument signed by each of the parties hereto.

13.2.   Transferability.

(a)     The respective rights and obligations of each party hereto shall not be assignable by such party without the prior written consent of the other parties hereto, except that the Purchaser may assign its right to purchase the Acquired Interests to any Affiliate of the Purchaser, provided that the Purchaser shall remain liable for all of Purchaser's obligations hereunder; and further provided Purchaser may assign its rights hereunder to the New Lenders as collateral security for the loans being made to finance the transactions contemplated hereby.

- 34 -

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assignees. Nothing herein expressed or implied is intended to confer upon any person, other than the parties hereto and their respective successors and permitted assignees, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

13.3.    Notices. Any notice, request or other document to be given hereunder to a party hereto shall be in writing and delivered in person or sent by registered or certified mail, postage prepaid, or by Federal Express (priority service), and by telephone facsimile transmission ("fax") confirmed by telephone, or via email as follows:

- 35 -

If to Purchaser, addressed to it at:

Alexander P. Coleman
Annex Capital Advisors, LLC
350 So. County Rd., Ste. 102-120
Palm Beach, FL 33480
Fax:    (212) 554-5808
Email: acoleman@annexcapital.com

with a copy to:

Robert W. Forman, Esq.
Shapiro Forman Allen & Sava LLP
380 Madison Avenue
New York, NY 10017
Fax:    (212) 883-1941
Email: forman@sfa-law.com

If to Sellers:

Morad Harouni
356 22nd Street
Santa Monica, CA  90402
Fax: (323) 581-9899
Email:  meatco@aol.com

and

The Avisar Family Trust dated September 12, 2000

4155 Dixie Canyon Ave.
Sherman Oaks, CA 91423-4337
Email: eytan.avisar@gmail.com

with a copy to (which shall not constitute notice):

Mark J. Kelson, Esq.
Greenberg Traurig, LLP
2450 Colorado Ave., Suite 400E
Santa Monica, CA 90404
Fax:  (310) 586-0556
Email: kelsonm@gtlaw.com

Any party hereto may change its address for receiving notices, requests and other
documents by giving written notice of such change to the other parties.

- 36 -

54

13.4.   Specific Performance.  Each party hereto acknowledges and agrees that the subject matter of this Agreement is unique and that the other party(ies) would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached, and that remedies at law would be inadequate to compensate such damaged party.  Accordingly, any damaged party will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to seek specific enforcement of this Agreement and the terms and provisions hereof, in addition to any other remedy at law or in equity.  Each party waives any defense that a remedy at law is adequate and any requirement to post bond or provide similar security in connection with actions instituted for injunctive relief or specific performance of this Agreement.

13.5.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  Each party agrees to the exclusive jurisdiction and venue of any federal or state court in the City of Los Angeles and the State of California with respect to any dispute arising under or related to this Agreement.

13.6.   Partial Invalidity.  In the event that any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

13.7.   Section Headings.  The section headings and table of contents contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

13.8.   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

13.9.   Entire Agreement.  This Agreement, together with the Schedules and Exhibits and the agreements and instruments delivered pursuant hereto, contains the entire agreement between the parties, and supersede all prior agreements and understanding between them relating to the subject matter hereof.

13.10.  Confidentiality.  Prior to the Closing Date, and at all times thereafter if the transactions contemplated herein are not consummated, the Purchaser agrees to keep secret all confidential information regarding the Company which it has received from the Sellers during or prior to the negotiation of this Agreement or its investigation of the Company.  The Purchaser agrees not to use any of such confidential information in the conduct of its business or any business controlled by it or otherwise and, if this Agreement is terminated for any reason prior to the Closing Date, the Purchaser agrees to deliver to the Sellers, upon the Sellers' request, all memoranda, notes records, agreements, reports and other documents, and any copies thereof, relating to the Company or the Sellers, which the Purchaser may then possess or have under its control.

- 37 -

13.11. <u>Expenses</u>. Each party shall bear its own costs and expenses in connection with the negotiation, execution and consummation of this Agreement and the transaction contemplated hereby except that in the event of any dispute hereunder the prevailing party shall be entitled to an award of its reasonable legal fees and expenses incurred in enforcing its rights hereunder.

13.12. <u>Conflicts of Counsel</u>. The fact that Greenberg Traurig, LLP ("GT") may have acted as counsel to the Company and/or each of the Sellers shall not be asserted by the Purchaser to be a conflict preventing or limiting GT from representing in any respect any or all of the Sellers after Closing.

\* \* \*

- 38 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on and as of the day and year first above written.

SELLERS:

_____
Morad Harouni

THE AVISAR FAMILY TRUST

_____
Eytan Avisar, Trustee

_____
Susan Avisar, Trustee

COMPANY:

MEATCO PROVISIONS, INC.

By: _____
Name: _____
Title: CEO

PURCHASER:

MEATCO ACQUISITION COMPANY, LLC
By: Annex Capital Advisors, LLC

By _____
Name: Alexander P. Coleman
Title: Managing Member

Signature Page to Interest Purchase Agreement

57

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on and as of the day and year first above written.

SELLERS:

_____
Morad Harouni

THE AVISAR FAMILY TRUST

_____
Eytan Avisar, Trustee

_____
Susan Avisar, Trustee

COMPANY:                        MEATCO PROVISIONS, INC.

By: _____
Name:
Title:

PURCHASER:                      MEATCO ACQUISITION COMPANY, LLC
                                By: Annex Capital Advisors, LLC

By _____
Name: Alexander P. Coleman
Title:  Managing Member

Signature Page to Interest Purchase Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on and as of the day and year first above written.

SELLERS:

_____
Morad Harouni

THE AVISAR FAMILY TRUST

_____
Eytan Avisar, Trustee

_____
Susan Avisar, Trustee

COMPANY:

MEATCO PROVISIONS, INC.

By: _____
Name:
Title:

PURCHASER:

MEATCO ACQUISITION COMPANY, LLC
By: Annex Capital Advisors, LLC

By _____
Name: Alexander P. Coleman
Title: Managing Member

Signature Page to Interest Purchase Agreement

**NEW MEATCO PROVISIONS, LLC**

SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

**April 20, 2012**

**EXHIBIT "2"**

**NEW MEATCO PROVISIONS, LLC**
**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

## TABLE OF CONTENTS

ARTICLE I. ORGANIZATION AND POWERS..................................................................1

    Section 1.01    Organization.................................................................1

    Section 1.02    Purposes and Powers......................................................1

    Section 1.03    Principal Place of Business ...............................................1

    Section 1.04    Fiscal Year ...............................................................1

    Section 1.05    Qualification in Other Jurisdictions .......................................2

    Section 1.06    Tax Matters Partner.......................................................2

    Section 1.07    Taxation as Partnership...................................................2

    Section 1.08    Limited Liability Company Interests; Units................................2

    Section 1.09    Tax Treatment............................................................2

ARTICLE II. MEMBERS....................................................................................3

    Section 2.01    Members..................................................................3

    Section 2.02    Admission of Additional Members ........................................3

    Section 2.03    Meetings of Members. ....................................................3

    Section 2.04    Action Without a Meeting.................................................3

    Section 2.05    Voting Rights ............................................................4

    Section 2.06    Limitation of Liability of Members.. ......................................4

    Section 2.07    Authority ................................................................4

    Section 2.08    No Right to Withdraw.....................................................4

    Section 2.09    Rights and Privileges of Classes of Units .................................5

    Section 2.10    Pledge of Units...........................................................5

    Section 2.11    Rights to Information .....................................................5

ARTICLE III. BOARD OF DIRECTORS....................................................................6

    Section 3.01    Directors.................................................................6

    Section 3.02    Powers of the Directors....................................................8

    Section 3.03    Resignation of Directors ..................................................8

    Section 3.04    Liability of Directors......................................................8

ARTICLE IV. OFFICERS ..................................................................................9

    Section 4.01    Number; Titles; Election; Term; Qualification ............................9

    Section 4.02    Removal .................................................................9

i

Section 4.03    Vacancies ............................................................................9

Section 4.04    Authority ............................................................................9

Section 4.05    Compensation........................................................................9

Section 4.06    Chairman .............................................................................9

Section 4.07    President .............................................................................9

Section 4.08    Other Officers.......................................................................9

Section 4.09    Expenses..............................................................................9

Section 4.10    Indemnification. ....................................................................9

ARTICLE V. CAPITAL ACCOUNTS; CONTRIBUTIONS....................................10

Section 5.01    Capital Accounts ..................................................................10

Section 5.02    Contributions.......................................................................11

ARTICLE VI. DISTRIBUTIONS AND ALLOCATIONS ......................................11

Section 6.01    Distribution of Company Funds..................................................11

Section 6.02    Distributions........................................................................11

Section 6.03    Distribution of Assets in Kind....................................................11

Section 6.04    Allocation of Profits and Losses .................................................12

Section 6.05    Special Allocations.................................................................13

Section 6.06    Tax Allocations .....................................................................13

Section 6.07    Other Allocation Provisions ......................................................14

Section 6.08    Tax Distributions...................................................................14

Section 6.09    Withholding..........................................................................14

ARTICLE VII. DISSOLUTION, LIQUIDATION, AND TERMINATION.......................15

Section 7.01    Dissolution ..........................................................................15

Section 7.02    Notice of Dissolution ..............................................................15

Section 7.03    Liquidation ..........................................................................15

Section 7.04    Certificate of Cancellation ........................................................15

ARTICLE VIII. INCENTIVE UNITS .............................................................16

ARTICLE IX. TRANSFERS OF INTERESTS ....................................................16

Section 9.01    General Restrictions on Transfer.................................................16

Section 9.02    Involuntary Transfers..............................................................17

Section 9.03    Requirements for Transfer ........................................................18

Section 9.04    Effect of Transfer ..................................................................18

Section 9.05    Prohibited Transfers ...............................................................19

Section 9.06    Preemptive Right...................................................................19

ii

ARTICLE X. TAG ALONG RIGHTS ................................................................20

    Section 10.01  Tag-Along Rights Generally .......................................................20

    Section 10.02  Allocation of Tag-Along Units ...................................................20

    Section 10.03  Transfer Mechanics ...................................................................21

    Section 10.04  Transfers to Third Parties after Members Decline Tag-Along Rights ..............21

    Section 10.05  Exceptions to Tag-Along Rights ................................................22

ARTICLE XI. RIGHT TO COMPEL SALE .......................................................22

    Section 11.01  Rights to Compel Sale Generally ..............................................22

    Section 11.02  Compelled Sale Pursuant to a Sale of Units ...............................22

    Section 11.03  Compelled Sale Other Than Pursuant to a Sale of Units ..............23

    Section 11.04  Cooperation in Connection with Compelled Sale .......................24

    Section 11.05  Notice of Consummation of Compelled Sale ..............................24

ARTICLE XII. CONFLICTS OF INTEREST ......................................................24

    Section 12.01  Transactions with Interested Persons .........................................24

ARTICLE XIII. GENERAL PROVISIONS .........................................................24

    Section 13.01  Notices .....................................................................................24

    Section 13.02  Entire Agreement ....................................................................24

    Section 13.03  Successors; Assigns; Amendments ...........................................25

    Section 13.04  Defaults; No Circumvention of Agreement ...............................25

    Section 13.05  Further Assurances; Certificates ...............................................25

    Section 13.06  Waiver of Certain Rights .........................................................25

    Section 13.07  Notice to Members of Provisions of this Agreement ..................25

    Section 13.08  Interpretation ...........................................................................25

    Section 13.09  Counterparts .............................................................................26

    Section 13.10  Governing Law; Severability ....................................................26

    Section 13.11  Definitions ...............................................................................26

    Section 13.12  Confidentiality .........................................................................29

# NEW MEATCO PROVISIONS, LLC
## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

This Second Amended and Restated Limited Liability Company Agreement is being entered into as of April 20, 2011, by New Meatco Provisions, LLC (the "Company") and the Persons listed as Members on Exhibit A attached hereto (such entities and their respective successors in interest and such persons who may join this Agreement in the future being hereinafter referred to individually as a "Member" or collectively as the "Members"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in Section 14.11.

Prior to April 18, 2011, Meatco Provisions, Inc. ("Old Meatco") formed the Company as a limited liability company under the laws of the state of Delaware and contributed all of the assets and liabilities of Old Meatco to the Company in exchange for 100% of the membership interests of the Company.

On April 18, 2011, Meatco Acquisition Company, LLC ("MAC LLC") purchased and acquired from Old Meatco 80.10% of the membership interests of the Company pursuant to the terms and conditions of the Membership Interest Purchase Agreement (the "Purchase Agreement"), dated as of April 18, 2011, among MAC LLC, Old Meatco, Morad Harouni ("Harouni") and the Avisar Family Trust ("Avisar").

On April 18, 2011, the Company and the Members entered into an Amended and Restated Limited Liability Company Agreement;

The Company and the Members now wish to enter into this Agreement in order to create a class of Preferred Units on the terms and conditions set forth herein, and to set forth the rights and obligations of the Members, to perfect the organization of the Company and to reflect the understandings among all of the Members with respect to the Company's organization, operation and management.

In consideration of the mutual covenants expressed herein, the parties hereby agree as follows:

## ARTICLE I. ORGANIZATION AND POWERS

1.01    Organization. The Company has been formed by the filing of its Certificate of Formation with the Delaware Secretary of State pursuant to the Act on March 11, 2011.

1.02    Purposes and Powers. The Company has been formed for the purpose of engaging in any business not prohibited under the Act. The Company shall possess and may exercise all of the powers and privileges granted by the Act

1.03    Principal Place of Business. The principal office and place of business of the Company shall be 4901 State Street, Vernon, CA 90058-3016.

1.04    Fiscal Year. Except as otherwise required by the Internal Revenue Code of 1986, as amended (the "Code"), the fiscal year of the Company shall end on December 31 in each year.

1

1.05     Qualification in Other Jurisdictions.  The Board shall cause the Company to be qualified or registered under the applicable laws of any jurisdiction in which the Company transacts business and is required to be so qualified or registered.

1.06     Tax Matters Partner.  MAC LLC shall be the "Tax Matters Partner" ("TMP") of the Company under Section 6231 of the Code and the Treasury Regulations thereunder.  Each Member hereby consents to such designation and agrees that upon the request of the Company it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.  Notwithstanding the foregoing, (a) the TMP will give Old Meatco prior notice of all telephonic or other meetings with the Internal Revenue Service or any state taxing authority, (b) Old Meatco shall have the right to attend such meetings, (c) the TMP shall not make any election or decision under the Code or make any statement, filing or agreement with the Internal Revenue Service or any state taxing authority without the prior approval of the Board, (d) in any proceeding the TMP shall promptly take such action as may be necessary to cause each of the other Members to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code (or similar provision of state tax law), and (e) in any proceeding the TMP shall furnish to the other Members a copy of all notices or other written communications received by the TMP from the Internal Revenue Service (except such notices or communications that are sent directly to the Members).

1.07     Taxation as Partnership.  The Company has been formed so as to qualify and shall be treated as a partnership for United States federal and state income tax purposes concurrently with MAC LLC's purchase of the membership interest from Old Meatco and the Members agree not to take any action inconsistent with the Company's classification as a partnership for United States federal and state income tax purposes.

1.08     Limited Liability Company Interests; Units.  The limited liability company interests (as defined in the Act) of the Company shall be expressed in units of ownership ("Units"), with the aggregate number of such units outstanding at any particular time representing the entire ownership interests of all Members in the Company.

1.09     Tax Treatment.  The Members acknowledge and agree that the purchase by MAC LLC of 80.10% of the membership interests of the Company from Old Meatco will be treated for federal and state income tax purposes as a purchase by MAC LLC (following the New Meatco Formation and Contribution (as defined in the Purchase Agreement), or by the Company in connection with the distribution or deemed distribution of the debt-financed portion of the purchase price to Old Meatco following the Deemed Contribution (defined below)) of assets of Old Meatco, subject to a *pro rata* share of the liabilities encumbering such assets, or assumed in connection with the formation of the Company with respect to such distribution, or deemed distribution, followed by a contribution (the "Deemed Contribution") of such purchased assets by MAC LLC to the Company (which is treated as a new partnership for tax purposes), subject to such liabilities, and a contribution to the Company by Old Meatco, of any assets not so purchased, subject to any such liabilities so assumed.

## ARTICLE II. MEMBERS

2.01    Members.  The names of the Members of the Company, their addresses, the number of Units held by each Member and the Percentage Interest of each Member are listed on Exhibit A.  Such Exhibit shall be amended from time to time by the Secretary to reflect (a) the withdrawal of Members or the admission of additional Members pursuant to this Agreement and (b) any changes in the number of Units owned by any Member (and corresponding Percentage Interest) after the date hereof.  The Secretary shall notify the Members of changes in Exhibit A, which shall constitute the record list of the Members for all purposes of this Agreement.

2.02    Admission of Additional Members.  With the consent of the Board, and subject to the provisions of Article IX, additional persons may be admitted to the Company as Members and may participate in the profits, losses, distributions and capital of the Company upon such terms as set forth herein.  New Members shall be admitted at the time when all conditions to their admission have been satisfied, as determined by the Board; provided, however, that any Permitted Transferee shall be automatically admitted as a new Member upon such Permitted Transferee's compliance with Section 9.03.

2.03    Meetings of Members.

(a)    Meetings of Members may be called for any proper purpose at any time by the Board or the Members holding at least 15% of the Units entitled to vote.  The Secretary, acting on behalf of the Board, or the Members calling the meeting, shall determine the date, time, place and purpose of each meeting of Members, and written notice thereof shall be given by the Secretary to each Member not less than ten days nor more than 60 days prior to the date of the meeting.  Notice shall be sent to Members of record on the date when the meeting is called.  The business of each meeting of Members shall be limited to the purposes described in the notice.  A written waiver of notice, executed before or after a meeting by a Member or its authorized attorney and delivered to the Secretary shall be deemed equivalent to notice of the meeting.

(b)    Members holding a majority of the outstanding Units entitled to vote shall constitute a quorum for the transaction of any business at a meeting of Members.  Members may attend a meeting in person or by proxy.  Members may also participate in a meeting by means of conference telephone or similar communications equipment that permits all Members present to hear each other.  If less than a quorum of the Members is present, the meeting may be adjourned by the Chairman to a later date, time and place, and the meeting may be held as adjourned without further notice.  When an adjourned meeting is reconvened, any business may be transacted that may have been transacted at the meeting as originally called.

(c)    The Chairman, or such other person designated by the Board, shall determine the order of business and the procedures to be followed at each meeting of Members.

2.04    Action Without a Meeting.  Any action required or permitted to be taken at any meeting of Members may be taken without a meeting if one or more written consents to such action is signed by the holders of the number of the Units required to approve the action being taken; provided that notice of such proposed action is provided to all Members at least two (2) business days prior to the taking of any such action; and provided further, however, that the Company shall immediately provide an executed copy of such written consent to any non-executing Member.

3

2.05    Voting Rights. Except as otherwise provided herein, each Unit that is not an Incentive Unit shall be entitled to one vote on all matters for which such Unit is entitled to vote. Notwithstanding any other term of this Agreement to the contrary, Holders of Incentive Units shall have no right to vote on any matter and shall hold only a non-voting, equity interest in the Company. Subject to the provisions of Article XIII and unless otherwise prohibited by law or by other express provisions of this Agreement, the Members may act on matters in which they have an interest notwithstanding such interest. Unless otherwise required by the Act or provided expressly in this Agreement, all actions, approvals and consents to be taken or given by the Members under the Act, this Agreement or otherwise shall require the affirmative vote or written consent of Members holding a majority of the outstanding Units entitled to vote; provided that, the following matters shall require the affirmative vote or written consent of Members holding not less than two-thirds of the outstanding voting Units:

(a)    The establishment of different classes of Members or Units;

(b)    The redemption or exchange of any Units or the conversion of the Units into indebtedness of the Company;

(c)    An alteration of the primary purpose or business of the Company as set forth in this Agreement; and

(d)    The filing of a bankruptcy petition on behalf of the Company.

2.06    Limitation of Liability of Members. Except as otherwise provided in the Act, no Member of the Company shall be obligated personally for any debt, obligation, expense, encumbrance or liability of or against the Company, its assets or of any other Member, whether arising in contract, tort or otherwise. No Member shall be required to lend any funds to the Company. Except as otherwise provided in the Act, by law or expressly in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company, and no Member shall be liable to the Company or any other Member for acting in good faith reliance upon the provisions of this Agreement. No Member shall have any responsibility to restore any negative balance in its Capital Account or to contribute to or in respect of the liabilities or obligations of the Company or return distributions made by the Company except as required by the Act or other applicable law. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for making its Members responsible for the liabilities of the Company. The Company shall indemnify and hold harmless each of the Members and their respective officers, employees, directors, stockholders, members, partners, agents and other Affiliates acting with due authority on behalf of the Company pursuant to the terms of this Agreement from and against any claim by any third party against such Member or such other Person, except to the extent such damages arise from actions of such Member or such other Person that constitute willful misconduct or fraud on the part of such Member or such other Person.

2.07    Authority. Unless specifically authorized by the Board, no Member shall be an agent of the Company or have any right, power or authority to act for or to bind the Company or to undertake or assume any obligation or responsibility of the Company or of any other Member.

2.08    No Right to Withdraw. No Member shall have any right to resign or withdraw from the Company, other than as a result of transferring all of such Member's Units in compliance with the terms hereof, without the prior written consent of the other Members. No Member shall have any right to receive any distribution or the repayment of its Contribution, except as provided in Articles VI, VII, IX or XII.

4

2.09    <u>Rights and Privileges of Classes of Units</u>. There is hereby created a class of Units designated as the "Preferred Units." There shall be 4,800 Preferred Units, each with an original cost of $1,000. Each Preferred Unit shall be identical to all other Preferred Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of a Preferred Unit as set forth herein. The Preferred Units are not entitled to vote at a meeting of the Members.

2.10    <u>Pledge of Units</u>.

(a)    Notwithstanding any other provisions in this Agreement, each Member shall be entitled to pledge, and otherwise grant a lien and security interest in and to, its Units and/or all of its right, title and/or interest under this Agreement in favor of the Company's lenders (or an agent on behalf of such lenders) without any further consents, approvals and/or actions required by such lenders (or agent), any Member, the Company and/or any other person under this Agreement or otherwise. So long as any such pledge of, or security interest in, each Member's Units is in effect, no consent of the Company and/or any Member shall be required to permit a pledgee thereof or any purchaser of any Member's Units from such pledge to be substituted for such Member under this Agreement upon the exercise of such pledgee's rights with respect to such Units, and such substituted member shall have all rights and powers as such Member under this Agreement, including, without limitation, all voting rights under this Agreement. So long as any pledge of any Units is in effect, this provision shall inure to the benefit of such pledgee and its successors, assigns and/or designated agents, as an intended third-party beneficiary, and no amendment, modification or waiver of, or consent with respect to this provision shall in any event be effective without the prior written consent of such pledgee.

(b)    The Company hereby irrevocably elects that all Units in the Company shall constitute securities within the meaning of and governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction. The Company shall cause each Member's Units to be evidenced by a certificate issued by the Company to such Member (a "<u>Unit Certificate</u>"), and, so long as any pledge of any Units is in effect, each such Unit Certificate shall bear the following legend: "This certificate evidences an interest in New Meatco Provisions, LLC and constitutes a security within the meaning of and governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and, to the extent permitted by applicable law, each other applicable jurisdiction". So long as any pledge of any Units is in effect, this Section 2.10(b) shall not be amended and any purported amendment to this provision shall not take effect until all outstanding Unit Certificates have been surrendered for cancellation

2.11    <u>Rights to Information</u>.

(a)    Members shall have the right to receive from the Chairman upon request a copy of the Certificate and of this Agreement, as amended from time to time, and such other information regarding the Company as is required by the Act, subject to Section 13.12. Subject to Section 13.12, the Company shall provide to each Member and its representatives reasonable access to the books and records of the Company and its Subsidiaries, following the Company's receipt of a written notice from such Member requesting such access.

(b)    The Company shall furnish to the Members copies of any financial statements or other reports the Company is required from time to time to furnish to its lending institutions.

5

## ARTICLE III. BOARD OF DIRECTORS

3.01    Directors.

(a)     The management of the Company's business shall be vested in the Board and in such committees of Directors as the Board may from time to time establish. The Board shall initially consist of five (5) Directors. The initial members of the Board (individually, a "Director" and collectively, the "Directors") of the Company are set forth on Exhibit B attached hereto. For so long as MAC LLC owns 50.1% or more of the voting Units of the Company (collectively, the "MAC LLC Units") it may, at its reasonable discretion, (and following reasonable consultation with Old Meatco) be entitled to appoint four (4) Directors to the Board (the "MAC LLC Nominees" and each a "MAC LLC Nominee"). For so long as Old Meatco or any Affiliate thereof retains at least 10% of the voting Units of the Company, Old Meatco shall be entitled to appoint one (1) Director to the Board (the "Old Meatco Nominee"). In the event that the number of Units held by MAC LLC falls below the MAC Ownership Threshold, it shall be entitled to appoint such number of directors as is equal to the number of directors (rounded to the nearest whole number) constituting the entire board multiplied by the percentage of voting Units it owns. The size of the board may be expanded by Board action provided that the number of directors which either Old Meatco or MAC LLC shall not be reduced if they maintain the minimum percentages set forth above. The Board shall determine how any additional board seats created by such expansion are appointed.

(b)     Subject to the provisions of this Section 3.01(b), from and after the date hereof, each of the Members shall vote its voting Units at each regular or special meeting of the Members (or in any written consent executed in lieu of such a meeting of Members) called for the purpose of filling positions on the Board and shall take all actions reasonably necessary to ensure that the Board remains comprised of the number of MAC LLC Nominees and Old Meatco Nominees set forth in Section 3.01(a) above.

(c)     To effectuate the provisions of this Section 3.01, the Secretary of the Company, or if there be no Secretary such other officer of the Company as the Board may appoint to fulfill the duties of Secretary, shall not record, and the Company shall not give effect to, any vote or consent contrary to, or inconsistent with, the terms of this Section 3.01.

(d)     If, prior to his election to the Board pursuant to this Section 3.01, any Nominee shall be unable or unwilling to serve as a Director, the Member or Members who nominated any such Nominee shall be entitled to nominate a replacement, who shall then be a Nominee for purposes of this Section 3.01. If, following election to the Board pursuant to this Section 3.01, any Nominee shall resign, die or be removed or be unable to serve for any reason prior to the expiration of his or her term as a Director, the Member or Members who nominated such Nominee shall within 30 days of such event, notify the Board in writing of a replacement Nominee, and all Members shall vote their Units, at any regular or special meeting called for the purpose of filling positions on the Board, or in any written consent executed in lieu of such a meeting of Members, and shall take all actions necessary, to ensure the election to the Board of such replacement Nominee to fill the unexpired term of the Nominee whom such new Nominee is replacing; provided that no person may be selected by a Member or group of Members as a Nominee if such person previously served as a Director and was previously removed for Cause in accordance with clause (f) of this Section 3.01. If a Member or Members shall fail to so notify the Board of a replacement Nominee in accordance with this clause (c) within a reasonable time, the Board may, in the event that there is an insufficient number of Directors to constitute a quorum or otherwise conduct any business before the Board, nominate any other person to fill the vacancy until the Members entitled to fill such vacancy nominate a replacement.

6

(e)     Each Member hereby agrees to use such Member's reasonable efforts to call, or cause the appropriate officers and Directors to call, a special meeting of Members and to vote all of the Units owned or held of record by such Member for, or to take all actions by written consent in lieu of any such meeting necessary to cause, the removal (with or without Cause) of any Director if the Persons designating such Director pursuant to this Section 3.01 request, in writing, his removal for any reason (with or without Cause (as set forth in clause (f) of this Section 3.01) notwithstanding the provisions of Section 3.01(f)). Except for any action taken in accordance with the previous sentence of this Section 3.01 or with respect to the removal of a Director for Cause, each Member further agrees to take no action, whether by voting of Units or otherwise, with respect to the removal of any Director that was not designated by such Member pursuant to this Section 3.01.

(f)     In order to effectuate the provisions of this Section 3.01, each Member hereby agrees that when any action or vote is required to be taken by such Member pursuant to this Agreement, such Member shall use all reasonable efforts to call, or cause the appropriate officers and Directors of the Company to call, a special or annual meeting of the Members of the Company, as the case may be, or execute or cause to be executed a consent in writing in lieu of any such meetings to effectuate such member action.

(g)     Each Member hereby agrees that, subject to the requirements of applicable law, no Director shall be removed without Cause (except as provided in Section 3.01(d) hereof). "Cause" shall mean (i) the commission of an act of fraud or embezzlement against the Company or any of its Subsidiaries, (ii) the breach, violation or failure to comply in any material respect with the terms and conditions of any agreement between such Director and the Company, provided, such breach, violation or failure to comply remains uncured for a period of at least 30 days after receipt by such Director of written notice thereof, but only to the extent that such breach, violation or failure to comply is curable by its nature, or (iii) any conviction or guilty plea for a felony (or a plea of nolo contendere thereto).

(h)     Except as expressly provided herein with respect to the appointment of officers, a Director may not delegate his right to manage the business and affairs of the Company to any other person; provided, however, that such limitation shall not affect the ability of the Company to hire employees and retain legal, accounting, financial and other advisors, consultants, agents and representatives as the Board may deem necessary or appropriate from time to time.

(i)     Each Director shall be entitled to one vote.

(j)     An action, proposal or resolution shall be approved and adopted by the Board or a committee thereof only if it has received the affirmative vote of a majority of the total number of votes held by all the Directors or those comprising such committee, as the case may be; provided that, the following matters shall require the affirmative vote of at least two-thirds of the total number of votes held by the Directors voting on such matters:

(i)     The sale or disposition of all or substantially all of the business or assets of the Company as part of a single transaction or a series of transactions;

(ii)     The merger of the Company with another limited liability company, corporation or other entity;

(iii)     The acquisition of another business (whether through the acquisition of stock, equity interests, assets or otherwise) for aggregate consideration in excess of $1,000,000; and

7

(iv)    The sale or issuance of any Units or other interests in the Company by the Company to any Person, other than pursuant to Article VIII.

(k)    The Board and any committee thereof may hold meetings, both regular and special, either within or without the State of Delaware. Regular meetings of the Board or any committee thereof may be held with notice at such time and at such place as may from time to time be determined by the Board or such committee. Special meetings of the Board may be called by the Chairman or by any Director. Notice of regular and special meetings stating the place, date and hour of the meeting shall be given to each Director either by mail, telephone or facsimile not less than 48 hours before the date of the meeting.

(l)    At all meetings of the Board, or any committee thereof, a majority of the Directors, or members of such committee, shall constitute a quorum for the transaction of business.

(m)    Directors shall be afforded the opportunity to participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection (l) shall constitute presence in person at such meeting.

3.02    Powers of the Directors.

(a)    The Board shall have the right and authority to take all actions that the Directors deem necessary, useful or appropriate for the management and conduct of the Company's business. The Directors may delegate any or all such duties to the officers of the Company.

(b)    The Board may exercise all powers of the Company and do all such lawful acts and things as are not by the Act or this Agreement directed or required to be exercised or done by the Members, including without limitation, the power to enter into a contract to sell all or substantially all of the assets of the Company.

3.03    Resignation of Directors. A Director may resign from his position as a Director by notice to the Members. Such resignation shall be effective as set forth in such notice.

3.04    Liability of Directors. To the extent that, at law or in equity, a Director has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, a Director acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement. In exercising his or her rights and performing his or her duties under this Agreement, each Director is entitled to rely (unless he or she has knowledge concerning the matter in question that would cause such reliance to be unwarranted) on information, opinions, reports or statements of one or more employees or other agents of the Company whom such Director reasonably believes to be reliable and competent in the matters presented, or any attorney, accountant or other person as to matters that the Director reasonably believes to be within such person's professional or expert competence. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Director otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Director. No amendment or repeal of this Section 3.04 shall adversely affect the rights and protection afforded to a Director under this Section 3.04 for acts or omissions occurring prior to such amendment or repeal.

8

## ARTICLE IV. OFFICERS

4.01    Number; Titles; Election; Term; Qualification. The Board may appoint officers of the Company. The officers of the Company shall be a Chairman, a President, one or more Vice Presidents (and, in the case of each vice president, such descriptive title, if any, as the Board shall determine), a Chief Financial Officer and a Secretary. The Company may also have a controller, one or more assistant controllers, one or more assistant secretaries and such other officers and such agents as the Board may from time to time appoint. The initial officers of the Company are set forth on Exhibit C hereto. Each officer and agent shall hold office for the term for which he or she is elected or appointed and until his or her successor has been elected or appointed and qualified or until his or her earlier resignation or removal in accordance with this Agreement. Any two or more offices may be held by the same person, except the offices of President and Secretary.

4.02    Removal. Any officer or agent may be removed by the Board whenever in their judgment the best interests of the Company and the Members will be served thereby, subject to any contract rights of such person. Election or appointment of any officer or agent shall not of itself create contract rights.

4.03    Vacancies. Any vacancy occurring in any office may be filled by the Board.

4.04    Authority. Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Directors.

4.05    Compensation. The compensation, if any, of officers and agents shall be fixed from time to time by the Board or a committee established by the Board; provided, that the Board may by resolution delegate to any one or more officers of the Company the authority to fix compensation for employees other than the officers.

4.06    Chairman. The Chairman shall preside at all meetings of the Board and of the Members with such duties and responsibilities as are commensurate with such position.

4.07    President. The President shall have such duties and responsibilities as are commensurate with such position and as from time to time may be assigned by the Board and which are consistent with such officer's employment agreement with the Company, if any.

4.08    Other Officers. Any other officers appointed shall perform such duties and have such powers as from time to time may be assigned to them by the Board or the President.

4.09    Expenses. The Company shall reimburse the Directors and the officers for expenses reasonably incurred in attending meetings of the Board.

4.10    Indemnification.

(a)    The Company shall defend, indemnify, and save harmless the Directors and the officers of the Company (each an "Indemnified Person") for all loss, liability, damage, cost, or expense (including reasonable attorneys' fees) incurred by reason of any demands, claims, suits, actions, or proceedings arising out of (i) the Indemnified Person's relationship to the Company or (ii) such Indemnified Person's capacity as a Director or officer, except for such loss, liability, damage, cost, or expense as arises out of the theft, fraud, willful misconduct, or gross negligence by such Indemnified Person. Expenses incurred in defending a civil or criminal action suit or proceeding shall be paid by the

9

Company in advance of the final disposition of such action, suit or proceeding, and not less often than monthly upon receipt of an undertaking by and on behalf of the Indemnified Person to repay such amount if it shall be ultimately determined that he or she is not entitled to be indemnified by the Company. The indemnification and advancement of expenses authorized in or ordered by a court pursuant to this Section 4.10 shall continue for a person who has ceased to be a Director or officer and inures to the benefit of the heirs, executors and administrators of such a person. No amendment or repeal of this Section 4.10 shall adversely affect the rights and protection afforded to the Directors and officers under this Section 4.10 for acts or omissions occurring prior to such amendment or repeal.

(b)     The Company may obtain, at the expense of the Company, directors and officers insurance coverage in an amount and on such terms as determined by the Board.

## ARTICLE V. CAPITAL ACCOUNTS; CONTRIBUTIONS

5.01    Capital Accounts.

(a)     A separate capital account (each, a "Capital Account") shall be established for each Member and shall be maintained in accordance with applicable regulations under Section 704(b) of the Code. Each Member's Capital Account shall be increased by (i) the amount of money contributed by it to the Company; (ii) the fair market value of property or property interests contributed by it, or treated as contributed by it, to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to pursuant to the provisions of Section 752 of the Code); and (iii) the amount of income and gain (or items thereof) allocated to it, including income and gain exempt from tax and income and gain described in Treasury Regulation 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation 1.704-1(b)(4)(i); and shall be decreased by (iv) the amount of money distributed to it by the Company; (v) the fair market value of property distributed to it by the Company (net of liabilities secured by such distributed property that it is considered to assume or take subject to pursuant to the provisions of Section 752 of the Code); and (vi) the amount of loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation 1.704-1(b)(2)(iv)(g), but excluding items described in Treasury Regulation 1.704-1(b)(2)(ii)(d)(6) and loss or deduction described in 1-704(b)(4)(i) or (b)(4)(iii), and shall otherwise be adjusted in accordance with Regulations Section 1.704-1(b). In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

(b)     The Capital Accounts of the Members shall reflect revaluations of property in all events in which such revaluation is permissible or required under the Regulations, including the issuance of an interest in the Company as consideration for the provision of services to or for the benefit of the Company. In the event that the Capital Accounts of the Members are, in accordance with the preceding sentence, computed with reference to a book value of any asset that differs from its adjusted tax basis, then the Capital Accounts shall be adjusted for depreciation, depletion, amortization, and gain or loss, as computed for book purposes with respect to such asset in accordance with the Regulations.

(c)     The foregoing provisions, and other provisions of this Agreement relating to the maintenance of Capital Accounts and allocation of income, gain, loss, deduction and credit, are intended to comply with Regulations Section 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with those Regulations.

5.02    Contributions. Each Member has made or agreed to make certain contributions to the capital of the Company (herein "Contributions") and, with respect to MAC LLC only, deemed capital contributions (herein "Deemed Contributions"), in the amounts set forth on Exhibit A. The initial Capital Account balances of each Member shall be equal to the fair market value of the property or property interests contributed by such Member, or which are treated as contributed by such Member, in exchange for such Units as set forth on Exhibit A (but shall not include any Deemed Contributions). No Member shall be required to make any Contribution to the capital of the Company. The Company may borrow from its Members (in arm's length transactions at commercially reasonable terms) as well as from banks or other lending institutions to finance its working capital or the acquisition of assets upon such terms and conditions as shall be approved by the Board, and any such loans by Members shall not be considered Contributions or reflected in their Capital Accounts. No Member shall be entitled to any interest or compensation with respect to its Contribution or any services rendered on behalf of the Company except as specifically provided in this Agreement or approved by the Board. No Member shall have any liability for the repayment of the Contribution of any other Member and shall look only to the assets of the Company for return of its Contribution.

## ARTICLE VI. DISTRIBUTIONS AND ALLOCATIONS

6.01    Distribution of Company Funds. Except as set forth in Sections 6.02 and 6.08 and as limited by the Act, all funds and assets of the Company, which are determined in the sole and absolute discretion by the Board to be available for distribution, shall be distributed to the Members, at such time or times as the Board may determine in its sole and absolute discretion, pro rata in proportion to their Percentage Interests.

6.02    Distributions. The Company shall make distributions of all assets distributable to the Members in the following priority:

(a)    First, to the holders of the Preferred Units *pro rata* based on the number of Preferred Units held by each until the Preference Amounts of all Preferred Units have been reduced to $0;

(b)    Second, 100% to the Initial Members, *pro rata*, until each Initial Member has received an amount equal to all of its respective Contributions and Deemed Contributions, and any additional contributions or deemed contributions;

(c)    Third, 100% to each Initial Member, *pro rata*, until each Initial Member has received an amount equal to its Preferred Return;

(d)    thereafter, *pro rata* in proportion to each Member's Percentage Interests, excluding any Incentive Units unless and until such Incentive Units are by their terms entitled to participate *pro rata* in distributions with other Units.

6.03    Distribution of Assets in Kind. No Member shall have the right to require any distribution of any assets of the Company in kind. If any assets of the Company are distributed in kind, such assets shall be distributed *pro rata* in proportion to their Percentage Interests. Any Member entitled to any interest in such assets shall, unless otherwise determined by the Board, receive separate assets of the Company and not an interest as tenant-in-common with other Members so entitled in each asset being distributed. To the extent the Company distributes any property in kind, such property shall be treated as if it were sold for an amount equal to its fair market value, and any resulting gain or loss shall be allocated to the Members' Capital Accounts in accordance with Section 6.04.

11

6.04    Allocation of Profits and Losses.

(a)      All items of Company income, gain, loss and deduction as determined for book purposes shall be allocated among the Members and credited or debited to their respective Capital Accounts in accordance with Regulations Section 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible (i) that such allocations satisfy the economic effect equivalence test of Regulations Section 1.704-1(b)(2)(ii)(i) and (ii) that all allocations of items that cannot have economic effect (including credits and nonrecourse deductions) are allocated to the Members in proportion to their Percentage Interests unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder.  To the extent possible, items that can have economic effect shall be allocated in such a manner that the balance of each Member's Capital Account at the end of any taxable year (increased by such Member's "share of partnership minimum gain" as defined in Regulations Section 1.704-2) equals such Member's Target Capital Account.

(b)      For purposes of computing the amount of any item of Company income, gain, loss or deduction to be allocated pursuant to Section 6.04(a) and to be reflected in the Capital Accounts, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); provided that:

(i)      the computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(l)(B) or Code Section 705(a)(2)(B) and Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes;

(ii)      if the book value of any Company property is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(iii)      items of income, gain, loss or deduction attributable to the disposition of Company property having a book value that differs from its adjusted basis for tax purposes shall be computed by reference to the book value of such property; and

(iv)      items of depreciation, amortization and other cost recovery deductions with respect to Company property having a book value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's book value in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), taking into account the remedial method of allocation referred to in Section 6.06, or such other method of allocation determined as provided therein.

(c)      To the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

6.05    Special Allocations. Notwithstanding anything in Section 6.04 to the contrary:

(a)    Losses, deductions and Code Section 705(a)(2)(B) expenditures attributable to partner nonrecourse debt (as defined in Regulations Section 1.704-2(b)(4)) shall be allocated in the manner required by Regulation Sections 1.704-2(i). If there is a net decrease during a taxable year in partner nonrecourse debt minimum gain (as defined in Regulations Section 1.704-2(i)(3)), items of income and gain for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to the Members in the amounts and of such character as determined according to Regulations Section 1.704-2(i)(4).

(b)    Nonrecourse deductions (as determined according to Regulations Section 1.704-2(b)(1)) for any taxable year shall be allocated to the Members in proportion to their Percentage Interests unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder. Except as otherwise provided in Section 6.05(a), if there is a net decrease in the "minimum gain" during any taxable year, each Member shall be allocated items of income and gain for such taxable year (and, if necessary, for subsequent taxable years) in the amounts and of such character as determined according to Regulations Section 1.704-2(f). This Section 6.05(b) is intended to be a "minimum gain chargeback" provision that complies with the requirements of Regulations Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c)    If any Member that unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has a deficit balance in such Member's Capital Account as of the end of any taxable year, computed after the application of Sections 6.05(a) and 6.05(b) but before the application of any other provision of this Article VI, then items of income and gain for such taxable year shall be allocated to such Member in proportion to, and to the extent of, such deficit Capital Account balance. This Section 6.05(c) is intended to be a "qualified income offset" provision as described in Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)    The allocations set forth in this Section 6.05 (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate income, gain, loss and deduction of the Company or make Company distributions. Accordingly, notwithstanding the other provisions of Article VI, but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if items of income, gain, deduction and loss had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other items of income, gain, deduction and loss among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero.

6.06    Tax Allocations.

(a)    Income, gain, loss and deduction of the Company will be allocated for federal, state and local income tax purposes among the Members in accordance with the allocation of such income, gain, loss and deduction among the Members for computing their Capital Accounts; except that if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gain, loss and deduction will be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

13

(b)　　In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, or treated as contributed to the capital of the Company, shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.  Such allocation shall be made in accordance with the remedial method, described in Regulations Section 1.704-3(d), or such other method determined by the Board in its sole discretion.

(c)　　If the book value of any Company asset is adjusted pursuant to the requirements of Regulations Section 1.704-1(b)(2)(iv)(e) or (f), subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its book value in the same manner as under Code Section 704(c), in accordance with the method determined by the Board.

(d)　　Allocations pursuant to this Section 6.06 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of income, gain, loss, deduction and distributions or other Company items pursuant to any provision of this Agreement.

6.07　　Other Allocation Provisions.  Any other elections or other decisions relating to the allocations of items of income, gain, loss, deduction or credit or any other elections or other decisions with respect to federal income tax matters shall be made by the Board in any manner that reasonably reflects the purposes and intentions of this Agreement; provided that the MAC LLC in its discretion may cause the Company to file an election under Section 754 of the Code in connection with the purchase of membership interests in the Company referred to herein.

6.08　　Tax Distributions.  After the end of each fiscal year, the Company shall calculate and distribute to the Members an aggregate amount of cash (a "Tax Distribution") equal to the product of (i) each Member's share of the Company's taxable income (or reasonably estimated taxable income) for the fiscal year and (ii) the maximum federal individual income tax rate and the maximum combined state and local individual income tax rate to which any Member (or its members) is subject; provided however, the Company shall only be required to make such distribution to the extent it is permitted to do so under the Company's credit agreements; and further provided that such distribution shall be treated as an advance of the distributions which such Member may otherwise be entitled to receive.

6.09　　Withholding.  All amounts withheld pursuant to the Code or any provision of any state, local, or foreign tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 6.09 for all purposes under this Agreement.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state, local, or foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local, or foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

## ARTICLE VII. DISSOLUTION, LIQUIDATION, AND TERMINATION

7.01    Dissolution.  The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following:

        (a)       the unanimous written consent of the Board;

        (b)       the entry of a decree of judicial dissolution under Section 18-802 of the Act; or

        (c)       the sale of all or substantially all of the assets of the Company, determined on a consolidated basis, in any one transaction or series of transactions.

7.02    Notice of Dissolution.  The Chairman shall promptly notify the Members of the dissolution of the Company.

7.03    Liquidation.  Upon dissolution of the Company, the Chairman shall act as its liquidating trustee or the Chairman may appoint one or more Members or agents as liquidating trustee.  The liquidating trustee shall proceed diligently to liquidate the Company and wind up its affairs and to make final distributions as provided in this Section 7.03.  The costs of dissolution and liquidation shall be borne as a Company expense.  Until final distribution, the liquidating trustee may continue to operate the business and properties of the Company with all of the power and authority of the Chairman.  As promptly as possible after dissolution and again after final liquidation, the liquidating trustee shall cause an accounting to be made by a firm of independent public accountants of the Company's assets, liabilities and results of operations.  Notwithstanding anything herein to the contrary, income gain, losses and deductions with respect to any sale of property pursuant to the liquidation, dissolution and winding up of the Company pursuant to this Section 7.03 (and, if necessary, other items of Company income, gain, loss and deduction in the year in which the Company is liquidated, including allocations of gross income) shall be allocated in a manner that causes each Member's Capital Account to equal the amount that would be distributed to such Member pursuant to Section 6.02 if all proceeds from the liquidation of the Company were distributed in the order of priority set forth in Section 6.02.  Upon the winding up of the Company, the assets of the Company shall be distributed as follows:

        (a)       *first*, to creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction (whether by payment or the making of reasonable provision for payment thereof) of liabilities of the Company; and

        (b)       *thereafter*, the balance of the assets of the Company shall be distributed to the Members in accordance with Section 6.02.

7.04    Certificate of Cancellation.  On completion of the distribution of Company assets as provided herein, the Company shall be terminated, and the Chairman (or such other person or persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware under the Act, cancel any other filings made pursuant to Sections 1.01 and 1.05, and take such other actions as may be necessary to terminate the existence of the Company.

## ARTICLE VIII. INCENTIVE UNITS

From and after the date hereof, the Company may, at the discretion of the Board, issue non-voting Units ("Incentive Units") representing in the aggregate a Percentage Interest not in excess of 15% on a fully diluted basis to key employees, officers, Directors and service providers of the Company and its Subsidiaries, in such amounts and on such terms and conditions as the Board deems appropriate in its sole discretion, which Incentive Units may be issued in one or more series. Such terms and conditions may include, without limitation, restrictions on transfer and/or the periodic vesting of the rights of the holder of such Incentive Units to participate in distributions of Company funds based on, for example, completion of a specific period of employment or service with the Company and/or its Subsidiaries. Such terms and conditions shall be set forth in an equity incentive plan of the Company, as may be adopted from time to time by the Board, or in an equity award agreement pursuant to which such Incentive Units are issued, the form of which shall be prescribed by the Board in its sole discretion. In connection with the issuance of any such Incentive Units, the Company is authorized and directed to elect the Safe Harbor described in the proposed IRS Rev. Proc. Referred to in IRS Notice 2005-43 (or any successor Rev. Proc. or IRS Regulation), and the Company and each Member (including any person to whom such Units are issued) agree to comply with all of the requirements of such Safe Harbor with respect to all Incentive Units, while such election remains in effect. No Person shall be entitled to receive Incentive Units unless it agrees in writing to be bound by the terms and provisions of this Agreement. Any Incentive Units granted hereunder will be profits interests entitled to participate in distributions under Section 6.02 as set forth in the award agreement for such Incentive Units. Further, such Incentive Units shall be automatically cancelled if the Company's lenders foreclose upon the Units pledged by the Members as security for any loans made to the Company by such lenders. As a condition to the receipt of any Incentive Unit, the Board may require the recipient to execute a limited guaranty and pledge of the Units in favor of the Company's lenders in form and substance similar to the guaranty and pledge agreement executed by the Company's members.

## ARTICLE IX. TRANSFERS OF INTERESTS

9.01    General Restrictions on Transfer.

(a)    No Units now or hereafter owned by any Member or any Permitted Transferee of any Member, or any interest therein, may be Transferred except (a) to a Permitted Transferee of such Member or from any Permitted Transferee of such Member to such Member or another Permitted Transferee of such Member or Permitted Transferee or (b) pursuant to and in accordance with Section 9.02, or Article X or XI or XIII. No Transfer of Units in violation of this Agreement shall be made or recorded on the books of the Company and any such Transfer shall be void and of no effect. Harouni and Old Meatco shall not (i) transfer or permit the transfer of any record of beneficial ownership in Old Meatco unless simultaneously therewith he transfers Old Meatco's Interests to himself or an entity in which he has 100% beneficial ownership or a trust of which he or his family members are the only beneficiaries, or (ii) directly or indirectly, through his ownership of Old Meatco or otherwise, increase the Percentage Interests that to which he has beneficial ownership to greater than 19.90% of the Company. By execution of the signature page to this Agreement, Annex Capital Advisors, LLC agrees that it will not transfer of any of its membership interests in MAC LLC.

(b)    Notice of Proposed Transfer. Prior to any Transfer of Units (other than an Involuntary Transfer), any Member proposing to Transfer any of such Member's units shall promptly forward to the other Members, a written notice ("Transfer Notice") stating: (i) the Member's bona fide intention to Transfer such Units; (ii) the name, address and phone number of each proposed transferee (including a Permitted Transferee); (iii) the aggregate number of such Member's units proposed to be Transferred to each proposed transferee (the "Offered Units"); (iv) the bona fide cash price or, in

16

reasonable detail, other consideration for which the Member proposes to Transfer the Offered Units (the "Offered Price") or an indication that the transfer price is without consideration; and (v) the material terms of the Transfer.

(c)     Promissory Note Priority Restriction.  Neither MAC LLC, nor any of its Affiliates or Permitted Transferees, may sell or otherwise Transfer any of such Member's Units to any Third Party so long as any amount remains outstanding on that certain Promissory Note dated as of April 18, 2011 between the Company and Old Meatco issued in connection with the Purchase Agreement unless simultaneously therewith, all amounts due under the Note are paid in full.

9.02    Involuntary Transfers.

(a)     In the case of any Transfer of title or beneficial ownership of Units upon default, foreclosure, forfeit, court order or otherwise than by a voluntary decision on the part of a Member (an "Involuntary Transfer"), the Company, or its designee (such Person, the "Involuntary Transfer Purchaser"), shall have the right to purchase such Units pursuant to this Section 9.02.  Upon the Involuntary Transfer by a Member of any Units, such Member shall promptly (but in no event later than two days after such Involuntary Transfer) furnish written notice (the "I.T. Notice") to the Company indicating that the Involuntary Transfer has occurred, specifying the name of the Person to whom such Units have been transferred (the "Involuntary Transferee") and giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer.  Upon the receipt of the I.T. Notice, and for 30 days thereafter, the Involuntary Transfer Purchaser shall have the right to purchase, and subject to Section 9.02(e) the Involuntary Transferee shall have the obligation to sell, all, but not less than all, of the Units acquired by the Involuntary Transferee for a purchase price equal to the Fair Market Value of such Units on the date of the Involuntary Transfer.  The Board and/or the Involuntary Transfer Purchaser shall make any election or other decision relating to the income tax treatment of the purchase of the Units from the Involuntary Transferee, including but not limited to, an election to treat payments for the Involuntary Transferee's share of the Company's goodwill as payments in liquidation of the Involuntary Transferee's interest in the Company pursuant to Code Section 736(a).

(b)     For purposes of this Agreement, "Fair Market Value" means the fair market value of a Unit as reasonably determined by the Board in good faith; provided, however, that if a Member objects to such value as determined by the Board and, within 30 days after such Member is notified in writing of the Board's determination, the Member notifies the Company in writing of such objection, then such value shall be determined by binding arbitration in accordance with this Section 9.02(b).  Within 30 days after the Company receives a notice of objection from a Member, each of the Company and the Member shall appoint one arbitrator, each of whom must be an individual or qualified representative of a firm that is independent of the parties and regularly engages, as a primary occupation, in the professional appraisal or valuation of businesses or business interests.  Within 30 days after the appointment of the two arbitrators, the arbitrators so appointed will select a third arbitrator.  The first two arbitrators will have sole discretion in the selection of the third arbitrator, except that the third arbitrator must be an individual or qualified representative of a firm that is independent of the parties and regularly engages, as a primary occupation, in the professional appraisal of businesses or business interests.  If the first two arbitrators are unable to agree on a third arbitrator within such 30-day period, then such dispute shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under such association's rules.  The selection of a third arbitrator by such association shall be final and binding upon the parties.

(c)    The standard of value to be used by the arbitrators shall be the fair market value of the Units being valued as of the date of the Transfer, taking into account all relevant factors. Each arbitrator shall use such arbitrator's sole discretion in determining the amount of investigation such arbitrator considers necessary in arriving at a determination of the value of the Units. The Company shall make available on a timely basis all books and records requested by any arbitrator, and all material made available to any one arbitrator shall be made available to all arbitrators.

(d)    Concurrence by at least two of the three arbitrators shall constitute a binding determination of Fair Market Value. Absent such concurrence, the value shall be the average of the valuations of (a) the third arbitrator and (b) one of the other two arbitrators whose valuation is closest to the third arbitrator's valuation. The value determined by the arbitrators shall be reported to the Company and the Member in writing, signed by the arbitrators concurring as to the determined value, within sixty (60) days of the appointment of the third arbitrator. All of the fees and expenses of each of the arbitrators (as well as the fees and expenses of the American Arbitration Association) identified above shall be borne equally by the Company and the Member.

(e)    The closing of the purchase of the Units acquired by the Involuntary Transferee will take place on the date designated by the Involuntary Transfer Purchaser, which date will not be more than 30 days after the final determination of the Fair Market Value. The Involuntary Transfer Purchaser will pay for Units acquired by the Involuntary Transferee by delivery of immediately available funds to the Involuntary Transferee in the amount of the Fair Market Value.

9.03    Requirements for Transfer. In addition to all other requirements of this Article IX, every Transfer of an interest in the Company permitted hereunder shall be subject to the following requirements:

(a)    the transferee shall establish that the proposed Transfer will not cause or result in a breach of any agreement binding upon the Company or any violation of law, including without limitation, federal or state securities laws, and that the proposed Transfer would not cause the Company to be an investment company as defined in the Investment Company Act of 1940, as amended;

(b)    the transferee shall establish to the satisfaction of the Board that the transferee would not adversely affect the classification of the Company as a partnership for federal tax purposes, terminate its classification as a partnership under Code Section 708, or have a substantial adverse effect with respect to federal income taxes payable by the Company or any Member; and

(c)    the transferee shall execute a counterpart of this Agreement and such other documents or instruments as may be required by the Board to reflect the provisions hereof.

Until the foregoing requirements are met, the Members, the Company and its Directors, officers, employees and agents shall not be entitled to or required to recognize any legal, equitable or other interest in the Company on the part of any purported transferee, whether or not any of them have express or other notice of such claim or interest, except as otherwise required by applicable law.

9.04    Effect of Transfer.

(a)    No Transfer of Units may be made (and shall not be effective) unless in each case (i) such transferee (including a Permitted Transferee) agrees in writing to be bound (to the same extent as the Member Transferring Units) by the terms and conditions of this Agreement by a supplemental agreement reasonably satisfactory in form and substance to the Board, excluding any

18

Director with an interest in the Transfer, and (ii) the Transfer is in compliance with all applicable federal, state and foreign securities laws.

(b)      Unless admitted to the Company as a Member pursuant to the provisions hereof, Transferees shall have only the right to profits, losses, distributions and capital with respect to the Units Transferred and shall not have any voting rights hereunder. Units held by a Transferee who has not been admitted as a Member shall not be deemed to be outstanding for purposes of determining the number of Units voted on any matter.

9.05      Prohibited Transfers. Any Transfer in violation of any provisions of this Agreement shall be null and void and ineffective to Transfer any interest in the Company and shall not be binding upon or be recognized by the Company, and any such transferee shall not be treated as or deemed to be a Member for any purpose. In the event that any Member shall at any time transfer its interest in violation of any of the provisions of this Agreement, the Company and the other Members, in addition to all rights and remedies at law and equity, shall have and be entitled to an order restraining or enjoining such transaction, it being expressly acknowledged and agreed that damages at law would be an inadequate remedy for a Transfer in violation of this Agreement.

9.06      Preemptive Rights.

(a)      The Board may at any time and from time to time, cause the Company to issue additional Units or securities containing options or rights to acquire Units or securities convertible into Units with any such Units being of any class and having such respective rights, privileges, powers and authorities as the Board shall determine; provided that, prior to issuing any newly-issued Units, the Company shall first offer (a "Preemptive Offer") to each Member the right to subscribe to purchase such number of newly-issued Units, at the same price and on the same terms as those being offered by the Company, pro rata in proportion to the respective Percentage Interest in voting Units held by such Member. Any Member who does not irrevocably accept a Preemptive Offer within ten (10) days after being given notification thereof will be deemed to have declined such Preemptive Offer. The Company may issue and sell such Units described in the Preemptive Offer to any purchaser at a price not less than the price at which they were offered in the Preemptive Offer and on other terms and conditions no more favorable to the purchasers thereof than those offered in the Preemptive Offer for a period not to exceed sixty (60) days following the expiration of the ten (10) day offer period given to the Members described in the foregoing sentence. Any Units not issued or sold to any purchaser during such sixty (60) day period will thereafter again be subject to the preemptive rights provided for in this Section 9.06.

(b)      The provisions of this Section 9.06 shall not be applicable to the issuance of securities (i) upon the conversion of Units of one class into Units of another class, (ii) as a Unit split or other subdivision or combination of the outstanding Units, (iii) in any transaction in respect of a security that is offered to all Members on a pro rata basis, (iv) granted to employees, officers, directors or consultants of the Company pursuant to the equity incentive plan, (v) in connection with any debt financing of the Company in which an Member is not a participant, or (vi) in connection with a business acquisition, merger, consolidation, strategic alliance or similar transaction approved by the Board. Notwithstanding anything to the contrary in this Agreement, Incentive Units shall not entitle its holder to any preemptive rights under this Agreement.

## ARTICLE X. TAG ALONG RIGHTS

10.01   <u>Tag-Along Rights Generally.</u>

(a)      Any Member holding a Majority in Interest, or any of its Permitted Transferees may, in any one transaction or any series of similar transactions, Transfer any of its Units to any Third Party, but only if such Transferor offers to each Member other than the Transferring Member(s) (the "Tag-Along Offerees") to include, at the option of each Tag Along Offeree, in the Transfer to such Third Party, such number of Units (collectively, the "Tag-Along Units") as shall be determined in accordance with this Article X.

(b)      Upon the receipt by any Transferor or Transferors of a bona fide offer or offers from a Third Party to purchase or otherwise acquire its or their Units (other than a Transfer which pursuant to Section 10.05 hereof would not be subject to the provisions of Sections 10.01 through 10.04 hereof) which such Transferor or Transferors desire to accept, such Transferors shall cause the Third Party's offer to be reduced to writing and shall provide a copy of such Tag-Along-Notice to each of the Tag-Along Offerees (the "Tag-Along Notice"). The Tag-Along Notice must contain an offer to purchase or otherwise acquire Tag-Along Units from each of the Tag-Along Offerees according to the terms and conditions of this Section 10.01 and upon substantially the same terms and conditions as the terms and conditions contained in the Third Party's offer and shall be accompanied by a true and correct copy of the Third Party's offer. The Transferor shall provide the Tag-Along Offerees such information as is reasonably requested about the Third Party and the transaction described in the Tag-Along Notice.

(c)      At any time within ten (10) business days after its receipt of the Tag-Along Notice, each of the Tag-Along Offerees may irrevocably accept the Third Party offer included in the Tag-Along Notice for up to such number of Tag-Along Units as is determined in accordance with the provisions of this Article X by furnishing written notice of such acceptance to the Transferors and such Third Party.

(d)      Notwithstanding anything to the contrary contained in this Article X, provided such Transferor complies with all of its obligations under this Article X, there shall be no liability on the part of any Transferor to any other Member in the event that the sale of Units to the Third Party contemplated pursuant to this Section 10.01 is not consummated for any reason whatsoever. Whether a sale of Units to the Third Party contemplated pursuant to this Section 10.01 is effected is in the sole and absolute discretion of the Transferors.

(e)      Notwithstanding anything to the contrary in this Agreement, Incentive Units shall not be entitled to the rights set forth in this Section 10.01.

10.02   <u>Allocation of Tag-Along Units.</u>

(a)      Each Tag-Along Offeree shall have the right to sell pursuant to the Third Party's offer a number of Tag-Along Units as that being sold by the Transferors up to the product of (x) the total number of Units to be acquired by the Third Party as set forth in the Tag-Along Notice (or such higher number of Units as such Third Party may agree to), times (y) a fraction, (1) the numerator of which shall be the number of Units held by such Tag-Along Offeree as of the date of the Tag-Along Notice and (2) the denominator of which shall be the aggregate number of Units held on such date by all selling Members; provided that all allocations referred to herein shall be determined in good faith by the Board in accordance with the provisions of this Section 10.02 and any Unit amounts so determined shall be rounded to avoid fractional Units.

(b)      If a Tag-Along Offeree does not elect to sell the full number of Tag-Along Units such Tag-Along Offeree is entitled to sell pursuant to Section 10.02(a), the Transferor shall deliver a written notice to each Tag-Along Offeree which has elected to sell the full amount of Tag-Along Units such Tag-Along Offeree is entitled to sell pursuant to Section 10.02(a) stating the number of Tag-Along Units not elected to be sold. Each fully electing Tag-Along Offeree shall be entitled, by delivering written notice to the Transferor within five business days following such notice, to sell up to the greater of (i) all of the Tag-Along Units not elected to be sold by Tag-Along Offerees and (ii) the number of Units owned by the electing Tag-Along Offeree divided by the total number of Units owned by all fully electing Tag-Along Offerees. Such election shall constitute an irrevocable acceptance of Third Party Offer with respect to such additional Tag-Along Units in accordance with Section 10.01(b). In the event the number of Tag-Along Units requested to be sold by the fully electing Tag-Along Offerees exceeds the aggregate Tag-Along Units available for sale by all of the fully electing Tag-Along Offerees, the remaining Tag-Along Units to be sold pursuant to this paragraph (b) shall be allocated pro rata among such fully electing Tag-Along Offerees based on the total number of Units owned by each such Tag-Along Offeree.

10.03   Transfer Mechanics. The purchase from the Tag-Along Offerees pursuant to this Article X shall be on substantially the same terms and conditions as are received by the Transferor and stated in the Tag-Along Notice provided to the Tag-Along Offerees by the Company, including (A) any representations, warranties, covenants and indemnities (provided that (x) no Tag-Along Offeree shall have any liability with respect to representations of any other Member with respect to such other Member's Units, the authority of such other Member to effect such transaction, the enforceability of such other Member's obligations thereunder and other representations and covenants particular to such other Member and (y) the maximum potential liability for any indemnities of a Tag-Along Offeree shall be limited to the lesser of (i) such Tag-Along Offeree's pro rata portion of the indemnity obligations or (ii) the amount of the aggregate proceeds received or receivable by such Tag-Along Offeree), (B) the same respective per Unit price for each Unit proposed to be sold and (C) the date of sale or other disposition. Concurrently with the consummation of the sale or other disposition of Units of the Transferor and Tag-Along Units of the Tag-Along Offerees to the Third Party pursuant to the Third Party's offer, the Transferor shall notify the Tag-Along Offerees thereof, shall remit to each Tag-Along Offeree the total sales price of the Tag-Along Units of such Tag-Along Offeree sold or otherwise disposed of pursuant thereto, and shall furnish such other evidence of the completion and time of completion of such sale or other disposition and the terms and conditions thereof as may be reasonably requested by each such Tag-Along Offeree.

10.04   Transfers to Third Parties after Members Decline Tag-Along Rights. If within 20 business days after the receipt of the Tag-Along Notice, any Tag-Along Offeree has not accepted the offer contained in the Tag-Along Notice, such Tag-Along Offeree will be deemed to have waived any and all rights with respect to the sale or other disposition of Tag-Along Units described in the Tag-Along Notice and the Transferors and each other electing Tag-Along Offeree shall have three months in which to sell or otherwise dispose of Units described in the Third Party's offer, on terms and conditions not more favorable to the Transferors than were set forth in the Tag-Along Notice. If, at the end of such three-month period, the Transferors have not completed the sale or other disposition of Units of the Transferors and Tag-Along Units of each Tag-Along Offeree in accordance with the terms and conditions of the Third Party's offer, all the restrictions on Transfer contained in this Agreement with respect to Units owned by the Transferors shall again be in effect.

21

10.05   Exceptions to Tag-Along Rights. The provisions of this Article X shall not be applicable to any Transfer of Units (a) from a Member to any Permitted Transferee of such Member, or from any such Permitted Transferee of such Member to such Member or another Permitted Transferee of such Member or such Permitted Transferee, provided that in any Transfer to such a Permitted Transferee such Permitted Transferee must agree in writing to be bound by the terms and conditions of this Agreement pursuant to the provisions of Section 9.04, or (b) made pursuant to and in accordance with Section 9.02. Nothing herein shall be deemed to permit a purchase by the Company of any Units owned by a Member or any of its Permitted Transferees unless the other Members are offered the opportunity to participate in such purchase on a pro rata basis.

## ARTICLE XI. RIGHT TO COMPEL SALE

11.01   Rights to Compel Sale Generally. A Majority In Interest and its Permitted Transferees (for purposes of this Article XI, the "Compelled Sale Group") shall have the right (the "Compelled Sale Right") to cause the Sale of the Company to a Third Party that is not an Affiliate of any member of the Compelled Sale Group (the "Third Party Purchaser") (any such sale, the "Compelled Sale"); provided that the conditions set forth below in this Section 11.01 are satisfied. If the Compelled Sale Group proposes to exercise its Compelled Sale Right, it shall send at least twenty (20) days prior written notice of the exercise of its Compelled Sale Right to each of the remaining Members (together with their Permitted Transferees, the "Remaining Members"), setting forth the consideration to be paid by the Third Party Purchaser and the other terms and conditions of such transaction, which transaction shall have been negotiated on an arms' length basis (such notice, the "Compelled Sale Notice"). Each Remaining Member will bear its pro rata share (based upon its share of aggregate proceeds) of any indemnities required of all of the Members in connection with such Compelled Sale (provided that (x) no Remaining Member shall have any liability with respect to representations or covenants of any other Member with respect to such other Member's Units, the authority of such other Member to effect such transaction, the enforceability of such other Member's obligations thereunder and other representations and covenants particular to such other Member and (y) the maximum potential liability for any indemnities of such Remaining Member shall be limited to the lesser of (i) such Member's pro rata portion of the indemnity obligations or (ii) the amount of the aggregate proceeds received or receivable by the Remaining Member, including any amounts held in escrow or other contingent payments). Without limiting the generality of the foregoing sentence, the Remaining Members shall not be required to participate in any Compelled Sale in which the Remaining Members receive less per Unit than the Compelled Sale Group receives with respect to its Units except as is necessary to fulfill the intent of Section 6.02 or, with respect to the Incentive Units, as determined by the Board in its reasonable discretion to account for the incentive hurdle, vesting period and other terms and conditions related to the Incentive Units that affect the value of such Incentive Units.

11.02   Compelled Sale Pursuant to a Sale of Units.

(a)      In the event that the Compelled Sale Group determines to exercise its Compelled Sale Right by requiring a sale of Units to the Third Party Purchaser, then the Compelled Sale Group may, at its option, require each Remaining Member to sell all Units held by him, her or it to the Third Party Purchaser. A member of the Compelled Sale Group shall notify the Remaining Members of the anticipated date of consummation of the Compelled Sale at least fifteen (15) business days prior to the date thereof, together with a copy of the purchase and sale agreement and all material ancillary documents (which agreements and documents shall be on substantially the same terms and conditions as are received by the Compelled Sale Group) to be executed and delivered in connection therewith, and thereupon, provided that such documents are consistent with Section 11.01, each of the Remaining Members shall deliver to a representative of the Compelled Sale Group designated in the Compelled Sale Notice, any and

22

all transfer documents and other documents reasonably required to be executed in connection with such transaction within five (5) business days prior to such anticipated date of consummation, provided that all such transfer documents and other documents shall be subject to the terms of Section 11.01.

(b)    In the event that a Remaining Member fails to deliver such documents and instruments of transfer to the Compelled Sale Group, then from and after the date of consummation of the Compelled Sale (i) the Company shall cause the books and records of the Company to show that such Units are bound by the provisions of this Article XI and that such Units may be transferred only to the Third Party Purchaser and (ii) such Remaining Member (A) shall not be entitled to the consideration it is to receive under this Article XI until it cures such failure (provided that after curing such failure it shall be so entitled to such consideration without interest), (B) shall for all purposes be deemed no longer to be a Member of the Company and have no voting rights with respect to such Units, (C) shall not be entitled to any distributions with respect to the Units held by it, (D) shall have no other rights or privileges granted to Members under this or any other agreement, and (E) in the event of liquidation of the Company, shall have rights subordinate to the rights of any equity holder with respect to any consideration it would have received if it had complied with this Article XI, if any, until it cures such failure (provided that after curing such failure it shall be so entitled to such consideration without interest). If any party so fails to deliver such documents and instruments of transfer as so required, it shall execute, acknowledge and deliver all such further agreements and take all such further actions as may be reasonably necessary or desirable to give effect to the provisions of this Section 11.02(b).

(c)    If, within six (6) months after the Compelled Sale Group gives the Compelled Sale Notice, the Compelled Sale Group has not completed the sale of all of the Units in accordance herewith, (i) the Compelled Sale shall be abandoned by the Compelled Sale Group and all related agreements and documents shall be terminated thereby and (ii) the Compelled Sale Group shall return to each of the Remaining Members all documents and instruments of transfer that relate to the sale of the Units that such Member delivered for sale pursuant hereto.

(d)    Members who deliver to the Compelled Sale Group documents or instruments of transfer with respect to Units in accordance with this Section 11.02 or otherwise pursuant to a Compelled Sale shall retain full voting control (to the extent such Units are entitled to vote) and any other rights and incidents of ownership associated with such Member's ownership of such Units (including rights with respect to such Units pursuant to this Agreement) until the applicable Compelled Sale has been completed or such documents and instruments of transfer have been returned in accordance with the provisions of this Article XI and such Units will be held by the Compelled Sale Group for the exclusive benefit of such Member until such time.

11.03    Compelled Sale Other Than Pursuant to a Sale of Units. In the event that the Compelled Sale Group determines to exercise its Compelled Sale Right in connection with a merger, consolidation, equity swap, business combination, sale of assets or similar transaction, then the Compelled Sale Group may, at its option, require the Remaining Members to vote in favor of such transaction. In particular, in the event of any such proposed transaction, upon any request by the Compelled Sale Group, each of the Members shall use its respective reasonable efforts (i) to call, or cause the appropriate officers and directors to call, a special meeting of Members to consider approval of such proposed transaction, and (ii) vote in favor of such proposed transaction all of the Units owned or held of record by such Member (to the extent entitled to vote) at each regular or special meeting of the Members called for the purpose of voting on such matter, or in any written consent executed in lieu of such a meeting of Members, and shall take all actions reasonably necessary, to ensure that all necessary Member approvals for such transaction are obtained.

23

11.04   <u>Cooperation in Connection with Compelled Sale</u>. Subject to satisfaction of the conditions set forth in Section 11.01, each Member shall reasonably cooperate with the Compelled Sale Group in the event that the Compelled Sale Group determines to exercise its Compelled Sale Right pursuant to this Article XI and shall take all reasonably necessary and appropriate actions in connection with any such Compelled Sale as may be reasonably requested by the Compelled Sale Group (including, without limitation, entering into such agreements and instruments in connection with any such Compelled Sale as may be reasonably requested by the Compelled Sale Group).

11.05   <u>Notice of Consummation of Compelled Sale</u>. Concurrently with the closing of any Compelled Sale, the Compelled Sale Group shall give notice thereof to the Remaining Members, shall remit to each of the Remaining Members the total transaction proceeds to which such Members are entitled pursuant thereto, and shall furnish such other evidence of the completion and time of completion of such sale or other disposition and the terms and conditions thereof as may be reasonably requested by such Members.

## ARTICLE XII. CONFLICTS OF INTEREST

12.01   <u>Transactions with Interested Persons</u>. Subject to the limitations contained in this Section 12.01, the Company or any of its Subsidiaries may contract and transact business with such Persons (including one or more of its Members and Directors) on such terms and for such reasonable compensation as it shall determine, notwithstanding the fact that any Member or Director may have an interest in such Person; <u>provided, however</u>, that, unless such transaction has been expressly approved by a majority of the Directors which have no interest in the transaction being considered and voted upon, the compensation paid to any such Person shall be comparable to that which would otherwise have been paid to any Third Parties providing goods and services to the Company or its Subsidiary, as applicable, at arm's length and on commercially reasonable terms. Further, subject to proper approval as required by the first sentence of this Section 12.01, unless entered into in bad faith, no Member or Director interested in such contract or transaction, because of such interest, shall be considered to be in breach of this Agreement or liable to the Company, any Member, or any other person or organization for any loss or expense incurred by reason of entering into such contract or transaction or shall be accountable for any gain or profit realized from such contract or transaction.

## ARTICLE XIII. GENERAL PROVISIONS

13.01   <u>Notices</u>. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents required or permitted to be given under this Agreement must be in writing and shall be deemed to have been given (a) if by personal delivery, on the day of such delivery, (b) if by certified or registered mail, on the fifth business day after the mailing thereof, (c) if by next-day or overnight mail or delivery, on the day delivered or (d) if by fax, on the day following the day on which such fax was sent, provided that a copy is also sent by certified, registered or overnight mail. Such notices, requests and consents shall be given (x) to Members at their addresses on Exhibit A, or such other address as a Member may specify by notice to the Secretary or the other Members, or (y) to the Company at the address of the principal office of the Company specified in Section 1.03. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.02   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Members relating to the subject matter hereof and supersedes all prior contracts or agreements with respect thereto, whether oral or written.

13.03   Successors; Assigns; Amendments.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable except to a Permitted Transferee or otherwise in accordance with the terms hereof.  This Agreement may not be modified or amended, nor any waiver of, consent to or departure from the provisions hereof may be made without the affirmative vote of a majority of the Members; provided, however, that notwithstanding the foregoing, (a) this Agreement may be amended, modified or supplemented by the Company, and waivers of, consents to or departures from the provisions hereof may be given by the Company, in order to cure any ambiguity, defect or inconsistency in this Agreement, and (b) no amendment of this Agreement may be made, including pursuant to clause (a) above, without the consent of any affected voting Member if such amendment (i) would modify the limited liability of such voting Member in a manner materially adverse to such Member, (ii) would amend any provision of this Section 13.03, (iii) would change the amount of distributions made pursuant to Article VI hereof in a manner materially adverse to such voting Member or (iv) would materially and adversely affect such voting Member in a different manner than all of the other Members.  The Board shall give written notice to all Members promptly after any amendment has become effective, other than amendments solely for the purpose of the admission of additional Members to the Company.

13.04   Defaults; No Circumvention of Agreement.  A default by any party to this Agreement in such party's compliance with any of the conditions or covenants hereof or performance of any of the obligations of such party hereunder shall not constitute a default by any other party.  No Member or any of its Permitted Transferees may do indirectly, through the sale of its equity interests or equity interests of its or their subsidiaries or otherwise, that which is not permitted by this Agreement (including, without limitation, the provisions of Articles IX, X and XI hereof).

13.05   Further Assurances; Certificates.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions, as reasonably requested by any party hereto.  Upon the reasonable request of any Member, the Company agrees to issue one or more certificates evidencing the Units owned by such Member.

13.06   Waiver of Certain Rights.  The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance herewith in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

13.07   Notice to Members of Provisions of this Agreement.  By executing this Agreement, each Member acknowledges that such Member has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the Transfer of Membership Interests set forth in Article IX, and (b) all of the provisions of the Certificate.  Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

13.08   Interpretation.  For the purposes of this Agreement, terms not defined in this Agreement shall be defined as provided in the Act; and all nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular, or plural, whichever shall be applicable.  Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  Titles or captions of Articles and Sections contained in this

Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

13.09   Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties had signed the same document, and all counterparts shall be construed together and shall constitute the same instrument.

13.10   Governing Law; Severability. This Agreement is governed by and shall be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. If any provision of this Agreement or its application to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, and that provision shall be enforced to the greatest extent permitted by law. All disputes hereunder shall be resolved in the Chancery Court of the State of Delaware and each party hereby submits to the jurisdiction of that Court.

13.11   Definitions. As used herein, the following definitions shall have the following designated meanings:

"Act" means, the Delaware Limited Liability Company Act set forth in Title 6 of the Delaware Code (6 Del. C. § 18-101, et seq.), as amended from time to time.

"Affiliate" means, with respect to any Person which is not a natural person, any director or officer of such Person, or any Person that beneficially owns at least 10% of the capital stock or other equity interest of such specified Person or any other Person controlling, controlled by, or under common control with that first Person as that term is defined under the Securities Act and with respect to any natural person, such person's immediate family, as defined in Instruction 2 of Item 404(a) of Regulation S-K under the Securities Act.

"Board" means the Board of Directors of the Company.

"MAC LLC Nominees" has the meaning set forth in Section 3.01(b) hereof.

"Capital Account" has the meaning set forth in Section 5.01 hereof.

"Cause" has the meaning set forth in Section 3.01(f) hereof.

"Certificate" or "Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware.

"Certificate of Cancellation" means the Certificate of Cancellation of the Company filed with the Secretary of State of the State of Delaware.

"Code" has the meaning set forth in Section 1.04 hereof.

"Company" has the meaning set forth in the Preamble hereof.

"Compelled Sale" has the meaning set forth in Section 11.01 hereof.

"Compelled Sale Group" has the meaning set forth in Section 11.01 hereof.

"Compelled Sale Notice" has the meaning set forth in Section 11.01 hereof.

"Compelled Sale Right" has the meaning set forth in Section 11.01 hereof.

"Confidential Information" has the meaning set forth in Section 13.12 hereof.

"Contributions" has the meaning set forth in Section 5.02 hereof.

"Deemed Contributions" has the meaning set forth in Section 5.02 hereof.

"Director" has the meaning set forth in Section 3.01(a) hereof.

"Eligible Member" has the meaning set forth in Section 11.01(a) hereof.

"Fair Market Value" has the meaning set forth in Section 9.02 hereof.

"Governmental Entity" means any United States or any foreign, federal, state or local government, court, administrative agency or commission or other governmental or regulatory body or authority.

"I.T. Notice" has the meaning set forth in Section 9.02 hereof.

"Incentive Units" has the meaning set forth in Article VIII.

"Indemnified Person" has the meaning set forth in Section 4.10 hereof.

"Initial Members" means MAC LLC and Old Meatco.

"Involuntary Transfer" has the meaning set forth in Section 9.02 hereof.

"Involuntary Transfer Purchaser" has the meaning set forth in Section 9.02 hereof.

"Involuntary Transferee" has the meaning set forth in Section 9.02 hereof.

"MAC LLC Units" has the meaning set forth in Section 3.01(a) hereof.

"MAC LLC Nominee(s)" has the meaning set forth in Section 3.01(a) hereof.

"Majority In Interest" means any Member or group of Members who, individually or collectively, own 51% or more of the issued and outstanding Units.

"Member" has the meaning set forth in the Preamble hereof.

"Nominee" has the meaning set forth in Section 3.01(b) hereof.

"Old Meatco Nominee(s)" has the meaning set forth in Section 3.01(a) hereof.

"Percentage Interest" means with respect to a Member the percentage determined by dividing the number of Units held by such Member by the aggregate outstanding Units of all Members.

"Permitted Transferee" means, with respect to a Member or a Permitted Transferee of such Member in the event of any Transfer of Units, (i) the Company, (ii) any other Member, (iii) any Affiliate, (iv) any shareholder, partner, member, director, officer, managing member or employee of such Member or any Affiliate thereof, (v) the spouse or lineal descendants of any of the foregoing that is a natural person, including, without limitation, Transfers by bequest or devise, or to a trust or trusts for the benefit of any of the foregoing; provided that in each case each such transferee (other than the Company) has agreed in writing, in accordance with Article IX hereof, to be bound by the terms and conditions of this Agreement to the same extent and in the same manner as the Member transferring such Units; provided further that the transfer to any such Person is in compliance with all applicable federal, state and foreign securities laws.

"Person" means any individual, corporation, limited liability company, association, partnership, joint venture, trust, estate or other entity or organization.

"Preference Amount" means, with respect to each Preferred Unit, an amount initially equal to $1,000, as such amount is increased on a daily basis from and after the date of issuance thereof by applying an accretion rate of seven percent (7%) per annum, compounding quarterly on January 1, April 1, July 1 and October 1 of each year, beginning on April 1, 2012, and as such amount is from time to time decreased by subtracting all distributions (other than tax distributions under Section 6.08) made from time to time under Section 6.1 in respect of such Preferred Unit.

"Preferred Units" means the Membership Interests in the Company established pursuant to Section 2.09 and referred to herein as "Preferred Units."

"Preferred Return" means, in respect of any Initial Member, a cumulative preferred return to such Initial Member that accrues and accumulates at a rate of eight percent (8%) per annum on the Contributions and Deemed Contributions of such Member, compounded annually.

"Purchase Agreement" has the meaning set forth in the Preamble hereof.

"Regulatory Allocations" has the meaning set forth in Section 6.05(d) hereof.

"Remaining Members" has the meaning set forth in Section 11.01 hereof.

"Sale of the Company" means the sale of the Company pursuant to which any Third Party or Affiliated group of Third Parties acquires (a) all of the Units of the Company (whether by merger, consolidation or sale or transfer of Units) or (b) all or substantially all of the Company's assets determined on a consolidated basis.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Subsidiary" of any Person at any time means any other Person, directly or indirectly, controlled by, or more than 50% of the outstanding equity interests of which is, at the time, owned or controlled directly or indirectly by, such first Person or a Subsidiary of such first Person.

"Subsidiary Board" has the meaning set forth in Section 3.05 hereof.

"Tag-Along Notice" has the meaning set forth in Section 10.01(b) hereof.

"Tag-Along Offerees" has the meaning set forth in Section 10.01(a) hereof.

28

"Tag-Along Units" has the meaning set forth in Section 10.01(a) hereof.

"Target Capital Account" means, with respect to a Member for any taxable year or other period, an amount (which may be positive or negative) equal to the amount such Member would receive (or that such Member would be required to contribute to the Company) if the Company sold all of its properties for an amount equal to the book value (as determined pursuant to Regulations Section 1.704-1(b)(2)(iv)) of such property (reduced, but not below zero, by the amount of nonrecourse debt to which such property is subject) and distributed all of the proceeds remaining after payment of all liabilities (other than nonrecourse liabilities) of the Company in liquidation immediately following the end of such taxable year in accordance with Section 6.02.

"Tax Distributions" has the meaning set forth in Section 6.08 hereof.

"Tax Matters Partner" or "TMP" has the meaning set forth in Section 1.06 hereof.

"Third Party" means, with respect to any Person, any Person who is not an Affiliate of such first Person.

"Third Party Purchaser" has the meaning set forth in Section 11.01 hereof.

"Transfer" or "transfer" (including its correlative meanings, "Transferor" and "Transferee") means any direct or indirect sale, assignment, mortgage, transfer, pledge, gift, hypothecation or other disposition of or transfer of Units, or contract to do any of the foregoing (other than any bona fide pledge or hypothecation of equity to, or the execution of a profit-sharing or similar agreement (provided that such arrangement does not afford to such transferee any beneficial or other ownership interest or rights in such equity, any rights under this Agreement or any other rights, remedies, actions, claims or the like against the Company, its officers, directors, members or affiliates, other than rights of such transferee against the transferor arising solely from such transfer) with, a financial institution(s) or other Person in connection with any loan from such financial institution(s) or other Person).

"Treasury Regulations" or "Regulations" mean, except where the context indicates otherwise, the permanent, temporary, proposed or proposed and temporary regulations of the Department of the Treasury promulgated under the Code as such regulations may be lawfully changed from time to time.

"Units" has the meaning set forth in Section 1.08 hereof.

13.12    Confidentiality.  Except with the prior written consent of the Company and except as otherwise required by law or regulatory authority, each Member shall, and shall use all reasonable efforts to cause each of its representatives to (a) hold in strict confidence all confidential, proprietary or other non-public information or trade secrets relating to the Company or its Subsidiaries or their respective assets or operations (the "Confidential Information"), and (b) not release or disclose in any manner whatsoever to any other person any such Confidential Information; provided that (i) the foregoing provisions shall not apply to any disclosure, to the extent reasonably required, to (A) those of such Member's investors, Affiliates, consultants, representatives, advisors, employees, agents, prospective purchasers and financing sources auditors, attorneys and other representatives (each a "Recipient"), including the professional advisors of each Recipient, who agree to be bound by the provisions of this Section 13.12 or are otherwise bound by a general duty of confidentiality or have agreed to be bound by a confidentiality agreement containing provisions substantially similar to this Section 13.12 and (B) any other Persons in connection with any actions taken pursuant to Article IX, X or XI of this Agreement so long as such Persons agree to retain the Confidential Information in confidence on the terms and conditions set forth herein, (ii) the foregoing provisions shall not apply where such Member or any of its

29

representatives is compelled to disclose such Confidential Information, by judicial or administrative process or, in the reasonable opinion of its counsel, by other requirements of law or regulatory authority (provided that prior written notice of such disclosure is given to the Company and any such disclosure is limited to only that portion of the Confidential Information which such person is compelled to disclose), (iii) the term "Confidential Information" shall not include information (A) which is or becomes generally available to the public other than as a result of prohibited disclosure of such information by such Member, such Member's Affiliates or any of their respective representatives, (B) becomes available to the recipient of such information on a non-confidential basis from a source which is not, to the recipient's knowledge, bound by a confidentiality or other similar agreement with respect to such information, or by any other legal, contractual or fiduciary obligation which prohibits disclosure of such information, or (C) which can be demonstrated to have been developed independently by the representatives of such recipient which representatives have not had any access to any information which would otherwise be deemed to be "Confidential Information" pursuant to the provisions of this Section 13.12, and (iv) each of the Members acknowledges and agrees that any information it may receive from the Company in its reports to security holders is confidential, proprietary and non-public in nature.

***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

NEW MEATCO PROVISIONS, LLC

By: _____
Name:
Title: CEO

MEMBERS:

MEATCO ACQUISITION COMPANY, LLC
BY: ANNEX CAPITAL ADVISORS, LLC
    (MANAGING MEMBER)

By: _____
Name:
Title:

MEATCO PROVISIONS, INC.

By: _____
Name:
Title:

_____
Morad Harouni

ANNEX CAPITAL ADVISORS, LLC (with respect to
Section 9.01(a) only

By: _____
Name:
Title:

Signature Page to LLC Company Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

NEW MEATCO PROVISIONS, LLC

By:  _____
Name:
Title:

MEMBERS:

MEATCO ACQUISITION COMPANY, LLC
BY: ANNEX CAPITAL ADVISORS, LLC
        (MANAGING MEMBER)

By:  _____
Name:  *Robert E. Fowler, III*
Title:  *Managing Partner of Managing Member*

MEATCO PROVISIONS, INC.

By:  _____
Name:
Title:

_____
Morad Harouni

ANNEX CAPITAL ADVISORS, LLC (with respect to Section 9.01(a) only

By:  _____
Name:  *Robert E. Fowler, III*
Title:  *Managing Partner*

Signature Page to Second A/R LLC Company Agreement

Exhibit A

| Name and Address of Member | Common Units | Percentage Interest in Common Units | Initial Capital Contribution | Preferred Units |
|---|---|---|---|---|
| Meatco Acquisition Company, LLC<br>c/o Alexander P. Coleman<br>Annex Capital Advisors, LLC<br>350 So. County Rd., Ste. 102-120<br>Palm Beach, FL 33480<br>Fax:    (212) 554-5808<br>Email:  acoleman@annexcapital.com<br><br>with a copy to:<br><br>Robert W. Forman, Esq.<br>Shapiro Forman Allen & Sava LLP<br>380 Madison Avenue<br>New York, NY 10017<br>Fax:    (212) 883-1941<br>Email:  forman@sfa-law.com | 80,100 | 80.10% | $7,830,000* | 4,800 |
| Meatco Provisions, Inc.<br>c/o Morad Harouni<br>356 22nd Street<br>Santa Monica, CA  90402<br>Fax:<br>Email:  meatco@aol.com<br><br>with a copy to (which shall not constitute notice):<br><br>Mark J. Kelson, Esq.<br>Greenberg Traurig, LLP<br>Fax:    (310) 586-0556<br>Email:  kelsonm@gtlaw.com | 19,900 | 19.90% | 1,957,000† | - 0 - |
| Totals: | 100,000 | 100% | $9,787,000 | 4,800 |

---

* $7,000,000 of such amount is a Contribution and $830,000 of such amount is a Deemed Contribution.

† The entire amount is a Contribution

Exhibit B

## **Directors**

**MAC LLC Nominees**
Alexander P. Coleman
Robert Fowler
Rick Mazur
Josh Goldberg

**Old Meatco Nominees**
Morad Harouni

Exhibit C

## Officers

| NAME | TITLE |
| --- | --- |
| Rick Mazur | Chairman |
| Morad Harouni | President and Chief Executive Officer |
| Amant Dewan | Secretary |
| Daniel Koskovich | Chief Financial Officer |

EXECUTION COPY

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is effective as of the Effective Date (as defined below), by and among New Meatco Provisions, LLC, a Delaware limited liability company (the "Company"), and Morad Harouni (the "Executive").  Certain definitions are set forth in Section 7 of this Agreement.

### RECITALS

A.    Executive is co-founder and Chief Executive Officer of Meatco Provisions, Inc., a California corporation ("Meatco").

B.    Immediately prior to the Effective Date (as defined below), Meatco has contributed all of its assets and liabilities to the Company in exchange for 100% of the Company's Membership Interests.

C.    Immediately following the contribution described in Paragraph B above, Meatco Acquisition Company, LLC, is acquiring from Meatco an 80.1% interest in the Company.

D.    The Company and Executive desire to enter into this Agreement setting forth the terms and conditions of Executive's employment with the Company.

The parties hereto agree as follows:

1.    Effective Date.  The effective date of this Agreement shall mean the date on which the events described in Recital C occur (the "Effective Date").

2.    Employment.  The Company hereby employs Executive, and Executive hereby accepts such employment with the Company, upon the terms and conditions set forth in this Agreement for the period (the "Employment Period") beginning on the Effective Date and ending December 31, 2013 (the "Expiration Date"), unless sooner terminated in accordance with this Agreement; provided, however, that if this Agreement is not terminated pursuant to the provisions of this Agreement, the Employment Period shall be automatically renewed for successive one-year periods commencing on Expiration Date of the original Employment Period, unless either party provides the other with written notice of its intent to terminate this Agreement at least sixty (60) days prior to the end of the Employment Period or any renewals thereof as provided for herein.

3.    Position and Duties.

(a)    During the Employment Period, Executive shall serve (i) as the Company's President and Chief Executive Officer, and (ii) as a member of the Company's board of managers ("Board"), and shall have such duties, responsibilities and authorities consistent with such positions subject to the Company's Operating Agreement.  During the Employment Period, Executive shall report directly to the Board.  The Company's chief financial officer ("CFO") shall report to the Board.

**EXHIBIT "3"**

(b)     Executive shall perform Executive's duties and responsibilities to the best of Executive's abilities in a diligent, trustworthy, businesslike and efficient manner. Executive shall devote commercially reasonable efforts and his full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of the Company.

4.     Compensation, Benefits, and Expenses.

(a)     During the Employment Period, the Company shall pay to Executive a base salary of $300,000 per annum (the "Base Salary"), which Base Salary shall be payable in regular installments in accordance with the Company's general payroll practices. Executive's Base Salary will be subject to periodic review (which shall occur at least annually) and such periodic increases as the Board, in its sole discretion, shall deem appropriate. The term "Base Salary" as used in this Agreement shall refer to the Base Salary as it may, at the Board's discretion, be increased and shall not thereafter be decreased.

(b)     In addition to the Base Salary, Executive will be entitled to receive an annual cash performance bonus (a "Bonus") of up to 100% of Executive's then current Base Salary, with the precise amount of such Bonus and the performance metrics and targets as determined by the Board in its discretion after consultation with Executive, which determinations shall be made by the Board within thirty (30) days following the end of each fiscal year during the term of this Agreement. Executive will also be eligible to receive equity incentive awards under the Company's management equity incentive plan as determined by the Board (or committee thereof) in its discretion after consultation with Executive.

(c)     During the Employment Period, Executive and/or his dependents, as the case may be, shall be entitled to participate in all of the Company's benefit plans and programs for which executive-level employees and/or members of the Company and its Subsidiaries are eligible, including without limitation, savings plans, retirement plans, welfare benefit plans (including, without limitation, medical, prescription, dental, disability, life, accidental death, and travel accident insurance, but excluding severance plans) and similar plans, practices, policies and programs; provided, that, at Executive's sole election, the Company shall advance to Executive all costs and expenses associated with Executive maintaining the welfare benefit plans Executive enjoyed at the time of the execution of this Agreement in lieu of Executive participating in those welfare benefit plans offered by the Company. In connection with the foregoing, Executive shall be entitled to be no less than $10,000 per year for reimbursement of medical insurance expenses and no less than $7,200 per year for reimbursement of automobile expenses.

(d)     During the Employment Period, Executive shall be entitled to four (4) weeks paid time off per annum in accordance with the plans, policies, programs and practices of the Company.

(e)     The Company promptly shall reimburse Executive for all reasonable expenses incurred by Executive in the course of performing Executive's duties under this Agreement that are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

- 2 -

(f)    During the Employment Period and thereafter with respect to acts arising prior to the date of termination, the Company shall indemnify and hold harmless Executive to the fullest extent permitted by Delaware law, for any and all claims arising out of, or relating to, Executive's services to, or position as an officer or director of, Company and/or any of its Subsidiaries or Affiliates. In addition, during the Employment Period and thereafter with respect to acts arising prior to the date that Executive ceases to be a member of the Company or a member of the Board, as applicable, Executive shall be entitled to indemnification to the fullest extent permitted by the Company's organizational documents and this Agreement, for any and all claims arising out of, or relating to Executive's membership interest in the Company and/or position as a member of the Board.  The Company shall advance any and all costs to be incurred by Executive in the course of the defense of any claims for which Executive is entitled to indemnification hereunder. The Executive's indemnification right shall survive termination of this Agreement. Executive shall not be entitled to indemnification for any claims which arise from Executive's bad faith, gross negligence or willful misconduct. Executive shall, in addition to any other legal or contractual rights to indemnification provided by the Company, be provided coverage under all indemnification policies and director and officer liability policies maintained by the Company for its senior executives.  For a period of two (2) years following the termination of Executive's employment with the Company, the Company shall maintain liability insurance for Executive with coverage for claims incurred during or arising from Executive's term of employment, which coverage shall be consistent with coverage existing for Executive at the date of termination.

5.    <u>Termination; Effect of Termination.</u>

(a)    The Employment Period shall end on the Expiration Date; provided that

(i)    the Employment Period shall terminate immediately upon Executive's death or Disability;

(ii)    the Employment Period may be terminated by the Company at any time prior to such date for Cause or without Cause; and

(iii)    the Employment Period may be terminated by Executive at any time for Good Reason or for any other reason or for no reason at all;

any termination by the Company, or by Executive, shall be communicated by Notice of Termination to the other party hereto given in accordance with this Agreement.  For purposes of this Agreement, a "<u>Notice of Termination</u>" means a written notice that:

(A)    indicates the specific termination provision in this Agreement relied upon;

(B)    to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated; and

- 3 -

(C)    if the date of termination is other than the date of receipt of such notice, specifies the termination date.

(b)    If, during the Employment Period, the Company shall terminate Executive's employment hereunder for Cause, Death or Disability or if Executive shall terminate this Agreement and Executive's employment hereunder other than for Good Reason, Company shall, by the next regular pay date of the Company:

(i)    pay to Executive the Base Salary earned, but not yet paid to Executive, prior to the date of such termination;

(ii)    reimburse Executive for any expenses incurred by Executive through the date of termination in accordance with Sections 4(e) above; and

(iii)    pay to Executive accrued vacation and illness allowance in each case up to the date of such termination.

(c)    If, during the Employment Period, the Company shall terminate Executive's employment hereunder without Cause or Executive shall terminate Executive's employment hereunder for Good Reason, Company shall, by not later than the next regular pay date of Company following the date of such termination:

(i)    pay to Executive the Base Salary earned, but not yet paid to Executive, prior to the date of such termination;

(ii)    reimburse Executive for any expenses incurred by Executive through the date of termination in accordance with Sections 4(e) above; and

(iii)    pay to Executive accrued vacation and illness allowance in each case up to the date of such termination.

(d)    In addition, upon a termination without Cause or for Good Reason prior to a Change in Control, the Company shall, by not later than the next regular pay date of the Company following such termination, pay to Executive, in a lump sum (the "Lump Sum Payment"), an amount equal to the greater of Executive's Base Salary for (x) one year or (y) the balance of the Employment Period (as if it expired on December 31, 2013). If a termination without Cause or for Good Reason occurs within 12 months following a Change in Control, Executive shall be entitled to a Lump Sum Payment equal to his then current Base Salary plus his most recently received Bonus. The Company shall further pay or reimburse Executive for COBRA benefits for himself and his dependents for the twelve (12) months following the date of termination irrespective of whether a Change in Control occurs or has occurred. The payments with respect to the continuing obligation on the part of Company to reimburse or pay COBRA payments after the termination date under this Section 5(d) and to make the Lump Sum Payment under this Section 5(d), shall be subject to Executive's execution and delivery to the Company of a release, in form reasonably satisfactory to the Company, releasing the Company, its Affiliates

- 4 -

and Subsidiaries and related parties from all claims and liabilities; provided, however, the release shall not apply to claims that relate to:

       (i)    the obligations of the Company under this Agreement that are intended to survive the termination of Executive's employment or any other obligations of the Company that are intended to survive the termination of Executive's employment;

       (ii)    Executive's continuing or future participation in, or right to amounts which are vested under, any plan, program, policy or practice provided by the Company, any of its Subsidiaries and/or any of its Affiliates and for which Executive may qualify or that arise under any contract or agreement between Executive and the Company, any of its Subsidiaries and/or any of its Affiliates;

       (iii)    Executive's rights as a member of the Company, including, without limitation, his rights under the Company's operating agreement; or

       (iv)    Executive's right to indemnification under Company's organizational documents and this Agreement and coverage under the Company's Directors and Officers liability and general insurance policies, if any, for any claims arising out of or relating to Executive's:

       (A)    status as a member of the Company;

       (B)    position as a member of the Board; or

       (C)    services to, or position as an officer, director, manager, of the Company or any of its Affiliates or Subsidiaries, in each case, other than claims resulting from Executive bad faith, gross negligence, willful misconduct or breach of his duty of loyalty to the Company.

       (e)    In addition to the payments and benefits set forth in this Section 5 or elsewhere in this Agreement, amounts which are vested benefits or which Executive, his dependents, and his heirs are otherwise entitled to receive under any plan, program, policy or practice on the date of termination, shall be payable in accordance with such plan, policy, practice or agreement, provided that in the event Executive's employment hereunder is terminated without Cause or Executive terminates his employment hereunder for Good Reason any unvested equity awards, if any, shall accelerate and become fully vested and shall be deemed to have been so vested immediately prior to such termination.

       (f)    Notwithstanding anything set forth in this Agreement to the contrary, in the event that any payment, coverage or benefit provided under this Agreement would, in the opinion of the independent certified accountants for the Company, not be deemed to be deductible in whole or in part in the calculation of the Federal income tax of Company or any other person making such payment or providing such coverage or benefit, by reason of Section 280G of the Code, the aggregate payments, coverages or benefits provided under this Agreement shall be reduced to the

- 5 -

"safe harbor" level under Section 280G so that the entire amount which is paid or provided to Executive shall be deductible notwithstanding the provisions of Section 280G of the Code.

(g)     Executive shall not be required in any way to mitigate the amount of any payment or benefit provided for under Section 5 of this Agreement, including, but not limited to, seeking other employment, nor shall the amount of any payment or benefit provided for under Section 5 be reduced by any compensation earned by Executive as the result of employment with or services provided to another company after the date of Executive's termination of employment hereunder, or otherwise.

6.     Confidential Information.   Executive acknowledges that the information, observations and data obtained by Executive while employed by the Company or any predecessor entity, (including Meatco) concerning the business or affairs of the Company or any of its Affiliates or Subsidiaries ("Confidential Information") shall be the property of the Company or such Affiliate or Subsidiary.  Therefore, Executive agrees that Executive shall not disclose to any unauthorized person or use for Executive's own purposes any Confidential Information without the prior written consent of the Board, unless and to the extent that:

(a)     the aforementioned matters become generally known to and available for use by the public other than as a result of a violation of this Section 6;

(b)     such information is requested by a governmental agency with oversight authority relating to Company, its Subsidiaries and/or its Affiliates; or

(c)     by operation of law.

Executive shall deliver to the Company at the termination of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential Information or the business of the Company or any Affiliate or Subsidiary that Executive may then possess or have under Executive's control.

7.     Definitions.   As used in this Agreement, the following terms shall have the respective meanings set forth below:

"Affiliate" means, with respect to any Person, any other Person controlling, controlled by, or under common control with such Person.  For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" as used with respect to any Person) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

- 6 -

104

"Cause" means any of the following:

(i)     Executive willfully commits malfeasance towards the Company (including without limitation misappropriation of funds or other property, acts of fraud or dishonesty), or is convicted or pleads nolo contendere to any felony or any misdemeanor involving moral turpitude;

(ii)     Executive willfully breaches any of his material duties to the Company under this Agreement or otherwise violates any other material provision of this Agreement, which breach or violation can reasonably be expected to be cured within thirty (30) days, and has not been cured to the Company's reasonable satisfaction within thirty (30) days after it notified Executive thereof in writing;

(iii)     Executive willfully fails to obey appropriate and lawful directions from the Board consistent with this Agreement and Executive's role as Chief Executive Officer, which failure has not been cured within fifteen (15) days after the Company notified Executive thereof in writing;

(iv)     If any representation or warranty of Executive under the Interest Purchase Agreement dated of even date herewith by and among Meatco Acquisition Company, LLC, on the one hand, and Executive, The Avisar Family Trust dated September 12, 2000 and Meatco Provisions, Inc., on the other hand, is breached in any material respect solely and directly as a result of Executive's fraud, willful misconduct or intentional omission in making such representation or warranty; or

(v)     Executive willfully and knowingly makes a material misrepresentation to the Board.

For the purposes hereof, "Company" shall include its subsidiaries and affiliates.

For purposes of this definition, no act or omission by Executive shall be considered "willful" unless it is done or omitted to be done by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interests of the Company. Any act or omission based upon and consistent with a resolution duly adopted by the Board or, if the legality of the act or omission is in issue, based upon the advice of counsel for the Company shall be presumed to be done or omitted to be done by Executive in good faith and in the best interests of the Company. The Company's termination of Executive's employment shall not be deemed to be for Cause unless and until there shall have been delivered to Executive a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the Board at a meeting of the Board called and held for such purpose (after reasonable notice is provided to Executive and Executive is given an opportunity, together with counsel, to be heard before such Board), finding that, in the good faith opinion of such Board, grounds for termination for Cause exists.

"Change in Control" shall mean any event which results in:

(i)     the sale of all or substantially all of the assets of the Company;

- 7 -

(ii)    the merger or consolidation of the Company with another corporation or entity in which the Company is not the surviving entity;

(iii)    the acquisition by any single person or entity or related persons or entities of more than fifty percent (50%) of the outstanding and issued voting securities of the Company in a transaction in which the owners of the Company receive consideration for their interests; or

(iv)    a merger or consolidation of the Company with another corporation or entity that results in the former members of the Company, as they existed immediately prior to such merger or consolidation, owning in the aggregate less than 50% of the outstanding voting securities of the surviving or resulting corporation or entity.  For the avoidance of doubt, a financing in which the Company issues equity interests shall not be deemed to be in Change in Control.

"Code" means the United States Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder.

"Disability" means the physical or mental illness, condition, impairment, restriction or incapacity of Executive, such that Executive shall be substantially unable to perform and discharge his essential duties and responsibilities under this Agreement, for a period of at least one hundred twenty (120) consecutive days, or shorter periods totaling more than one hundred and eighty (180) days during any period of three hundred and sixty five (365), as certified by a physician, psychiatrist or other mental practitioner satisfactory to the Company if the Company so requests.

"Good Reason" shall mean:

(i)    prior to a Change in Control, any action taken by the Company that results in a material diminution of Executive's title, position, authority, or duties from those contemplated by Section 3(a), or any unreasonable interference by Company with Executive's ability to perform his duties or exercise authority appropriate to his title, other than isolated incidents not taken in bad faith, that are remedied by Company within 30 days after written notice by Executive;

(ii)    the relocation of the Company's headquarters to a location more than twenty (20) miles from the Company's current headquarters in Vernon, California;

(iii)    prior to a Change in Control, Executive is not elected or appointed or re-elected or re-appointed, to serve as a member of the Board;

(iv)    any failure by the Company to comply with any material provision of this Agreement (including, without limitation, any provision of Section 4 of this Agreement), other than an isolated, insubstantial and inadvertent failures not occurring in bad faith, that is remedied by the Company within 30 days after receipt of notice thereof given by Executive, except with respect to a payment default for which the cure period shall be 10 days only; or

- 8 -

        (v)     following a Change in Control, assignment to Executive of any duties inconsistent in any respect with Executive's position as in effect immediately prior to the Change in Control (including status, offices, titles and reporting requirements, authority, duties or responsibilities), or any other action by the Company that results in any diminution in such position, authority, duties or responsibilities.

        Executive may not terminate his Employment for Good Reason unless he shall have met with the Company Board of Directors, if requested by the Company Board of Directors during any time period permitted above for notice of his intent to resign for Good Cause, and informed the Board of the purported grounds for termination and given the Company the opportunity to cure such grounds.

        "Person" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

        "Subsidiary" means any corporation, partnership, association or other business entity of which:

        (i)     if a corporation, a majority of the total voting power of units entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company; or

        (ii)     if a partnership, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by the Company. For purposes hereof, the Company shall be deemed to have a majority ownership interest in a partnership, association or other business entity if the Company, directly or indirectly, is allocated a majority of partnership, association, or other business entity gains or losses, or is or controls the managing director or general partner (or Person having like authority) of such partnership, association or other business entity.

8.    Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested) or sent by reputable overnight courier service (charges prepaid) to the address indicated below:

        If to Executive:

                Morad Harouni
                356 22nd Street
                Santa Monica, CA  90402

- 9 -

with a copy (that shall not be deemed notice to Executive) to:

> Mark J. Kelson, Esq.
> Greenberg Traurig, LLP
> 2450 Colorado Avenue, Suite 400E
> Santa Monica, CA 90404

If to the Company:

> Meatco Acquisition Company, LLC
> c/o Annex Capital Advisors, LLC
> 350 So. County Rd., Ste. 102-120
> Palm Beach, FL 33480
> Attn:   Alexander P. Coleman
> Phone: (212) 644-3502
> Fax:    (212) 554-5808
> Email: acoleman@annexcapital.com

with a copy to:

> Shapiro Forman Allen & Sava LLP
> 380 Madison Avenue
> New York, NY 10017
> Attn:   Robert W. Forman, Esq.
> Phone: (212) 972-4900
> Fax:    (212) 883-1941
> Email: forman@sfa-law.com

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when so delivered or sent or, if mailed, five days after deposit in the U.S. mail.

9.    <u>General Provisions</u>.

     (a)    <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

     (b)    <u>Complete Agreement</u>.  This Agreement embodies the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

- 10 -

(c)     <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(d)     <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Executive and the Company and their respective successors, heirs and assigns; provided that the obligations of Executive under this Agreement shall not be assignable.  As used in this Agreement, "<u>Company</u>" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(e)     <u>Choice of Law; Jurisdiction</u>.  All issues and questions concerning the construction, validity, performance, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.  The parties to this Agreement agree to the exclusive jurisdiction and venue of the federal and state courts of the State of California with respect to any claim arising under this Agreement or with respect to the performance hereof.

(f)     <u>Remedies</u>.  Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages would not be an adequate remedy for certain breaches of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(g)     <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and Executive.

* * *

- 11 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Employment Agreement on the date first above written.

NEW MEATCO PROVISIONS, LLC

By: _Richard L. Mazer_
Name: RICHARD L. MAZER
Title: CHAIRMAN

_____
Morad Harouni

Signature Page to Employment Agreement

110

**IN WITNESS WHEREOF,** the parties hereto have executed this Employment Agreement on the date first above written.

NEW MEATCO PROVISIONS, LLC

By: _____
Name:
Title:

Morad Harouni

Signature Page to Employment Agreement

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.**

A true and correct copy of the foregoing document entitled: **SECOND AMENDED COMPLAINT 1) TO AVOID FRAUDULENT TRANSFERS (ACTUAL INTENT); 2) TO AVOID FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD) 3) TO RECOVER FRAUDULENT TRANSFERS; 4) BREACH OF CONTRACT; 5) BREACH OF FIDUCIARY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **June 19, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Reagan E Boyce rboyce@ebg-law.com, ecf@ebg-law.com
- Larry W Gabriel lgabriel@ebg-law.com, nfields@ebg-law.com
- Steven T Gubner sgubner@ebg-law.com, ecf@ebg-law.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

☐    Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:  On **June 19, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Counsel for Defendants the Avisar Family Trust,
<u>Eytah Avisar, and Susan Avisar</u>
Ronald R. Camhi, Esq.
Michelman & Robinson, LLP
15760 Ventura Blvd., 5th Floor
Encino, CA  91436

Counsel for Defendant Morad Harouni
Jennifer Laser, Esq.
Valle Makoff LLP
11911 San Vicente Blvd., Suite 324
Los Angeles, CA  90049

☐    Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 10, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**BY EMAIL**

Ronald Camhi, Esq. – rcamhi@mrllp.com
Jennifer Laser, Esq. – jlaser@vallemakoff.com

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 19, 2015 | NIKOLA A. FIELDS | /s/ Nikola A. Fields |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**